IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| SIG SAUER, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:14-cv-00147-PB |
| | ) | |
| B. TODD JONES, Director, Bureau of | ) | |
| Alcohol, Tobacco, Firearms and Explosives, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.       STATEMENT OF UNDISPUTED FACTS AND PROCEDURAL HISTORY

Plaintiff Sig Sauer, Inc. is a federally-licensed manufacturer of firearms located in

Newington, New Hampshire.  DN 1 at ¶ 4.  By letter dated April 4, 2013, Sig Sauer submitted a

sample firearm to ATF's Firearms Technology Branch (FTB) for classification.  Administrative

Record (AR) at 790.   Specifically, Plaintiff requested confirmation that the submitted item,

which was affixed to the forward end of the firearm's barrel, was a muzzle brake and not a

silencer as defined by 18 U.S.C. § 921(a)(24).  AR at 790.   Plaintiff claimed the submission was

"designed and intended to reduce the felt recoil of the firearm by directing the propellant gases

perpendicular to the axis of the bore.  It will not silence, muffle, or diminish the report of the

firearm."  AR at 790.  By letter dated August 26, 2013, FTB responded that the item in question

was actually a "silencer component commonly referred to as a 'monolithic baffle stack.'  A

monolithic baffle stack is a silencer core that contains a series of baffles, spacers, ports, or

expansion chambers."  AR at 791-93.

By letter dated December 6, 2013, Plaintiff requested a reconsideration of the August 26 classification, and made the following arguments:  that the submission amplifies, not muffles sound; it reduces recoil and muzzle rise; items thought similar to the submission at issue have been marketed as muzzle brakes; and that the submitted part is not "intended *only* for use" in the assembly of a silencer, as required by section 921(a)(24).  AR at 796-808.  On February 21, 2014, FTB responded, stating that it found "no reason to amend [its] earlier findings." AR at 809.

Plaintiff then filed the instant suit. DN 1.  The parties agreed to stay the case for FTB to reconsider its determination.  DN 9.  FTB reaffirmed its classification, noting that silencer parts in and of themselves are not required by statute to muffle sound; that incidental effects, such as reducing recoil, do not control a classification; that while a manufacturer's stated intent for a part was relevant, in order to prevent the statute from being easily circumvented, it was not determinative; and that the design features of the submission are those of a conventional silencer core, not those of a conventional muzzle brake.  AR at 810-25.  By letter dated September 18, 2014, Sig Sauer submitted to FTB the declarations of a design engineer and its General Counsel, stating their goal was to design a muzzle brake, not a silencer part.  AR at 858-79.  In response, FTB again reaffirmed its classification.  AR at 885.

II.     BACKGROUND

    A.  The Gun Control Act and National Firearms Act

    The Gun Control Act (GCA) defines the term "firearm" to "mean any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A).  Also included in that definition is "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C).

"Firearm silencer" is further defined to mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. 18 U.S.C. § 921(a)(24).  The Sig Sauer item at issue is a silencer part or one of a combination of parts, not a silencer device as a whole.  Consequently, the first phrase of the definition found in section 921(a)(24) is not applicable.

The National Firearms Act (NFA) also defines the term "firearm" albeit more narrowly. See 26 U.S.C. § 5845(a).  However, the NFA definition also includes "any silencer (as defined in section 921 of title 18, United States Code.)"  26 U.S.C. § 5845(a)(7).  Therefore, if a device or part is considered a silencer, all NFA requirements—including requirements regarding making, transfers, taxes and registration—apply.  See 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841.

However, prior to 1986 and the Firearms Owners' Protection Act, neither the GCA nor NFA defined the term silencer to include parts.  Instead, the regulations implementing the NFA, 27 C.F.R. § 179.11, defined only a silencer as a whole as any device for silencing or diminishing the report of any portable weapon, such as a rifle, carbine, pistol, revolver, machine gun, submachine gun, shotgun, fowling piece, or other device from which a shot, bullet, or projectile may be discharged by an explosive, and is not limited to mufflers or silencers for "firearms" as defined.

Because the NFA did not expressly regulate silencer parts, and concerned about the proliferation of "do-it-yourself" silencer kits, Congress held hearings on the topic in 1984.  At these hearings, then-ATF FTB Chief Edward Owen testified as follows:

3

> One source supplies two pieces of aluminum tubing which by themselves
> would not be able to be used.  Another [source] supplies components
> which are eyelets, tubes of aluminum and a small container.  These
> components all together are a fairly simple matter to assemble, a very
> effective sound suppressor.  These eyelets would normally be placed
> inside the tube.  This is a do-it-yourself kit.

Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and

Silencers:  Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th

Congress, 1st Sess. 132 (1984).  See also id. at 156 ("[O]ne part might be sold at this table, and

the man will be gracious enough to direct you to that table where the second part might be

bought.  He, in turn, might direct you to a third table where the third part might be purchased.")

