BEFORE THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

On remand from *Sig Sauer Inc. v. B. Todd Jones*,
Civil Action No. 1:14-cv-00147
United States District Court
District of New Hampshire

## DECLARATION OF ETHAN LESSARD

I, Ethan Lessard, swear or affirm as follows:

1. My name is Ethan Lessard, and I am employed as a Design Engineer at Sig Sauer, Inc., 72 Pease Boulevard, Newington, N.H. 03801. My responsibilities include designing firearms, firearm parts, and firearm accessories. An area of my focus is the design of muzzle brakes, flash hiders, silencers, and other muzzle attachments. I make this declaration, which is based on my personal knowledge, in response to the undated letter from Earl Griffith, Chief, Firearms Technology Branch, to Steven Shawver, which Sig Sauer received August 15, 2014, and in support of Sig Sauer's determination that the item at issue is a muzzle brake and not a silencer.

2. I graduated from the University of New Hampshire in 2004 with a Bachelor of Science degree in Mechanical Engineering. In my final two years there, I also served as an intern in the Engineering Department at SIGARMS in Exeter, N.H., where I continued to work after graduation. In 2007, SIGARMS changed its name to Sig Sauer. It is frequently referred to simply as SIG. In 2009, I took a position in Research and Development at Advanced Armament, where I designed silencers, firearms, and related products. In 2011, I took a position as a Design Engineer at Sig Sauer and have worked there since.

### Goal to design an unrestricted rifle with a 16" barrel, a barrel extension that avoids high pressure during extraction, a muzzle brake that reduces recoil and muzzle rise, and that accepts parts for other uses

3. Sig Sauer designed the model MPX rifle with a 6.5" barrel and a permanently attached muzzle brake of 11" so that it is considered to have a barrel at least 16" in length, which allows it to be sold as an ordinary rifle. A rifle with a barrel under 16" in length is required to be registered with ATF, is subject to a $200 transfer tax, requires ATF authorization to transfer it and also to transport it across state lines, and has other legal requirements under the Gun Control Act and National Firearms Act. For those reasons, consumers generally avoid purchasing rifles with barrels under 16". One of the reasons Sig Sauer designed the MPX rifle with a barrel length of 6.5" and a muzzle brake of 11" was to give consumers the option of acquiring a rifle not subject to the NFA.

4. The following illustration is a cross-section view of an MPX rifle with an 8" barrel showing the trajectory of the bullet from the chamber to the muzzle of the barrel. When the cartridge is fired, the gases push the bolt carrier to the rear and open the bolt, ejecting the spent cartridge case. As explained below, if the barrel is too long, dangerous pressures may remain in the brass case during this sequence, potentially damaging the rifle and injuring the user.

ATF 859



5.      The MPX rifle was designed with a 6.5″ barrel to avoid overly high pressures in the operating system. Sig Sauer testing indicates that producing the rifle with a barrel longer than 11″would result in an unreliable, unsafe firearm. Our original standard production plan was  for a 6.5″ barrel.

6.      The MPX rifle is a gas-operated firearm, which means that the gas created by the fired cartridge is used to cycle the bolt and bolt carrier of the firearm so the fired cartridge case is ejected and the next round of ammunition is chambered and ready to fire.  The energy of the fired cartridge needs to be balanced with the mass of the moving parts and the energy stored in the action of the firearm to ensure reliable operation and safety to the shooter.  If the energy is insufficient, the fired cartridge may not eject properly, causing the firearm to jam.  Too much energy can also result in failures to extract and eject, and in extreme cases, case head failures, which can cause the firearm to blow up and injure the user.  An example of case head failure showing a rifle's blown up receiver and damaged parts can be seen at http://www.thefirearmblog.com/blog/2013/10/09/ar-15-kaboom-2/.

7.      The pressure resulting from the fired cartridge peaks when the bullet is expelled from the cartridge case and connects with the rifled barrel of the firearm.  As the bullet travels down the barrel, the volume of gas grows, allowing the internal pressure to fall (see graph below).  Increasing the barrel length increases the amount of time the bullet travels through the barrel, containing the pressure longer and increasing the energy for cycling the rifle.  Increasing this energy increases the velocity of the bolt carrier, putting stress on the firearm, which reduces durability.

ATF 860

8.     The 6.5" barrel is also necessary to delay the bolt opening in relation to the timing of the drop in internal pressure to safe levels.  Internal pressure on the spent cartridge case must be minimized during extraction in order to avoid malfunction of the firearm.  If there is too much internal pressure, then there is too much friction between the spent cartridge case and the chamber wall, resulting in failures to extract and eject the case.  Increasing pressure beyond that will also lead to case head failure.  When the action is locked, the brass case is supported in the steel chamber of the barrel. If the brass case contains too much pressure when the action is unlocked, the case can separate into two pieces near the head.  Case head failures are generally categorized as catastrophic failures which typically lead to the destruction of the firearm and potential injury to the shooter.

9.     The graph below demonstrates the range of gas system pressures for testing of the MPX rifle conducted with an 8.5-inch barrel and a 4.5-inch barrel, which is the range of barrel lengths that have been considered as ideal within the tradeoffs between length, weight, function, safety, muzzle velocity, and customer preferences. The important point to note is that the 4.5" barrel drops to atmospheric pressure at roughly 300 milliseconds (ms), while the 8.5" barrel drops to the same level at close to 1000ms, all the while the bolt carrier opens at the same time for both barrels. This means that the longer the barrel, the higher the residual internal pressure during extraction.



10.    The above issues involving pressure are further explained by reference to the gas operation of the firearm.  When the firing pin hits the primer, the gunpowder is ignited and the expanding gases push the bullet through the barrel.  Some of the escaping gas goes into a gas port, which pushes the bolt carrier rearward and ejects the now-empty cartridge case.

11.    The gas port location in the MPX rifle is located in what is called the "free bore," which is the area of the barrel nearest the chamber where the bullet first passes, and which is not rifled, as is the rest of the barrel.  Placement of the gas port in this location is intended to maximize reliability across the widest range of ammunition types.  Testing of the MPX rifle with 10 and 12-inch barrels showed indications of slow extraction and case bulging, which are indicators of the bolt opening under elevated pressure.  This condition led to the conclusion that a 16-inch barrel is not feasible with this gas system. Because we could see the signs of pressure visually, there was no need to incur the expense of setting up an instrumented barrel for testing.  Sig Sauer's testing indicated that a barrel of 6.5-8.5 inches in length is optimal to reduce internal pressure during opening, resulting in reliable, safe operation.

3

ATF 861

12.     To illustrate the above, I made a video on September 5, 2014, which is enclosed with this declaration (see Cut Away Barrel Ext BH.avi).  It demonstrates the time between initial bolt carrier motion and bullet exit. It is important to note that the bullet travels down the barrel much slower than when it exits.  (It is similar to a tug of war rope where there is no motion until the rope breaks, when there is a high velocity of the participants in opposite directions). Adding barrel length  allows the bullet to stay in the barrel – and maintain the high pressure state – longer, while the bolt carrier and bolt continue to open further (Red Arrow).