(testimony of John H. Tighe, Chief of Police, Pembroke Pines, Florida).  As a result, Congress

amended the definition to include the "combination of parts" and "any part" language.

     B.    The Administrative Procedure Act

Plaintiff asks the court to "hold unlawful and set aside FTB's determination as being

arbitrary and capricious, and not in accordance with law" and to "[d]eclare that the muzzle brake

at issue is not any part intended only for use in assembly or fabrication of a firearm silencer or

firearm muffler in the meaning of 18 U.S.C. § 921(a)(24)," thus excusing it from the NFA's

making, transfer, taxation, and registration requirement.  DN 1 at Wherefore Clause.  The APA

requires a "reviewing court to set aside an agency decision when the administrative record shows

that the decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.'"  Atieh v. Riordan, 727 F.3d 73, 75 (1st Cir. 2013) (citing 5 U.S.C. § 706(2)(A)).  An

agency decision "fails to pass this test" if the agency "relied on improper factors, failed to

consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it,

or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise."  Id. at 76.

However, the standard of review under the APA is "highly deferential" and "the agency's actions are presumed to be valid." River Street Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009) ("Under this standard, we are required to determine whether the agency's decision is supported by a rational basis, and if so, we must affirm."); Rhode Island Hosp. v. Leavitt, 548 F.3d 29, 34 (1st Cir. 2008) ("Judicial review under the APA thus consists of establishing parameters of rationality within which the agency must operate.") (internal quotation marks omitted).  "To the extent that we [the court] would have reached a different interpretation, we may not substitute [our] judgment for that of the agency."  City of Pittsfield, Mass. v. EPA, 614 F.3d 7, 12 (1st Cir. 2010) (internal quotation marks omitted); see also Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997) ("Subject, of course, to statutory constraints, policy choices are for the agency, not the court, to make. Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency.").  In addition, "[w]here issues involve elusive and not easily defined areas . . . , our review is considerably more deferential, according broad leeway to the [agency's] line-drawing determinations."  Nuclear Energy Institute, Inc. v. EPA, 373 F.3d 1251, 1276 (D.C. Cir. 2004) (citing Sinclair Broad. Group, Inc. v. FCC, 284 F.3d 148, 159 (D.C. Cir. 2002)).

"It matters not whether the ATF's decision is ultimately a good one or whether the court agrees with the ATF's decision.  Rather, what matters is whether plaintiff has presented sufficient evidence to meet his burden of proving that the defendant's decision . . . in this case is arbitrary and capricious."  Mullenix v. Bureau of Alcohol, Tobacco, Firearms and Explosives, No. 5:07-

CV-154, 2008 WL 2620175, at *5 (E.D.N.C. July 2, 2008) (internal citation omitted); <u>Modern Muzzleloading, Inc. v. Magaw</u>, 18 F. Supp. 2d 29, 37 (D.D.C. 1998) (ATF "does not bear the burden of convincing the Court that its position is better . . . it merely need convince the Court that the decision was not arbitrary and capricious."); <u>Gilbert Equipment Co.</u>, <u>Inc. v. Higgins</u>, 709 F. Supp. 1071, 1076 (S.D. Ala. 1989) (It "is of no moment that the administrative record might also support the opposite conclusion, as the court needs only determine that a rational basis exists for [ATF's] decision."), <u>aff'd</u>, 894 F.2d 412 (11th Cir. 1990).

       1.     <u>Summary Judgment under the APA</u>

The summary judgment "rubric has a special twist in the administrative law context." <u>Associated Fisheries</u>, 127 F.3d at 109. "Because the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." <u>Id.</u> A "reviewing court's role [in the summary judgment context] in a case governed by the APA is 'not to resolve contested fact questions which may exist in the underlying administrative record,' but rather to 'determine the legal question of whether the agency's action was arbitrary and capricious.'" <u>Conservation Law Foundation v. Federal Highway Admin.</u>, 630 F. Supp. 2d 183, 201 (D.N.H. 2007) (citing <u>Gilbert Equip. Co</u>, 709 F. Supp. at 1077; <u>see</u> <u>River Street Donuts</u>, 558 F.3d at 114 (APA review requires court to determine if agency's decision has a rational basis).

       2.     <u>The Administrative Record</u>

"The Supreme Court has consistently stated that review of administrative decisions is ordinarily limited to consideration of the decision of the agency . . . and of the evidence on which it was based, and that no de novo proceeding may be held. [T]he focal point for judicial review

should be the administrative record already in existence, not some new record made initially in the reviewing court." Olsen v. United States, 414 F.3d 144, 155 (1st Cir. 2005) (internal citations and quotation marks omitted); see also Town of Winthrop v. FAA, 535 F.3d 1, 14 (1st Cir. 2008) (denying request to "supplement" the administrative record where no showing of bad faith or failure to explain administrative action); Sher v. U.S. Dept. of Veterans Affairs, 488 F.3d 489, 497-498 (1st Cir. 2007) (same); Firearms Import/Export Roundtable Trade Group v. Jones, 854 F. Supp. 2d 1, 12 (D.D.C. 2012) (same; ATF case), aff'd, 498 F. App'x 50 (D.C. Cir. 2013). "The focal point of APA review is the existing administrative record." Atieh, 727 F.3d at 76. ("The relevant inquiry is—and must remain—not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision.")