13.     In the sequence below, one can see significant movement of the bolt carrier while the bullet is still in the barrel. As the carrier moves axially, it starts to rotate the bolt, unlocking it.  The red arrow shows the gap from the bolt carrier to the front of the ejection port, and the yellow arrow shows the bolt unlocking.

14.     The appearance of the secondary flash (Green Arrow) seen in the video indicates that there is still a high velocity of jetting gas well after the bullet (Blue Arrow) has left the barrel and, more importantly, after the bolt has unlocked (Yellow Arrow). This high velocity gas indicates an elevated pressure in the barrel and chamber.



15.     The following explains why Sig Sauer chose to use a muzzle brake as a type of barrel extender to lengthen the barrel.  A "muzzle brake" is defined as follows: "Device at the muzzle end usually integral with the barrel that uses the emerging gas behind a projectile to reduce recoil." *NRA Firearms Sourcebook* 439 (2006). "Recoil" means: "The rearward movement of a firearm resulting from firing a cartridge or shot shell.  Sometimes informally called 'kick.'" *Id.* at 450.  The term "muzzle jump" means: "The generally upward motion of the muzzle of a firearm which occurs upon firing." *Id.* at 439.  The

ATF 862

muzzle brake here was found to be effective in reducing recoil and muzzle jump (also known as muzzle rise).

16.     Testing demonstrates that the full length of the 11" muzzle brake contributes to the reduction in recoil. The braking of the gas pressure and the mass of the device both serve to reduce recoil. When a cartridge is fired and the gases escape from the muzzle, the gases flow against all of the surfaces of the muzzle brake, thereby reducing recoil.  These gases leave gunpowder fouling on the surface of the muzzle brake.  As shown in the photographs below, a light discoloration can be seen on the surfaces for the entire length of the muzzle brake.  That discoloration is gunpowder fouling.



17.     High speed video also proves that the MPX muzzle brake reduces recoil and muzzle rise in semi auto operation (single round fired, note the lack of magazine). This was set up to show free recoil by suspending the gun (above its center of mass) from the ceiling and remotely firing to eliminate human variables.

9/17/2014
MPX                                                             SN:62B000635 (Submitted to ATF)
MPX-C Brake                                                 SN: SSPT009 (Submitted to ATF)
Ammunition: RUAG Action4SXF
Vision Research Phantom V1610 High Speed Video Camera     SN:14891

ATF 863

MPX A2.avi shows the MPX with an A2 style muzzle brake at rest (L) and at peak recoil (R)



MPX C.avi shows the MPX with SIG muzzle brake at rest (L) and at peak recoil (R)



18.     Note the difference in angle between the peak recoil pictures.  The configuration with the SIG muzzle brake has less angular change with respect to horizontal, which shows the SIG muzzle brake reduces muzzle rise.  Again looking at the peak recoil pictures, the configuration with the A2 muzzle brake translates farther vertically (with respect to the light switch), and since this is a pendulum arrangement, this equates to more linear recoil.  In sum, the test results depicted in the photos establish that the 11" SIG muzzle brake reduced recoil and muzzle rise more effectively than the more conventional A2 style muzzle brake.

19.     In sum, Sig Sauer's design for the MPX rifle with a 6.5" barrel and an integral 11" muzzle brake achieved the following goals: (a) the rifle has a barrel at least 16" in length, freeing it of certain legal restrictions and thus making it commercially viable; (b) the rifle functions without high pressure and

ATF 864

undue stress on the bolt carrier because the expanding gases are able to exit through the muzzle brake; and (c) the rifle has reduced recoil and muzzle rise.

20.     To add to its versatility, the muzzle brake is threaded on the front end to allow the use of other muzzle devices.  The following are examples of such devices:

a. An extended muzzle brake, which (along with the added mass) can further reduce recoil and muzzle rise due to gas that may still be escaping.

b. A flash suppressor.  "Flash suppressor" is defined as: "A muzzle attachment designed to reduce muzzle flash (also called a 'flash hider')."  *NRA Firearms Sourcebook* 426.

c. A compensator.  "Compensator" is defined as: "A device attached to the muzzle end of the barrel that utilizes propelling gases to reduce recoil.  Also, see *muzzle brake*."  *Id.* at 418.  *E.g.*, the FSC30 Compensator "couples flash suppression with muzzle control. The FSC30 is an excellent choice for controlled follow up shot placement." http://primaryweapons.com/muzzledevices/#.VA9CZ6XD-AJ. Here is a photograph of that device (on right):

 

Muzzle attachments may act as combined muzzle brakes, compensators, and flash hiders.  *E.g.*, the Advanced Armament Corp. Brakeout is a Flash Suppressing Compensator, which "combines a rear muzzle brake chamber with the three-prong front end of our flash suppressors."  This device has a thread/shoulder/teeth arrangement that can be used to attach a silencer or other device. http://www.aacblog.com/wp-content/uploads/brakeout-for-web-final.jpg.  See illustration above (on the left).

d. A silencer.  For persons wishing to go through the legal process to obtain ATF authorization to make or buy a silencer, an outer tube and end cap may be obtained to assemble a silencer.

e. A blank firing adapter.   For persons who wish to have the gun function with blanks, this type of device contains the lower pressures of the blank long enough to properly cycle the action of the gun.

21.     The Sig Sauer muzzle brake has a shoulder on the rear end that properly seals certain muzzle attachments such as a silencer or a blank firing adapter.[1]

### Testing the device

---

[1]Also known as a blank safety device, it allows the safe firing of blank rounds. *E.g.*, see http://pmd.edgarbrothers.com/pages/BSD-Blank-Safety-Device1.aspx.

ATF 865

22.    Sig Sauer conducted tests on the muzzle device, which it reported in its letter to ATF dated December 6, 2013, at 1-2.  The device was attached to a prototype 9mm MPX rifle.  The prototype was produced as a sample to be displayed at the Sporting, Hunting, and Outdoor Trade Show held in Las Vegas in January 2013.  The prototype was produced without the proper heat treatment required for full durability.  Heat treatment is the thermal processing of materials (steels in this case) to increase desired properties (hardness and strength for this application).

23.    For the recoil test, four 9mm rounds were fired.  As reported in the letter to ATF, the device effectively reduced recoil and muzzle rise.  Also, on September 12, 2014, I tested the device again on a 9mm MPX rifle with 6.5" barrel.  As shown in the attached video, which is a true copy, the device was very effective in reducing recoil and muzzle rise.