3.    Standard of Review and Level of Deference

As stated above, it is well settled that review under the APA is deferential. Courts, however, have not been consistent on the level of deference—whether that of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), Skidmore v. Swift & Co., 323 U.S. 134 (1944), or something in between—accorded ATF classifications.[1]  See United States v. One TRW, Model M14, 7.62 Caliber Rifle, 294 F. Supp. 2d 896, 900 (E.D. Ky. 2003) ("The authority is inconsistent on the question of whether ATF firearm classifications enjoy full Chevron deference. Compare Modern Muzzleloading, Inc. v. Magaw, 18 F. Supp. 2d 29, 36

---

[1] Applying "Chevron deference" means "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 844.  "Skidmore deference" means that the "weight" of an agency's decision "in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.

(D.D.C.1998) (explicitly applying <u>Chevron</u> deference to review of ATF classification of Knight

Disc Rifle as a firearm), <u>with</u> <u>York v. Higgins</u>, 774 F.2d 417, 419–420 (10th Cir.1985) ('an

interpretive rule like the one involved in this case is not granted the 'force of law' of legislative

rules.').  However, the courts, . . . consistently recognize that when such decisions are shown to

be the product of substantial agency expertise, experience and thought, they are entitled to at

least the highest level of <u>Skidmore</u> respect."), <u>aff'd</u>, 441 F.3d 416 (6th Cir. 2006).   In a similar

case challenging the classification of a silencer device, as opposed to a part, the United States

District Court for the District of Columbia found that the ATF was not entitled to the full level of

deference under <u>Chevron</u> because the classification decision involved only a "straightforward

question of statutory interpretation" as opposed to the "interstitial" nature of a legal question, the

importance of the question to the administration of the statute was low, <u>id.</u> ("classifying putative

silencers is a simple task");  and the "extremely light consideration" the agency gave to this

question.  <u>See</u> <u>Innovator Enterprises, Inc. v. Jones</u>, ___ F. Supp. 2d ___, 2014 WL 1045975

(D.D.C. Mar. 19, 2014).   <u>But see</u> <u>Firearms Import/Export Roundtable Trade Group</u>, 854

F. Supp. 2d at 18 (upholding ATF's interpretation of 18 U.S.C. § 925(d) to ban importation of

certain firearm parts under <u>Chevron</u> "step one"); <u>Modern Muzzleloading</u>, 18 F. Supp. 2d at 35-36

("[S]ince the ATF's classification of [a firearm as not antique] 'amounts to or involves its

interpretation' of the GCA, a statute administered by the ATF, we review that interpretation

under the deferential standard announced in Chevron.")  <u>Compare</u> <u>Springfield, Inc. v. Buckles</u>,

116 F. Supp. 2d 85, 89 (D.D.C. 2000) (upholding ATF's interpretation of "sporting purposes" in

section 925(d)(3) under <u>Skidmore</u> deference), <u>aff'd</u>, 292 F.3d 813 (D.C. Cir. 2002).

To the extent this Court determines that the relatively informal nature of ATF's classification in this case deprives it of Chevron deference, ATF is still entitled to Skidmore deference to the extent this classification has the "power to persuade."  Moreover, courts have also given ATF deference in interpreting the GCA, without necessarily mentioning any particular level.  See Gun South, Inc. v. Brady, 877 F.2d 858, 864 (11th Cir. 1989) ("We must defer to the Bureau's interpretation of the Gun Control Act and its regulations absent plain error in the Bureau's interpretation.") (citing Udall v. Tallman, 380 U.S. 1, 16 (1965)); Gilbert Equip., 709 F. Supp. at 1075 ("Generally, the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.")

    4. Rule of Lenity

As a general matter, when construing a criminal statute, the rule of lenity requires that courts resolve ambiguity in favor of the defendant, McNally v. United States, 483 U.S. 350 (1987).  Although the GCA "is criminal in nature, the rule of lenity does not apply [here] and the ATF's decision is entitled to deference by the Court."  Modern Muzzleloading, 18 F. Supp. 2d at 33.  "The fact that the statute is criminal in nature is simply not enough to invoke the rule of lenity.  Rather, a Court must also find that there is a 'grievous ambiguity or uncertainty in the statute.'  . . . That maxim of construction is reserved for cases where, after seizing everything from which aid can be derived, the Court is left with an ambiguous statute.'"  Id. (finding that while the GCA does not speak directly to the question of how to classify an item, it does not contain a "grievous ambiguity")  (citing Staples v. United States, 511 U.S. 600, 619 n.17 (1994)).