24.    Because it was unsafe to fire more than a few shots through the 9mm MPX prototype rifle, we submitted to ATF previous sound testing of a 7.62x51 rifle with and without a muzzle brake, noting that these results were typical of adding a muzzle brake to a firearm. As reported in our December 6, 2013, letter to ATF, the device increased the sound.  Based on the results of that test, it was clear that sound would also increase if the device was attached to a 9mm MPX rifle.  That conclusion was verified by ATF's testing of the device when actually attached to a 9mm MPX rifle, as verified in ATF's letter received August 15, 2014, page 15, which states that "the SIG submission redirected the gases resulting in an increase of 2.41, 1.17, and 1.45 decibels to the side, front and rear of the firearm."

### Device Features

25.    ATF's letter received August 15, 2014, page 4, lists what it refers to as "components or design characteristics that are commonly found in conventional firearm silencers," including the following:

- Outer tube or body.
- Ported inner tube(s).
- Expansion chamber(s).
- Baffles or washers (that create separate expansion chambers within a device).
- Sound-dampening material such as foam, steel wool, and other materials.
- End caps.
- Encapsulators.
- Wipes.
- Baffling materials.
- Bleed holes.

26.    Several features listed above are also features of muzzle brakes. Muzzle brakes generally are ported tubes (albeit not ported "inner" tubes), which means that they have bleed holes for gases to escape, and they have baffles to redirect the gases in such manner as to reduce recoil and muzzle rise.

27.    An "expansion chamber" is a volume of space where gas can go from low volume, high pressure, to high volume, low pressure. A silencer has expansion chambers which contain the gases and slow down their release.  The Sig Sauer muzzle brake has spaces between each baffle, but because the device has no outer tube to contain the gases, it has no "chamber."

ATF 866

28.     The muzzle brake below, made by Elite Iron named the CQC1has a removable tube, expansion chambers, front end cap, bleed holes, as well as silencer mounting features (thread and shoulder). http://eliteiron.com/elite-iron-MuzzleBrakes.html.



29.     A flash suppressor made by Noveske called the KX5 has a tube, baffle, encapsulator, and expansion chamber.  http://www.shopnoveske.com/products/kx5-flash-suppressor-w-crush-washer).  It is illustrated below.



30.     The PWSCQB Compensator has a tube, expansion chamber, and a front end cap. http://primaryweapons.com/muzzledevices/cqb/#.VBSR9fldV7s.  It is illustrated below.



31.     The other items listed above by ATF as possible silencer features have various non-silencer uses. Outer tubes and end caps are used on lawn mower mufflers. Many uses for materials such as steel wool are obvious.  Wipes are nothing more than circular, flat pieces of rubber with many uses other than as silencer components.  Encapsulators are parts that compress elements within a tube.  While baffles can

9

ATF 867

be constrained in a silencer with an encapsulator, encapsulators are also used to hold lenses in telescopes, binoculars, and microscopes.

## Monolithic Baffle Cores

32.     ATF describes the SIG item as a "monolithic baffle core" with "expansion chambers, baffles, angled baffles, holes or slots." ATF letter received August 15, 2014, page 5. Because the SIG device has no outer tube, it cannot be said to have "expansion chambers." Muzzle brakes generally have "baffles, angled baffles, holes or slots," including the muzzle brakes shown in ATF's photos (page 12).

33.     Muzzle brakes with a "quick detach" (QD) feature are designed with baffles that may be angled and holes or slots that function to reduce recoil. A QD mounting feature allows the quick installation and removal of a muzzle device, whether a muzzle brake, flash hider, compensator, or silencer.

34.     Testing conducted by Sig Sauer on the muzzle brakes listed in the ATF letter received August 15, 2014, p. 12, demonstrates that assembly of an outer tube on virtually any muzzle brake creates a silencer. See discussion below.

## Comparison of Muzzle Brakes: Lengths and Calibers

35.     The device at issue here is longer than many other muzzle brakes so that the barrel is considered to be at least 16" in length. As explained above, using a longer rifled barrel caused high pressures that would render the rifle unreliable and potentially dangerous, while using a shorter rifled barrel with a longer muzzle device overcame that problem. Because the device reduces recoil and muzzle rise while achieving the 16" barrel at a lighter weight, the combined design features are ideal.

36.     ATF ignores the benefits of the design and provides photos of shorter muzzle brakes to suggest that this device is too long. Were it not for the legal restriction on rifles with barrels under 16" in length, this device could be shorter. Nonetheless, the length of the device does not interfere with, and instead facilitates, its ability to diminish recoil and muzzle rise.

37.     ATF's letter received August 15, 2014, shows muzzle brakes for calibers as large as the .50 BMG and suggests that recoil and muzzle rise are not factors for a semiautomatic 9mm rifle. ATF is either unaware of or ignores the fact that there are muzzle brakes even for .22 caliber rimfire rifles, which have far less recoil than 9mm rifles. The Mossberg Model 802 .22 bolt-action rifle muzzle brake looks very much like the .50 BMG muzzle brake, and it is considerably larger than more common .22 muzzle brakes.[2] The following shows the .22 Mossberg with muzzle brake:

---

[2]http://www.thefirearmblog.com/blog/2009/02/24/mossberg-big-muzzle-brake-coming-to-17-and-22-rifles/.

ATF 868



A similar muzzle brake is marketed for the Ruger 10/22, the most common .22 rifle ever sold.[3]

38.    Reduction of recoil and muzzle climb is an advantage when using *any* semiautomatic 9mm rifle. Such a rifle can be used for home defense, target shooting, and anything else for which a 9mm pistol can be used, except that it is not concealable. A 9mm rifle is easier to aim and control than a 9mm pistol. Muzzle brakes have been used on 9mm carbines made by Colt and others, and 9mm competition rifles with muzzle brakes are in production.[4]

### The Handguard

39.    The first MPX rifle sample Sig Sauer sent to ATF, in April 2013, was a prototype with a longer handguard that covered some of the muzzle brake as well as the rifled barrel. It was sent to ATF because SIG did not have any shorter handguards available at the time. The second sample, sent to ATF in June 2014, had the shorter handguard that extends no further than the muzzle of the barrel. The second sample is a more developed prototype that is closer to the configuration that will be produced for commercial distribution.

40.    ATF's letter received on August 15, 2014, focuses only on the first prototype and suggests that its longer handguard would have allowed the user to grasp it in the forward portion, which could result

---

[3] http://linode1.tacticalinc.com/m22500153-22lrbrmuzzle-brake-flash-hiderbrfor-ruger0174-10220174-rifle-p-1422.html.

[4] "Gun Review: JP Enterprises GMR-12 9mm Carbine" states:

> JP Enterprises is the gold standard when it comes to competition rifles. Take a look at the gun rack at a pro series 3-gun competition and you'll see what I mean — if a competitor isn't using a gun made by their sponsor, there's a 90% chance they're shooting a JP rifle. . . . So when I heard that JP was putting out a 9mm AR-15 carbine, I was all over it . . . .