The rule of lenity "as we have repeatedly emphasized, applies only if, after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the

statute such that the Court must simply guess as to what Congress intended. . . . The dissent

would apply the rule of lenity here because the statute's text, taken alone, permits a narrower

construction, but we have repeatedly emphasized that is not the appropriate test." <u>Abramski v.</u>

<u>United States</u>, ___ U.S. ___, 134 S. Ct. 2259, 2272 n.10 (2014) (internal quotation marks and

citation omitted).   The rule of lenity simply doesn't apply here.   As in <u>Modern Muzzleloading</u>,

the GCA does not address how to classify a silencer.   Therefore, although the parties may

disagree on the appropriate classification of the device in this case, this does not create a

"grievous ambiguity" in the statute, thus not allowing application of the rule of lenity.

Noteworthy, Plaintiff agrees that the statute is not ambiguous, let alone grievously so, <u>see</u> AR at

800 ("Sig Sauer contends there is no ambiguity in the statute").

III.    ATF'S CLASSIFICATION OF THE SIG SAUER SUBMISSION
        AS A SILENCER PART SUBJECT TO NFA REQUIREMENTS
        WAS RATIONAL, REASONABLE AND IN ACCORDANCE
        WITH THE LAW

        A.    <u>Intent is Relevant</u>

        A part is appropriately classified as a silencer, pursuant to section 921(a)(24), "if

*intended only* for use in such assembly or fabrication" of a silencer. (emphasis added).   Based on

the plain language of the statute, and as the plaintiff argues and ATF recognizes, AR at 799, 814,

intent is clearly relevant to the classification.   The parties differ, however, on how to discern

intent.   Plaintiff has stated that it intended the submission to be used not as a silencer but as a

muzzle brake because it reduces recoil and does not diminish the report of a firearm.   AR at 790.

The fact that its submission may also be used "as a component of a silencer," makes it a "dual

use item" and therefore not intended only for use in the assembly of a silencer.   AR at 800.

However, as discussed below, because a part in and of itself is unlikely to silence the report of a

firearm, and the weight of an additional part is likely to reduce recoil, these outcomes cannot

determine intent.  To determine otherwise would be to prevent any individual part from ever

being classified as a silencer. As such, discerning the significance of the manufacturer's stated

intent also requires an examination of the part's design and characteristics.

> 1.     The failure of a part to silence cannot, by itself, determine its intended
>         purpose or function.

A silencer part in and of itself generally will not silence a firearm, nor does the statutory

definition require it to do so.  The part must be intended for use in the assembly of a silencer, but

there is nothing in the language that requires that a part be an effective silencer.   Moreover, even

a *complete* silencer is not required by statute to be an effective silencer, the requirement is only

that the device be "for silencing."  <u>See</u> <u>United States v. Syverson</u>, 90 F.3d 227, 232 (7th Cir.

1996) (The "statute defines a silencer as 'any device *for* silencing, muffling, or diminishing' the

report of a firearm. Moreover, the statutory text notes that such a device can include a

combination of parts designed or intended for use in assembling a silencer; it can even include a

single part that is intended only for use in making a silencer. Thus, the statute does not limit the

definition of a silencer to 'a device *that* silences, muffles, or diminishes.' This is a significant

difference."); <u>United States v. Carter</u>, 465 F.3d 658, 667 (6th Cir. 2006) ("The word choice [of

section 921(a)(24)] indicates a concern for the *purpose* of the mechanism, and the parts thereof,

not the *function.*").

Despite the fact that a part is not, by statute, required to silence the report of a firearm,

ATF conducted more than 80 sound tests, using 9 different firearms, 8 different muzzle brakes,

and 4 silencers, AR at 311-541, as well as the Sig submission, AR at 560.   An analysis of the

results indicated that sound testing of silencer parts known as monolithic baffle cores and muzzle

brakes produced inconsistent test results for two reasons in particular.  First, the location of the microphone relative to the muzzle blast significantly affects sound pressure test results.  Simply moving the microphone in front of or behind the muzzle, or into and out of the muzzle blast, could result in a change of more than six decibels of the sound pressure level.  AR at 542. Second, baffles, used in monolithic baffle cores for silencers and in muzzle brakes, redirect a significant portion of the muzzle blast in multiple directions depending upon the design of the particular device.  For example, by simply placing a microphone in the path of these redirected propellant gases and sound waves, a test may seem to increase the report of a portable firearm, while in reality, no such increase in overall sound actually occurs.   AR at 551, 552, 554.

Moreover, that the Sig submission increased sound did not make it unique as to other recognized monolithic baffle cores, *i.e.*, silencer parts.  By way of comparison, the Gemtech GM-22 increased the decibels by 1.13 and 2.58 to the side and rear of the firearm, respectively; the ACC Titan increased the report of the firearm by .37, 2.58, and 2.89 decibels to the side, front and rear of the firearm, respectively; while the Sig submission increased the decibels by 2.41, 1.17 and 1.45 to the side, front and rear of the firearm, respectively.  AR at 828.  In summary, a silencer part is unlikely to reduce sound on its own nor does the statute require it to do so.  Despite the manufacturer's stated intent, however, in combination with other parts it may well be made to serve that function.