> [T]he civilian version is being marketed as a cheaper option for competition shooters. It's a valid use case, since most matches will allow you to run a pistol caliber carbine if you really want to . . . .

http://www.thetruthaboutguns.com/2013/12/foghorn/gun-review-jp-enterprises-gmr-12-9mm-carbine/.

ATF 869

in the hand being burned, and not just the rearward portion, which would be safe.  ATF then asserts that the longer handguard was evidence of intent that the submission be made into a silencer, because it indicates intent to encase the part with an outer tube.  ATF Letter, pages 13-14, 16.

41.     Sig Sauer sent ATF the rifle with the shorter handguard well in advance of ATF making this argument.  ATF fails to recognize the design process, which entails development of multiple prototypes that change over time.  The shorter handguard is used in the more developed prototype and is consistent with the muzzle brake design.  The length of the handguard has no bearing on design of the device as "any part intended only for use in" assembling or fabricating a silencer.

### Like the SIG Device, the Muzzle Brakes Identified as Such by ATF Can Be Converted into Silencers by Adding Other Parts

42.     ATF exhibits a photograph showing 10 items it refers to as "muzzle brakes" and 5 items it refers to as "monolithic cores," with the SIG submission in the middle.  Letter p. 12.  It states that it conducted sound testing of the device "by adding a piece of common automotive radiator hose to encase the Sig mono-core. The rubber hose was held in place with the aid of two plastic "zip" ties (see photo 22 attached). Sound meter testing showed that the Sig device when encased with the rubber radiator hose produced a 14.28 dB reduction in sound."  Letter, p. 15, note 2.

43.     ATF did not identify the makes and models of the muzzle brakes in its photograph.  However, I recognized the muzzle brake shown on the farthest right in ATF's photograph (Letter p. 12, see below with green arrow) as the Big Chubby, which was designed by Curtis Werries.  See https://www.ratworxusa.com/?q=node/87.   I conducted the same test as ATF by inserting radiator hoses over the Big Chubby (which was registered under the National Firearms Act via ATF Form 2 as a silencer 25 Aug 2014, sn: SAPT1204)



Photo showing: the SIG submission (center); a sampling of muzzle brakes (left); and monolithic baffle cores (right). (Note muzzle brake for largest .50 BMG caliber (far left); and silencer core for smallest .22 LR caliber (far right)).

44.     We used the same equipment, calibration, and testing protocol (MIL-STD-1474d) as used in all of our other sound tests:

ATF 870

Temperature: 82°F, 69% humidity, barometric pressure 29.82 in.

Larson Davis SoundTrack Model LxT1 Meter     SN:0002758
Larson Davis PRMLxT1 015643 PreAmp     SN:015643
PCB Piezotronics 377C10 Microphone     SN:126973
Larson Davis CAL200 Pistonophone (Calibrator)  SN: 8515
Calibrated at 114dB, @1kHz

Hose was Gates Vulco-Flex II (pn 25476), 1-1/2 x 14", from local automotive parts store.
Cut into 2 pieces,
        4" (to match the muzzle brake length)
        10" (to match the length of tube used by the ATF in their test)

M400 rifle with 16" barrel, caliber .300 AAC Blackout
Ammunition: 220 grain Remington (R300AAC8)

45.    This photograph shows the rifle with the Big Chubby muzzle brake, two unattached pieces of radiator hose, and a hose lock.



46.    The configuration below shows the Big Chubby device with 10" hose.  It provided 15.2 decibels (db) of sound reduction (1ml per Mil-Std-1474d) using a hose the same length as the ATF test (ATF got 14.28 and 16.73 db reduction on the SIG device with the radiator hose from the base position).



47.    The configuration below, using 4" hose to test the Big Chubby muzzle brake, provides 12.1db of reduction.

ATF 871



Sound Reductions

| | |
|---|---|
| ATF Sound Readings: SIG Brake: | 16.7db(A) (10" Hose on 2nd Submitted MPX) |
| | 14.3db(A)(10" Hose on 1st Submission MPX) |
| SIG Sound Reading: Big Chubby Brake: | 15.2 db(A) (10" Hose to match ATF test) |
| | 12.1 db(A) (4" Hose to match Muzzle Brake length) |

48.     We thus found that the Big Chubby, which the ATF considers a conventional muzzle brake, performs in a very similar manner to the SIG device with the ATF's "radiator hose test."

49.     Conclusion

   a.  ATF asserts that the length of Sig Sauer's muzzle brake contributes to their conclusion that it is a silencer part, but ATF fails to identify length as a silencer criterion.  A combination of design and safety considerations coupled with the greater product market acceptance from 16+ inch barrels resulted in the barrel and muzzle brake lengths selected.

   b.  ATF's attempt to distinguish muzzle brakes from "monolithic silencer cores" by demonstrating that a "monolithic core" diminishes the report of a firearm with the addition of an outer tube is invalid.  Both the muzzle brakes and "monolithic silencer cores" identified by ATF diminish the report of a firearm when an outer tube is added.

   c.  As demonstrated through testing, the SIG device reduces muzzle rise and recoil, which are salient characteristics of a muzzle brake.

   d.  ATF's arguments that the length of the handguard or caliber of a rifle indicate that the muzzle brake is a silencer part simply lack any engineering basis.


I declare under penalty of perjury that the foregoing is true and correct.


Ethan Lessard

September 18, 2014

14

ATF 872

BEFORE THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

On remand from *Sig Sauer Inc. v. B. Todd Jones*,
Civil Action No. 1:14-cv-00147
United States District Court
District of New Hampshire

## DECLARATION OF STEVEN SHAWVER

1.      My name is Steven Shawver, and I am Vice President, General Counsel, and Secretary officer for Sig Sauer, Inc.,[1] 72 Pease Boulevard, Newington, N.H. 03801.  I have personal knowledge of the information that follows below.  I am writing in response to the letter received from ATF on August 15, 2014, that was addressed to me.  (Hereafter referred to simply as the "Letter.")

### Intent to use the muzzle brake to increase barrel length to
### 16" or greater to avoid the short-barreled rifle category

2.      Sig Sauer designed the model MPX rifle with a 6.5" barrel and a muzzle brake of 11" to avoid the restrictions that apply to short-barreled rifles under the Gun Control Act (GCA). Restrictions apply to what is defined as a "short-barreled rifle," which includes a rifle with a barrel under 16" in length.  18 U.S.C. § 921(a)(8), 26 U.S.C. § 5845(a)(3).  Title II of the GCA, the National Firearms Act, requires that such rifles be registered with ATF, which must approve the transfer of any such rifle, which in turn requires payment of a $200 transfer tax.  26 U.S.C. §§ 5811, 5812, 5841.  Title I of the GCA requires ATF approval for a dealer to sell such rifles, and requires persons other than Federal firearms licensees to obtain ATF approval to transport such rifle in interstate or foreign commerce.  18 U.S.C. § 922(a)(4), (b)(4).