2.      The ability of a part to also reduce recoil cannot, by itself
        determine its intended purpose or function.

Because both muzzle brakes and silencers affect a firearm's propellant gases,[2] AR at 815,

816, the reduction of recoil alone is not evidence of the use to which it is intended to be put

because it occurs with either device.   Any good suppressor (silencer) "also significantly reduces

perceived recoil."  AR at 199; see also AR 68 ("Furthermore, sound suppressors reduced recoil

energy by 20 to 30 percent, making them about as effective as muzzle brakes for reducing felt

recoil . . . The best muzzle brake is a sound suppressor or silencer."); 228 ("The reflex

suppressor did, however, reduce the recoil energy from 23 to 15 Joules, which represents a

reduction of 35 percent."); 232 ("A suppressor can also measurably reduce muzzle flash and felt

recoil."); 240 ("a suppressed weapon results in recoil reduction (because the function of a

suppressor is to slowly allow the exit of the gases from the gun)").  Because a device that

reduces recoil also reduces the report of a firearm, a fact well known, the reduction of recoil, by

itself, cannot determine the purpose or function of the Sig submission.

B.      Subjective Intent v. Objective Intent

Plaintiff argues that because it claims its submission is intended as a muzzle brake, it is

not a part intended only for use as a silencer and the inquiry is at an end.  However, the

determination cannot be that simplistic, otherwise the statute would be easily circumvented.  If

the plaintiff's position prevails, all manufacturers will label a part as something other than a

silencer or silencer part and the part will become automatically free from regulation.  As a result,

---

[2] A silencer may contain two sound reducing sections, an expansion chamber which causes
propellant gases to expand and lose some of their energy, and a section filled with baffles, which
deflects, diverts and slows the gases.  AR at 230.  A muzzle brake redirects propellant gases,
usually with baffles to redirect the gases and a ported tube to allow those gases to escape.  AR at
816, 866.

contrary to the Congress' 1986 amendments to the definition of "silencer," no part will ever be a silencer (especially because as stated above, the part will also very likely reduce recoil).

A statute should not be interpreted to "frustrate Congress' manifest purpose."  See United States v. Hayes 555 U.S. 415, 417 (2009) (interpreting 18 U.S.C. § 922(g)(9) as the court below would render section 922(g)(9) a "dead letter" in some "two-thirds of the States from the very moment of its enactment"); United States v. Turkette, 452 U.S. 576, 580 (1981) ("[A]bsurd results are to be avoided" in statutory construction.); Cahoon v. Shelton, 647 F.3d 18, 22 n.3 (1st Cir. 2011) ("a statute should never be construed in a way that produces an absurd result"); Sullivan v. CIA, 992 F.2d 1249, 1252 (1st Cir. 1993) (disfavoring statutory interpretation leading to absurd results).  Plaintiff's argument would lead to an absurd result—the removal of silencer parts from the NFA based solely on the maker's stated intent.  This result was not intended by Congress.  See Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers:  Hearings on H.R. 641 and Related Bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132 (1984).  This is the case particularly where the manufacturing and dealing of firearms is well known to be a "pervasively regulated industry." Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010).  In order to avoid rendering the "part" section of 921(a)(24) essentially meaningless, the intent of the part must be viewed objectively, not subjectively by the manufacturer.  See Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 517-18 (1994) ("Petitioners argue that the term 'primarily intended' in this provision [21 U.S.C. § 857] establishes a subjective-intent requirement on the part of the defendant.  We disagree, and instead adopt the Government's position that [the statute] establishes objective standards for determining what constitutes drug paraphernalia."); id. at 519 (rejecting that the

term "primarily intended . . . for use" refers to a "state of mind"); id. at 521 ("Finally, an objective construction of the phrase 'primarily intended' is consistent with the natural reading of similar language in definitional provisions of other federal criminal statutes.") (citing 18 U.S.C. § 921(a)(17)(B) (definition of armor piercing ammunition)).  While the language at issue in Posters 'N' Things is not identical to the language for the silencer part at issue here ("primarily intended" v. "intended only"),[3] the opinion is instructive in its rejection of a subjective-intent standard.  Also instructive is United States v. Focht, 882 F.2d 55 (3d Cir. 1989), where the Government moved to enjoin a seller of fireworks components from distributing those components in interstate commerce.  The seller, Liberty Industries, was distributing "tubes" the "traditional filling" of which would "result in a firework over 1,000 times more powerful than allowed by law."  Id. at 57.  However, these same tubes could be used to assemble a less powerful firework that could be sold to the general public.  Id.