3.      None of the above restrictions apply to a rifle with a barrel 16" or more in length.  Most consumers who purchase firearms wish to avoid the red tape, delay, expense, and waiver of certain privacy rights that are inherent in these restrictions.  The MPX rifle with a barrel length of 6.5" and a muzzle brake of 11" gives consumers the option of acquiring a rifle not subject to the restrictions.

4.      In measuring barrel length, ATF considers a muzzle brake that is permanently attached to the barrel to be included in the barrel length.  ATF's predecessor agency recognized that permanently attaching "a sleeve-type muzzle brake to the muzzle end of a short barreled rifle" to lengthen the barrel would remove the rifle from the short-barreled category.  Revenue Ruling 55-570, 1955-2 C.B. 481, 1955 WL 10164 (IRS RRU) (copy attached).  It remains ATF's position that a muzzle device counts as part of the barrel length:  "The ATF procedure for measuring barrel length is to measure from the closed bolt (or breech-face) to the furthermost end of the

---

[1]Note that Sig Sauer is often referred to simply as "SIG."

barrel or permanently attached muzzle device."[2]  ATF, *National Firearms Act Handbook* 6 (ATF E-Publication 5320.8, Revised April 2009).[3]  A rifle originally made with a barrel length of at least 16" would not be in the short-barreled category, and one originally made with a barrel length under 16" may be removed from that category if it " is modified by permanently attaching an extension such that the barrel length is at least 16"."  *Id*. at 21.

5.      ATF fails to acknowledge Sig Sauer's intent to use the subject muzzle brake to ensure that the rifle has a barrel of 16" or more in length.  ATF discusses the longer length of the muzzle brake extensively without even once mentioning this legitimate reason, which was sanctioned as far back as the 1955 Revenue Ruling.  As explained below, the design of the muzzle brake at issue is particularly effective in reducing recoil and muzzle rise.

6.      Sig Sauer chose to design the barrel by combining a 6.5" barrel with a rifled bore and a 11" muzzle brake, rather than simply using a 16" barrel with a rifled bore, for two reasons.  First, testing revealed that use of a barrel with a rifled bore over about 8" created dangerous pressures in the operating mechanism.  Second, the muzzle brake effectively reduces recoil and muzzle rise.  These considerations are discussed at length in the Declaration of Ethan Lessard.

### The muzzle brake increases sound

7.      ATF's sound-meter testing found that use of SIG's muzzle brake "result[ed] in an increase of 2.41, 1.17, and 1.45 decibels to the side, front and rear of the firearm."  ATF letter, p. 15. Sig Sauer's testing also showed an increase in sound.  Sig Sauer letter to ATF, Dec. 6, 2013, at 1-2.

8.      ATF states that results of the muzzle brakes it tested were inconsistent because of the variables in design and the location of the microphone relative to the muzzle blast. Letter, p. 3. While ATF tests alleged silencers in criminal cases, it is unclear if ATF has written testing standards and protocols for silencer parts or for muzzle brakes, including those tested here. ATF's letter received August 15, 2014, does not provide information on the testing procedures it followed in testing Sig Sauer's muzzle device or the other muzzle devices mentioned in the letter.  If no such written procedures exist, Sig Sauer questions ATF's ability to compare Sig Sauer's muzzle device to other alleged muzzle brakes and make consistent classifications.  Sig Sauer also questions whether such testing procedures were conducted in a controlled and scientifically valid manner.  At any rate, it is clear ATF agrees that the SIG muzzle device increases sound.

### "Intended only for use"

9.      18 U.S.C. § 921(a)(24) provides: "The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling

---

[2]It adds: "Permanent methods of attachment include full-fusion gas or electric steel-seam welding, high-temperature (1100°F) silver soldering, or blind pinning with the pin head welded over."
[3]http://www.atf.gov/files/publications/download/p/atf-p-5320-8/atf-p-5320-8.pdf.

ATF 874

or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." ATF incorrectly contends that the device in question fits within the third definition as a "part intended *only* for use" in assembly or fabrication of a silencer.

10.    ATF states that, based on its design, an item may be "objectively intended for use in reducing" sound rather than "to perform an incidental function." Letter p. 4. However, "intent" has a plain meaning, and the second portion of the definition of silencer distinguishes design from intent: "any combination of parts, designed or redesigned, and intended for use . . . ." 18 U.S.C. § 921(a)(24). ATF concedes that the second definition of silencer does not apply here unless the item is "combined with an outer tube." Letter p. 5.

11.    ATF lists 10 design characteristics, including household items like washers and steel wool, it believes are commonly found in conventional firearm silencers. Letter p. 4. It does not opine that each of the enumerated design characteristics defines a silencer or how many of the characteristics are required for a complete silencer, a combination of parts, or a single part to be classified as a silencer under the statute. Moreover, ATF does not state whether the Sig Sauer device fits within any of the 10 characteristics. ATF also states that it compares items to "known silencer designs." Letter p. 6. That does not negate the requirement that a single part must be "intended only for use" in making a silencer.

12.    ATF concedes, as it must, that "the statute imposes an intent requirement. Therefore, the manufacturer's stated intent for the part is clearly relevant." Letter, p. 5. While ATF is correct in adding that manufacturers may not "market silencers" as other devices, intent requirements exist for parts with multiple uses. A complete silencer is still a silencer even if, to use ATF's words, it may have an "incidental function" as a choke, muzzle brake, flash hider, compensator, or door stop. But ATF's primary versus incidental function test bears no relation to the third portion of the statutory definition of silencer as "any part intended only for use" in making a silencer. 18 U.S.C. § 921(a)(24). A part with legitimate dual or multiple uses – whether a washer, lawnmower muffler, oil filter, plumbing pipe, or a muzzle brake – is not "any part intended only for use" in making a silencer.

13.    An objective test for alleged silencer parts was rejected in *United States v. Crooker*, 608 F.3d 94, 98 (1st Cir. 2010), as follows: "the machine-gun provision, by contrast to the silencer definition, explicitly adopts a test of objective capability . . . ." *Id.* (quoting definition of a machinegun as a weapon "which shoots, is designed to shoot, or can be readily restored to shoot " automatically). However, "the range of physical objects that can muffle a firearm is so large and of so many alternative uses that some filtering restriction is needed to prevent overbreadth and possibly vagueness." *Id.* A muzzle brake is one such alternative use.

14.    ATF states that relying exclusively on a manufacturer's labeling and marketing of a device would permit manufacturers to market silencers as flash hiders or other unregulated devices simply by claiming they are not intended to be used as silencers. Letter p. 5. We agree with ATF that a manufacturer's name for a part or how it is marketed is not solely determinative of whether it is or is not a "silencer" as defined. ATF may evaluate the part to determine whether it is in fact a muzzle brake or other unregulated muzzle attachment. If the part is effective in diminishing muzzle rise and/or recoil, then the dual use nature of the part controls. It would not

3

ATF 875

be relevant that the same part might also be adapted, with the addition of other parts, for use in a silencer. Conversely, if the part is not effective in performing the function alleged by the manufacturer, and if the part has design features of a silencer part, then the part may be "intended only for use" in assembly or fabrication a silencer. This approach avoids the "absurd result" about which ATF is concerned and gives meaning to the third portion of the statutory definition.