The district court found that the manufacturer's stated intent controlled, but the Court of Appeals reversed and remanded.  The appeals court rejected the subjective-intent standard applied by the district court, finding that it "undermines the statute's purpose because it allows the components into the home, and worse still, requires that they be assembled into a banned firework *before* a violation arises."  Focht, 882 F.2d  at 59.  Likewise, here the plaintiff's interpretation undermines the statute's requirement that silencers—and their parts—be registered.  Without the "part" definition of section 921(a)(24), the same concern of the Focht court is present here; namely that only assembled devices would be covered by the statute. Finally, in Syverson, the court rejected the defendant manufacturer's stated intent that the item at

---

[3] The Court also declined to address the "possible" application of section 857 to "multiple-use items."  511 U.S. at 526.

issue was actually a muzzle brake and affirmed his conviction for possession of a silencer.  See Syverson, 90 F.3d at 232 ("Contrary to Syverson's characterization of the record, there was evidence showing that he intended the cylinder to be a silencer."); see also Western States Import Co., Inc. v. United States, 154 F.3d 1380, 1383 (Fed. Cir. 1998) ("Courts attach little probative value to what importers themselves call what they import.")

Plaintiff alleges that United States v. Crooker, 608 F.3d 94 (1st Cir. 2010), rejected an "objective test."  AR at 875.  That is an overstatement.  The Crooker court cautioned that intent is relevant to ensure the silencer definition is not applied too broadly.  Crooker, 608 F.3d at 97-98.  ATF is not disputing that the manufacturer's stated intent is relevant – only that it is determinative.  Other factors must be considered.

1.      Design Characteristics

In order to avoid classifications based on subjective intent, FTB has consistently looked to specific external and internal components or design characteristics that are commonly found in conventional firearm silencers.  See AR at 813.  Based on reference materials and FTB's history of silencer classifications dating back to 1968, these characteristics include:

- Outer tube or body
- Ported inner tube(s)
- Expansion chamber(s)
- Baffles or washers (that create separate expansion chambers within a device)
- Sound dampening materials (for example, foam, steel wool)
- End caps
- Encapsulators
- Wipes
- Baffling materials
- Bleed holes.

AR at 13, 782-83.  However, because of the nature of silencers and their parts, it is not possible to state that certain of the above characteristics must be present.

16

> As with any other century-old technology, plenty of tinkering and
> experimentation with suppressor design has been conducted to produce
> better results.  Some suppressors contain only baffles, which others are all
> expansion chamber.  One of the more recent developments . . . is the use
> of what's known as a monolithic core.  Instead of a series of small
> components stacked in the suppressor tube, the internal support structure
> and baffle stack are milled from a single piece of steel or aluminum that
> can be easily removed from the tube for cleaning.

AR at 231.  For example, most silencers, but not all, contain baffles.  Requiring that baffles be

present would be under-inclusive (for those silencers without baffles) and over-inclusive (for true

muzzle brakes).  For the same reason, it is not possible to require a certain number of

characteristics be present (*i.e.* 5 of out 10, etc.) to classify an item as a silencer.  Because

silencers and muzzle brakes do share characteristics, such as baffles and end caps, AR at 816, the

presence of these characteristics cannot be mutually exclusive for classification purposes.

The Sig submission is a classic monolithic baffle core, as shown when compared with

other such cores.  <u>See</u> AR at 265-76, 308-09, 679-707, 709, 820-21, 839.  A monolithic baffle

core is an internal silencer part consisting of "expansion chambers, baffles, angled baffles, holes

or slots designed to aid in diverting and capturing hot gases created by the burning of propellant

powder."  AR at 818.  The core is designed to be encased and contains a method that facilitates

attachment to a firearm barrel.  AR at 819.  The Sig submission consists of an inner core or tube,

which contains progressively spaced baffles or walls that when assembled with an outer tube

form expansion chambers.  AR at 821-22.  The inner core is designed to be encased, as shown by

its threading at the forward end to receive an end cap, and by the ledge or shoulder at the back of

the monolithic baffle core against which an outer tube would be pressed to create a gas seal.[4]  AR

---

[4] Sig explains the threading as to enable the "use of other muzzle devices."  AR at 865, 878.
When combined with the conventional shorter muzzle brakes, this may make sense.  However,

at 715, 822.  Also noteworthy, the Sig submission is substantially larger than conventional

muzzle brakes, see AR at 306, 843 (comparing Sig submission with other muzzle brakes); 308

(comparing Sig submission with other mono-cores); 722 (characterizing Sig submission as

"gigantic"); 770 ("very large"); 822 (Sig submission is 250% longer than that of largest muzzle

brake); 867 (showing conventional muzzle brakes).  The Sig submission's length to width ratio is

much greater than that of conventional muzzle brakes, but consistent with the length of other

mono core silencers.  AR at 822.  This length is necessary for capturing and *dissipating* the

pressure of propellant gases and is a well-known design that permits increased capture of sound

waves and a corresponding greater reduction in sound.  See AR at 821.