### Intent to use as a muzzle brake to reduce recoil and muzzle rise

15.    Sig Sauer's device is indisputably an effective muzzle brake in that it diminishes recoil and muzzle rise, and the plan is to market it as such. Sig Sauer fully described its test protocols and results to demonstrate that the item significantly reduces recoil and muzzle rise. Letter of Dec. 6, 2013, at 3-4. It enclosed photographs of the testing showing a significant rearward push with a muzzle rise of approximately 45° without the device, and minimal rearward push with no perceptible muzzle rise with the device. ATF has not challenged SIG's findings and has not disclosed whether it even saw fit to conduct its own recoil testing. ATF's acceptance of the fact that the device reduces recoil and muzzle rise pervades its Letter.

16.    Like other muzzle brakes, the device may also be utilized as a silencer part. Sig Sauer has made it clear to ATF that the muzzle device is intended to be used as a muzzle brake *or* as a component in silencers manufactured by Sig Sauer. (Sig Sauer letter of December 6, 2013, p. 6). Indeed, in the interest of consistency, ATF's interpretation of the statute should result in all muzzle brakes being registered as silencers due to their ability to be encased and utilized in silencers. However, because the Sig Sauer muzzle brake and all other muzzle brakes are legitimate dual use parts, they cannot be "any part intended *only* for use" in assembling or fabricating a silencer.

17.    The statutory intent requirement is the same without regard to whether a device was designed before or after the definition of silencer was enacted in the Firearms Owners' Protection Act ("FOPA"), § 101, P.L. 99-308, 100 Stat. 449, 451 (1986). Congressman Harold Volkmer, FOPA sponsor, explained that "conventional" muzzle brakes are not "devices for silencing" and have "a common sporting purpose totally apart from muffling sound. If someone modified these legitimate devices however for the purpose of silencing, then the modified device would be a silencer." 132 Cong. Rec., 99th Cong., 2d Sess., H1757 (1986). He suggested neither that muzzle brakes that were designed after 1986 would be "unconventional" nor that "unconventional" muzzle brakes are "intended only for use" in making a silencer. Such a device would become a silencer only if, in his words, it is *modified* "for the purpose of silencing." Adding an outer tube and end cap to such devices may do that.

18.    ATF states that "conventional muzzle brakes reduce recoil and counteract muzzle rise by redirecting the propellant gases created by the discharge of a firearm." Letter p. 7. The Sig Sauer item does that. ATF adds that "many conventional muzzle brakes incorporate integral end caps and baffles," which "redirect propellant gases for the purposes of recoil reduction and counteracting muzzle rise . . . ." However, "these features do not create expansion chambers to reduce sound by capturing and slowing propellant gases . . . ." Yet an "expansion chamber" refers to a portion of a complete silencer, which is enclosed by an outer tube, and which in turn

4

allows gases to expand within the chamber before exiting.  The Sig Sauer device does not have an outer tube or expansion chambers, and it does not reduce sound.  Instead it has the following characteristic: "Muzzle brakes may create increased noise to the rear and sides of the brake because, in redirecting the propellant gasses, the muzzle brakes also redirect sound waves."  Letter p. 7.

19.    ATF adds that "conventional" muzzle brakes are not "designed to create an expansion chamber when encased."  Letter p. 7.  Yet almost all of them will in fact create an expansion chamber when encased.  See Declaration of Ethan Lessard.  Further, the issue here is whether the device is "intended only for use" in making a silencer when *not* encased, i.e., when it serves as a muzzle brake.

20.    As ATF concedes, "a silencer may be produced from a conventional muzzle brake when other parts are added," but that "conventional muzzle brakes are not 'for silencing, muffling or diminishing the report of a portable firearm.'"  Letter p. 9.  Indeed, all of the muzzle brakes that ATF tested could be made into effective silencers by addition of an outer cover.  The Sig Sauer device likewise would require other parts to make it into a device "for silencing, silencing, muffling or diminishing the report of a portable firearm," which is the first definition in § 921(a)(24).  Further, ATF's reference to muzzle brakes that are "conventional" has no definite meaning and is irrelevant to the statutory definition of a silencer.

21.    ATF goes on to say that the muzzle brake designs referred to by SIG are for "rifle caliber firearms, except one for a 12ga shotgun," but the SIG item is for 9mm, a pistol caliber.  Letter p. 9.  ATF asserts that controlling recoil and muzzle climb is "not a concern on the semiautomatic Sig firearm."  *Id.*  However, the 9mm caliber firearm at issue is defined as a "rifle" because it is designed to be fired from the shoulder, 18 U.S.C. § 921(a)(7), and the GCA does not distinguish between rifle and pistol caliber ammunition.  Moreover, controlling recoil and muzzle climb *is* a concern to maintain the sights on the target after each shot is fired, regardless of the caliber of the round being fired, a primary purpose of muzzle brakes.  Finally, nothing about caliber appears on ATF's list of silencer design features.  Letter p. 4.

### Monolithic baffles and muzzle brakes

22.    ATF describes the Sig Sauer device as a "monolithic baffle core" with "expansion chambers, baffles, angled baffles, holes or slots."  Letter p. 5.  "Monolithic baffles and muzzle brakes often share a common design feature; i.e., baffles. . . . [T]hey both work by redirecting propellant gases and sound waves that follow a fired projectile."  *Id.* p. 11.  Since both indisputably reduce recoil, this is a patent admission of dual use which should end the inquiry under the "intended only for use" portion of the silencer definition.

23.    ATF seeks to distinguish the baffles in a monolithic core by saying that they redirect gases and sound waves "in to a series of expansion chambers in order to reduce the report of the firearm."  Letter p. 11.  But that may occur only if a tube is inserted over the item, and it would occur as well with any muzzle brake.  The item at issue is a single part without a cover, and it increases sound while reducing recoil.  As ATF states, "the SIG submission consists of a one-piece inner core which contains progressively spaced baffles or walls that (*when assembled with*

ATF 877

*an outer tube*) form integral expansion or sound chambers." Letter p. 12 (emphasis added). But this case concerns the Sig Sauer item when *not* assembled with an outer tube.

24.     *Threading*.  ATF concedes that "the SIG submission possesses some design features of other conventional and progressively designed muzzle brakes on the market . . . ." Letter p. 12. However, it points to differences.  First, it is threaded at its forward end and has a shoulder at the rear, which would "facilitate attachment of an end-cap and silencer body . . . ." Letter p. 13. But Sig Sauer's initial letter of April 4, 2013, stated: "The muzzle end of the brake is threaded to provide the customer with the after-market option of attaching muzzle devices such as flash hider, muzzle brake, or silencer." Threading would indeed accommodate the addition of other parts that would create a silencer, which one may follow the legal procedures to carry out, but it also allows the attachment of other devices.