In contrast, conventional muzzle brakes reduce recoil and counteract muzzle rise by

*redirecting* the propellant gases.  While many conventional muzzle brakes do incorporate end

caps and baffles, they are not meant to be encased and thus do not create expansion chambers,

since they are generally open at the sides and/or the top[5] to allow the gases to escape.  Expansion

chambers are simply not necessary because the gases are redirected—reducing recoil—without

them.  In addition, muzzle brakes are typically much smaller than silencers, again, because the

extra length of a silencer core is not necessary to reduce recoil.  The blast of the firearm will

rapidly bleed off after the first three to four inches. AR at 850. While the plaintiff argues that

---

due to the length of the Sig item, it would add length beyond which Sig considers safe.  See AR at 859 ("if the barrel is too long, dangerous pressures may remain in the brass case during this sequence, potentially damaging the rifle and injuring the user").

5 As Sig points out, some muzzle brakes may be encased.  AR 867.  However, as mentioned above, this is precisely why FTB does not require a particular characteristic in order to make a classification because there is no one characteristic that makes an item a silencer.  In addition, ATF has acknowledged that conventional muzzle brakes may become silencers with the addition of parts.  AR 818.

"the 11" muzzle brake contributes to the reduction in recoil," AR at 863, Plaintiff does not explain how added length actually contributes to the reduction of recoil or state a quantifiable amount of reduction.

Sig Sauer argues that length cannot be considered because it is not a specific characteristic listed above.  See AR at 878.  However the inner tube *is* a characteristic, and its length and appearance cannot be ignored, particularly if the plaintiff is claiming that it affects the purpose, function, or use of the item.  See Gilbert Equip. Co, 709 F. Supp. at 1075(upholding classification of a firearm as "non-sporting" and thus not importable because the firearm's "overall appearance . . . was radically different from traditional sporting shotguns, and strikingly similar to shotguns designed specifically for or modified for [non-sporting] use").  Moreover, the fact that the plaintiff designed the submission to avoid classification as a short barreled rifle under the NFA, AR at 873, does not mean it is immune from the NFA in all other respects.  ATF agrees that it has taken the position that a muzzle device counts as part of the barrel length.  AR at 873.  That the affixed part adds to the overall firearm barrel length, however, does not negate that the length and other characteristics of this device are consistent with monolithic baffle cores.

2.    Other Indicia of Objective Intent

a.    Same part number

As evidence of objective intent, the item submitted by Sig Sauer as a "muzzle brake," which was welded onto the semi-automatic MPX rifle is *identical* to the item attached to their MPX machinegun, which the plaintiff admits is a silencer.  AR at 824.  Significantly, the items have the same item number, see AR at 852-54, and are identified on an invoice as a "silencer." AR at 855-56, 886, 890.  Plaintiff alleges that the same part number "does not imply that Sig

19

Sauer views the subject item . . . as only a silencer part." AR at 878. Plaintiff's position is unpersuasive. Assignment of the same part number clearly shows that Sig considers the *exact same part* to be a silencer. Its explanation that its characterization simply "reflects its compliance with ATF's determination" id., rings hollow as Plaintiff has challenged the determination from the outset, and ATF neither dictates nor regulates the use of parts numbers. See AR at 790, 796-801, 858-81.

> b.   The hand guard

In Plaintiff's initial submission for classification, the item contained an extended hand guard, which partially covered the item on the end closest to the chambered end of the barrel. However, actually placing a hand on the guard would, if the item was truly intended to be a muzzle brake, redirect hot gases onto the shooter's hand.  AR at 301-02, 822, 847-49. Muzzle brakes are designed to be in front of the shooter's hand, not in the shooter's hand. The plaintiff explains the longer hand guard by claiming it didn't "have any shorter handguards available at the time" and that the second sample sent to ATF has a shorter hand guard and is part of a "more developed prototype." AR at 869. However, it is incumbent upon the plaintiff to submit a prototype sufficiently developed to allow a meaningful classification and the initial prototype shows Plaintiff's intent for the item.

> C.   "Intended Only"

The "incidental effects" of the plaintiff's submission cannot be controlling. To hold otherwise would be to read out the silencer part prong of section 921(a)(24)'s definition because, as discussed above, essentially all previously-recognized silencer cores would become dual purpose muzzle brakes. Nor did Congress intend this result. During the discussion regarding the

silencer definition, it was asked if the definition was "designed to change the current interpretation" and it was stated that the "current law does not include *conventional* chokes, muzzle breaks, flash hiders, and compensators that are not designed or altered to be silencers, even though these devices may quash sounds in addition to their other lawful purpose." AR 881 (132 Cong. Rec. H1757 (Apr. 10, 1986)) (emphasis added). The response was that "no *conventional* choke, muzzle breaks, flash hiders, or compensators will fit within the definition of silencer." Id. (emphasis added). If the incidental effects of a muzzle brake will not make it a silencer, then it stands to reason that the incidental effects of a silencer will not make it a muzzle brake. See also AR at 288 (where effect is "merely incidental to the purpose of a device," that effect is not controlling in whether the device is a silencer). Here, the Sig Sauer item is a conventional silencer core, and the incidental effect of reducing recoil does not change the classification to a muzzle brake where the design characteristics show it to be a silencer. As recognized by the Firearms Law Deskbook, the term "'intended' must mean "something more than a figment of one's imagination." AR at 290.