25.     *Length*.  Second, ATF states that the SIG item "was significantly longer (250%) than that of the largest muzzle brake examined . . . ." Letter p. 13.  Indeed, as explained above, the Sig Sauer rifle barrel is 6.5" in length, and the muzzle brake must be at least 9.5" to increase the barrel length to the minimum 16" to have it treated as an ordinary rifle and to avoid the legal restrictions on short-barreled rifles.  The length of the item is intended to result in a rifle with a barrel at least 16" in length based on legal requirements, and is in no way an indication that the item is "intended only for use" in making a silencer.  As noted earlier, the lengths of the rifled bore of the barrel and of the muzzle brake are calculated to avoid dangerous high pressures when firing.  Moreover, if length is a factor in distinguishing a muzzle brake from a silencer, then that design feature should appear in ATF's list of such features.  See Letter, p. 4.  It is conspicuously absent.

26.     *Features of part, description, and item number*.  ATF states that the submitted item is identical in design and dimension to the monolithic baffle core in the actual silencer that Sig Sauer submitted.  Letter p. 15.  As noted previously, Sig Sauer has consistently advised ATF of its intention to use the device as a muzzle brake or, with the addition of an outer tube and end cap, as a part of a silencer.  Like washers and steel wool, a muzzle brake can be combined with other parts to make a silencer, but that fails to imply that the muzzle brake is intended to be used "only" to make a silencer.

27.     ATF also notes that SIG's invoice dated 7/10/2014 submitting samples to ATF used the same part number (8100045) and the word "silencer" for both the subject muzzle brake and a part that can be used with other parts to make a silencer.  Letter pp. 15-16.  This does not imply that Sig Sauer views the subject item, which undeniably has dual uses, as only a silencer part.  ATF's initial classification letter dated August 26, 2013, held that the subject item is a silencer and instructed Sig Sauer to register it as such.  Sig Sauer's calling the item a "silencer" and using the same part number for both samples reflects its compliance with ATF's determination.  That will change if the court rules otherwise.

## Conclusion

28.     ATF concludes that "although SIG argues that their submission is a muzzle brake because it is not 'intended only' for use in assembly of a firearm silencer, our tests indicate that the opposite." Letter p. 15.  Yet in adding that "SIG cites its own tests to argue that the

ATF 878

submission may be used as a muzzle brake or barrel extension," *id.*, ATF does not deny that the item may indeed be used for these purposes.  Its further assertion that such items "may serve incidental function as a muzzle brake" disregards that there is nothing "incidental" about such use.

29.      ATF further concludes that the item is "a part that 1) when combined with an outer tube is designed and intended for use in the assembly or fabrication of a silencer and 2) is intended <u>only</u> for use in the assembly or fabrication of a silencer and, therefore, is a '***firearm silencer***' . . . ." Letter p. 16.  ATF's first conclusion is at odds with the statute because the muzzle device is not "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler . . . ." 18 U.S.C. § 921(a)(24).  As ATF notes, it would need to be "combined with an outer tube" to meet that definition.

30.      ATF's second basis for the classification that the device "is intended <u>only</u> for use in the assembly or fabrication of a silencer," *id.*, is also without legal basis.  This conclusion ignores evidence submitted by Sig Sauer that the device is necessary to lengthen the rifle barrel to 16 inches to avoid regulation as a short-barreled rifle.  ATF also ignores evidence that the device is highly effective in decreasing recoil and muzzle rise and therefore is a dual-use part that is not *only* for use in assembling or fabricating a silencer.  ATF pays lip service to the word "only," but its interpretation of the statutory definition renders it without meaning.

31.      In sum, Sig Sauer's device is a muzzle brake and is not a firearm silencer or firearm muffler as defined in 18 U.S.C. § 921(a)(24).

I declare under penalty of perjury that the foregoing is true and correct.

STEVEN SHAWVER

September 10, 2014

7

ATF 879

ufacturers, Importers, and Deal-
e June 25, 1955, supersede Regu-
cigars and cigarettes.  The new
age of cigars and cigarettes sub-
the factory, have legibly printed
thereto, a mark consisting of the
rer, or his permit number, and a
se of the Federal stamps thereon,
ies the package to destroy such
.  It further provides that pack-
shall, before removal, have im-
ly affixed thereto, a class designa-
to the cigars contained in the

ng to Manufacturers, Importers,
o, effective July 19, 1955, super-
relate to manufactured tobacco.
package of manufactured tobacco
from the factory, have legibly
urely affixed thereto, a mark con-
the manufacturer, or his permit
forbids the reuse of the Federal
person who empties the package
ckage is emptied.

notice, factory brand, and classi-
ill the purpose of the mark (and
ages of large cigars) required in
of packages, wraps, or labels ap-
tions may continue to be used for
d tobacco until such stocks are
on with respect to tobacco prod-
se of the United States, see Rev-
Bulletin.

ks of packages and other packing
ded Regulations 8 for manufac-
ory taxpaid, see Rev. Rul. 55-589,

ERAL PROVISIONS

NS RELATING TO USED
AND PACKAGES

s by philatelists.  See Rev. Rul.

# CHAPTER 53.—MACHINE GUNS AND CERTAIN OTHER FIREARMS

## SUBCHAPTER A.—TAXES

### PART II.—TRANSFER TAX

## SECTION 5811.—TAX

(Also Section 5848.)                          Rev. Rul. 55-570

A gunsmith desires to affix a sleeve-type muzzle brake to the muzzle end of a short barreled rifle (a firearm within the purview of the National Firearms Act) in order to lengthen the barrel of the weapon to 18 inches or more, thereby removing it from the classification of a firearm as defined in section 5848 of the Internal Revenue Code of 1954.  *Held*, after proper registration of a short barreled rifle, the barrel may be lengthened to 18 inches (or more) by the attachment of an extension, such as a muzzle brake or barrel band, by silver soldering or by other *permanent* means.  After the barrel has been lengthened by approved means, subsequent transfer thereof may be effected without incurring liability for the transfer tax imposed under section 5811 of the Internal Revenue Code of 1954.

## SUBCHAPTER B.—GENERAL PROVISIONS

## SECTION 5848.—DEFINITIONS

26 CFR 179.20: Firearms.                       Rev. Rul. 55-699
(Also Part II, Federal Firearms Act, Section 1.)

The Internal Revenue Service has had the occasion to examine a burglar alarm device which consists of a metal cylinder 3⅞ inches in length, hinged in the middle so that it can be opened to chamber a 20-gauge shotgun shell after the portion of the shell containing the lead charge has been cut off.  A rim inside the barrel prevents a full length shell from being inserted.  On one side of the alarm is a wood screw which is a permanent part of the device and is used for attaching the device to a door or window frame.  At the end opposite the muzzle is a lever which releases the firing pin when the door or window is opened.  *Held*, the above-described device is not a firearm within the purview of the National Firearms Act (Chapter 53 of the Internal Revenue Code of 1954) or of the Federal Firearms Act, 15 U. S. C. 901–909, since it is chambered to accommodate a shell of 20 gauge diameter consisting only of primer, powder, and the necessary wadding to retain the powder charge, and is not capable of firing a shot or projectile by the action of an explosive.