> D.    Other devices

Plaintiff claims there are other devices similar to their submission that ATF has not classified as a silencer. "It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." El Rio Santa Cruz Neighborhood Health Center, Inc. v. Department of Health and Human Services, 300 F. Supp. 2d 32, 42 (D.D.C. 2004), aff'd, 396 F.3d 1265 (D.C. Cir. 2005); Comcast Corp. v. FCC, 526 F.3d 763, 769 (D.C. Cir. 2008) ("an agency must provide an adequate explanation to justify treating similarly situated parties differently"). And while it is true that similar items must be

treated similarly, a few common characteristics are not necessarily determinative.  This is to say that while some items may have similar characteristics (*i.e.* baffles), they will not necessarily have the same classification because these characteristics might serve a different function.  For example, in conventional muzzle brakes, baffles redirect propellant gases to counter the recoil of a firearm.  In comparison, baffles in silencers are designed to capture and *dissipate* the pressure of propellant gases—a longer tube permits greater capture of these gases.  Therefore, each item must be classified according to its own design characteristics and indicia of intent.  From a technical perspective, Plaintiff's submission is substantially different from "conventional muzzle brakes" in design, including overall length, allowing it to better capture and dissipate propellant gases.  Further, Plaintiff's submission is substantially similar to designs that are well-known in the firearms community as "monolithic" baffle cores that have been patented as silencer components.  AR 254-276.  Therefore, although Plaintiff's submission, like all monolithic baffle cores, shares characteristics with conventional muzzle brakes, the design of this particular item clearly supports ATF's classification.

## IV.   ATF'S CLASSIFICATION OF THE SIG ITEM, WHEN COMBINED WITH AN OUTER TUBE AND END CAP, AS SILENCER PARTS WAS RATIONAL AND REASONABLE.

As stated above, Sig's submission is a monolithic baffle core, which renders it a silencer under the "part" definition under 18 U.S.C. § 921(a)(24).  However, a monolithic baffle core, when combined with an outer tube and end cap, are also "parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer."  Id.; see AR at 300; 834, AR (photo 5 of 25).  Plaintiff does not dispute this, see DN1-3 at 6, and the statutory language does not require an "intended only" use for "parts" in the plural.  There is no requirement in the

language of section 921(a)(24) that the parts be in "close proximity" as Plaintiff suggests.  AR at

800.  Nor does the legislative history support this interpretation.  See H.R. Rep. No. 99-495;

1986 WL 31888, at 21 ("The definition of silencer is amended to include any part designed or

redesigned and intended to be used as a silencer for a firearm.  This will help control the sale of

*incomplete* silencer kits that now circumvent the prohibition on selling complete kits.")

(emphasis added); Hearings on H.R. 641 and Related Bills Before the Committee on the

Judiciary, 98th Congress, 1st Sess. at 156 ("[O]ne part might be sold at this table, and the man

will be gracious enough to direct you to that table where the second part might be bought.  He, in

turn, might direct you to a third table where the third part might be purchased."); AR at 289 ("the

1986 definition includes no requirement that a combination of parts be readily capable of

assembly.")  While not required to be in proximity, the plaintiff has in fact marketed all three

parts together.  See AR at 640, 758.

     Moreover, United States v. Thompson/Center Arms Co., 504 U.S. 505, 515 (1992), cited

by Plaintiff, AR at 799, specifically found that the "net effect of the new [1986] definition as

expanding the coverage of the Act *beyond* complete-part kits."  (emphasis added)  As such, the

fact that the Sig submission may be purchased separately from the outer tube and end cap, does

not mean it is not one of "parts . . . intended for use in assembling . . . a firearm silencer."

Additionally, Plaintiff does not dispute, that when combined with the outer tube, their

submission is in fact appropriately classified as a silencer.  See AR at 801 (Customer who

purchase the item and "later acquir[e] outer sleeves will result in . . . an NFA firearm.").

V.      <u>CONCLUSION</u>

As demonstrated above, the defendant's action in classifying Sig Sauer's submission as a

monolithic baffle stack was not arbitrary and capricious.  Instead, the classification decision was

rational, reasonable, and in accordance with the law.  As a result, this Court should grant

summary judgment in Defendant's favor.

Respectfully submitted,

JOHN P. KACAVAS
United States Attorney

T. David Plourde
Chief, Civil Division


By:  /s/ William J. Ryan
William J. Ryan
Special Assistant U.S. Attorney
District of New Hampshire
Office of Chief Counsel
Bureau of Alcohol, Tobacco, Firearms and
Explosives
244 Needy Road, Room 1119
Martinsburg, WV 25405-9431
304-260-1509
William.J.Ryan2@usdoj.gov

January 9, 2015