(D) by striking out "may permit" and inserting in lieu thereof "shall permit".

SEC. 105. AMENDMENTS TO SECTION 926.

Section 926 of title 18 of the United States Code is amended—

(1) by inserting "(a)" before "The Secretary" the first place it occurs;

(2) by inserting "only" after "prescribe";

(3) by striking out "as he deems reasonably" and inserting in lieu thereof "as are";

(4) by striking out the last sentence and inserting in lieu thereof "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation."; and

(5) by adding at the end the following:

"(b) The Secretary shall give not less than 90 days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.

"(c) The Secretary shall not prescribe rules or regulations that require purchasers of black powder under the exemption provided in section 845(a)(5) of this title to complete affidavits or forms attesting to that exemption.".

SEC. 107. TRANSPORTATION OF FIREARMS.

(a) IN GENERAL.—Chapter 44 of title 18, United States Code, is amended by inserting between section 926 and section 927 the following new section:

"§ 926A. Interstate transportation of firearms

"Any person not prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport an unloaded, not readily accessible firearm in interstate commerce notwithstanding any provision of any legislation enacted, or any rule or regulation prescribed by any State or political subdivision thereof.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter 44 of title 18, United States Code, is amended by inserting between the item relating to section 926 and the item relating to section 927 the following new item:

"926A. Interstate transportation of firearms.".

SEC. 108. AMENDMENTS TO SECTION 929.

Section 929(a) of title 18, United States Code, is amended—

(1) by inserting "(1)" before "Whoever,";

(2) by striking out "violence" each place it appears and inserting in lieu thereof "violence or drug trafficking crime,"; and

(3) by adding at the end the following:

"(2) For purposes of this subsection, the term 'drug trafficking crime' means any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).".

SEC. 109. AMENDMENT OF NATIONAL FIREARMS ACT.

(a) Section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)) is amended by striking out "any combination of parts designed and intended for use in converting a weapon into a machinegun," and inserting in lieu thereof "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use

in converting a weapon into a machinegun."

(b) CONFORMING AMENDMENT.—Section 5845(a)(7) of the National Firearms Act (26 U.S.C. 5845(a)(7)) is amended to read "(7) any silencer (as defined in section 921 of title 18, United States Code);".

SEC. 110. EFFECTIVE DATE.

(a) IN GENERAL.—The amendments made by this Act shall become effective 180 days after the date of the enactment of this Act. Upon their becoming effective, the Secretary shall publish and provide to all licensees a compilation of the State laws and published ordinances of which licensees are presumed to have knowledge pursuant to chapter 44 of title 18, United States Code, as amended by this Act. All amendments to such State laws and published ordinances as contained in the aforementioned compilation shall be published in the Federal Register, revised annually, and furnished to each person licensed under chapter 44 of title 18, United States Code, as amended by this Act.

(b) PENDING ACTIONS, PETITIONS, AND APPELLATE PROCEEDINGS.—The amendments made by sections 102(6)(B), 105, and 107 of this Act shall be applicable to any action, petition, or appellate proceeding pending on the date of the enactment of this Act.

(c) MACHINEGUN PROHIBITION.—Section 102(9) shall take effect on the date of the enactment of this Act.

The motion was agreed to.

The Senate bill was ordered to be read a third time, was read the third time, and passed.

The title of the Senate bill was amended so as to read: "An Act to amend chapter 44 (relating to firearms) of title 18, United States Code, and for other purposes."

A motion to reconsider was laid on the table.

A similar House bill (H.R. 4332) was laid on the table.

## THE SILENCER DEFINITION

(Mr. VOLKMER asked and was given permission to address the House for 1 minute.)

Mr. VOLKMER. Mr. Speaker, I ask for this time in order to engage in a colloquy with the gentleman from Idaho (Mr. CRAIG).

I yield to the gentleman from Idaho.

Mr. CRAIG. I appreciate the gentleman from Missouri yielding to enter into a colloquy regarding the silencer definition in the Volkmer substitute as modified by the McCollum amendment. I have just a few questions.

Mr. VOLKMER. Go ahead with the questions.

Mr. CRAIG. The language of the silencer definition in the substitute, which begins on page 5, line 20, states that a silencer is "any device or silencing * * *." I would like to know if this term is designed to change the current interpretation. For example, according to BATF, the current law does not include conventional chokes, muzzle breaks, flash hiders, and compensators that are not designed or altered to be silencers, even though these devices may quash sound in addition to their other lawful purposes.

Mr. VOLKMER. My substitute, as modified by the McCollum amend-

ment, does not change existing law. No conventional choke, muzzle breaks, flash hiders, or compensators will fit within the definition of silencer in the substitute because they are not "devices for silencing * * *." Each of these devices has a common sporting purpose totally apart from muffling sound. If someone modified these legitimate devices however for the purpose of silencing, then the modified device would be a silencer.

Mr. CRAIG. I thank my colleague for that explanation.

## FOREIGN POLICY SHOULD NOT BE HELD HOSTAGE TO PARLIAMENTARY PROCEDURES

(Mr. MICHEL asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. MICHEL. Mr. Speaker, the speaker has decided to place the question of aid to the freedom fighters in Nicaragua on the supplemental appropriation bill to be voted on next Tuesday.

We all know that placing this vitally important question on such a bill makes a foreign policy issue hostage to legislative maneuvering. We all know there are so many things wrong with the supplemental that it faces an almost inevitable veto by the President.

Given these facts, forcing us to vote on the Contra aid issue on a bill that is otherwise deeply flawed, dooms any realistic chance for the House to express its will on this issue.

We will go through the motions. We will not help the Contras even if the President's policy is overwhelmingly voted for in the supplemental.

It is as if a used-car salesman sells us a shiny car that is perfect in every way—except that it lacks an engine. It may look great, but it's not going anywhere.

That's where the supplemental is going—nowhere.

When the Sandinistas made their incursion into Honduras, my good friend, the majority leader, joined with me in a colloquy on the floor. He showed his deep concern that we get a fair and relevant vote on this issue.

At approximately the same time, the Speaker and the administration talked about the possibility of a clear and freestanding vote on these questions.

I understand that there has been a dispute over exactly what was agreed to during the conversations between the Speaker and the administration.

I don't know the specifics of the case. But whatever sins the Speaker may think the administration is guilty of, there is no use making American foreign policy pay the price.

There is an irony in all this: The majority wishes to micro-manage American foreign policy through legislative maneuvering and is able to do so by putting its hands on the most detailed