Case 1:14-cv-00147-PB Document 48 Filed 10/05/15 Page 1 of 120

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
SIG SAUER, INC.,                  *
            Plaintiff,            *   14-cv-147-PB
                                  *   July 17, 2015
            v.                    *   2:10  p.m.
                                  *
THOMAS E. BANDON, Acting          *
Director, Bureau of Alcohol,      *
Tobacco, Firearms and             *
Explosives,                       *
            Defendant.            *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:       Stephen P. Halbrook, Esq.
                         Halbrook Law Office
                         3925 Chain Bridge Road, Ste. 403
                         Fairfax, VA  22030

                         Mark C. Rouvalis, Esq.
                         Kenton James Villano, Esq.
                         McLane Graf Raulerson & Middleton
                         900 Elm Street
                         Manchester, NH  03105-0326

For the Defendant:       T. David Plourde, AUSA
                         U.S. Attorney's Office (NH)
                         Concord, NH  03301

                         William Ryan, SAUSA
                         Bureau of Alcohol, Tobacco,
                         Firearms & Explosives
                         Office of Chief Counsel
                         Martinsburg, WV  25405

Court Reporter:          Sandra L. Bailey, LCR, CRR
                         Official Court Reporter
                         U.S.D.C. 55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1454

```
 1                      BEFORE THE COURT

 2             THE CLERK:  Court is in session and has for

 3    consideration a motion hearing in Civil Case No.

 4    14-cv-147-PB, Sig Sauer, Inc. versus the U.S. Bureau of

 5    Alcohol, Tobacco, Firearms and Explosives.

 6             THE COURT:  I have a few questions before we

 7    get going.  Basic issues.  What statutes and regulations

 8    does the ATF rely on for its authority to issue

 9    classification letters?

10             MR. RYAN:  Yes, your Honor, I am William Ryan,

11    I've been appointed Special Assistant U.S. Attorney in

12    this case for the Bureau of Alcohol, Tobacco, Firearms

13    and Explosives.

14             Specifically, your Honor, the Department of

15    Justice was given the authority by Congress to implement

16    the GCA and the National Firearms Act.  That was

17    delegated down 28 CFR 0.130 to the director of ATF.

18             THE COURT:  And that regulation says whatever

19    authority we have in the Department of Justice to

20    implement the law we delegate to the ATF.

21             MR. RYAN:  That's right, sir.

22             THE COURT:  All right.  Is there any specific

23    statute that authorizes you to issue classification

24    letters?

25             MR. RYAN:  Not the ATF specifically, sir.
```

1          THE COURT:  Or the Justice Department?  Is

2    there a regulation that says when somebody wants to know

3    whether something qualifies as a firearm they can write

4    in, and when they do, the ATF shall respond?

5          MR. RYAN:  No, your Honor, no shall respond --

6          THE COURT:  Anything, I want to know anything,

7    is there any statute, or is there any regulation that,

8    from which you derive authority to issue classification

9    letters other than the CFR that you cite.

10          MR. RYAN:  Just as far as the Administrative

11    Procedures Act is concerned, sir.  In fact, there are

12    specific sections in the Gun Control Act and the

13    National Firearms Act such as sporting purposes and

14    other things where ATF or the Attorney General delegates

15    ATF must make determinations, but just as to what

16    constitutes an every day run-of-the-mill firearm, it's

17    just sent in by members of the industry who want to

18    insure that they are in compliance with the general

19    statute.

20          THE COURT:  Suppose you decided we're not

21    going to respond to classification letters anymore.

22    Would you be in violation of law?

23          MR. RYAN:  No, your Honor, not as in -- such

24    an example might be a firearms license where we're

25    required to grant the license or deny the license within

1    60 days.

2              THE COURT:  That's what I'm trying to find

3    out.  You could have said to them, go pound sand, we

4    don't feel like answering your question, and you would

5    not have been in any way acting impermissible.

6              MR. RYAN:  It just would have been impossible

7    to then implement the law.

8              THE COURT:  No, you could have them indicted

9    after they violated the law; right?

10             MR. RYAN:  Yes, sir, yes, sir.

11             THE COURT:  But I just, I want to be very

12   clear about this because I need you, you're the expert,

13   if there is a statute or regulation that bears directly

14   or indirectly on your authority to respond to

15   classification letters, I want to know what it is,

16   because there's no reference to it in the briefs.

17             You understand why I'm asking this, because

18   the degree of deference owed to your judgment, your

19   legal interpretation, may be affected by the authority

20   that you are relying on when you express your position

21   on things; right.

22             Okay, so I'm asking for is there a statute or

23   regulation that governs this and says when you -- if

24   someone wants to submit a request for classification,

25   they shall do X.  If we get a request for

1   classification, we will do Y, we will give you an

2   opportunity to hold a hearing, we will let you submit

3   records, we will give you a chance to object to our

4   proposed ruling.  There's none of that.

5                MR. RYAN:  No, sir.

6                THE COURT:  Okay.

7                MR. RYAN:  There are examples in the

8   regulation 27 CFR 478 and 479 that talk about, for

9   example, if someone wants to find out if a firearm is

10  importable.  It can be temporarily imported.  There are

11  procedures which we will make a determination and

12  determine whether it's importable under various tests

13  and send it back.

14               THE COURT:  Okay, so you do have some

15  regulations that address these kinds of issues and

16  establish formal procedures for resolving issues; right?

17               MR. RYAN:  Yes, sir.

18               THE COURT:  But you do not have any procedures

19  that address the means by which you resolve this

20  particular kind of question?

21               MR. RYAN:  That's right, sir, this

22  specifically.

23               THE COURT:  Do you consider your response to a

24  classification letter to have the force of law?

25               MR. RYAN:  It does as it applies and as it

1    will be used in the future, your Honor.  For example,

2    when a classification is made as to sporting purpose or

3    what is a handgun or a rifle, any of these things, that

4    will be used in the future as precedential authority for

5    whether that same firearm or similar firearm can get

6    classification.

7            THE COURT:  Well, okay, let's -- you

8    understand that when you adopt a regulation that has the

9    force of law to it, you have to comply with notice and

10   comment procedures; right?

11           MR. RYAN:  Yes, sir.

12           THE COURT:  Okay.  And if you don't comply

13   with those procedures, your regulation doesn't have the

14   force of law.

15           MR. RYAN:  That's right, sir.

16           THE COURT:  When you respond to a compliance

17   letter, you are not complying with notice and comment

18   procedures, you're not seeking views of the general

19   public with respect to something.  You are simply taking

20   what they give you, doing whatever process internally

21   you want to do and responding; right?

22           MR. RYAN:  That's right, sir.

23           THE COURT:  Now, is a response to a

24   classification letter of this sort done by a central

25   office of ATF?

1          MR. RYAN:  That's right, sir.

2          THE COURT:  Okay.  And what I'm trying to

3    figure out is, I'm surprised that you're suggesting that

4    a -- your letter response has the force of law, that

5    someone could go into court, say a criminal defendant,

6    if you issue a letter that says X is not a firearm, that

7    you believe they could take your classification ruling

8    three years later in a criminal prosecution, come into

9    my court, present that letter, and I would have an

10   obligation to follow it.

11         MR. RYAN:  As far as the classifications go

12   and the expertise that ATF has in this specific area,

13   sir, the interstitial nature, also Barnhart types of --

14         THE COURT:  Well, suppose you submitted an

15   amicus brief in the First Circuit on a particular issue.

16   Do you think your amicus brief has the force of law?

17         MR. RYAN:  An amicus brief, sir, I don't

18   believe so.

19         THE COURT:  Why does a classification letter

20   have the force of law?

21         MR. RYAN:  Because of the nature of what it is

22   that ATF is doing --

23         THE COURT:  Well, there may be deference owed

24   to an ATF position in an amicus brief.  That deference

25   is owned to it doesn't mean that it has the force of

```
 1    law.  You believe you have law making powers to respond
 2    to a classification letter request, and that's a law
 3    making power that you have.  That's an Article I law
 4    making power.
 5                 MR. RYAN:  As far as there's no -- there's no
 6    specific, other than general language given by Congress
 7    of this is a silencer, this is a firearm, that's all
 8    kicked to the Executive Branch.  The Executive Branch
 9    goes through, looks at those specific firearms-related
10    issues, sir, and makes that classification as this is
11    what a short barreled shotgun is or a silencer is.
12    There's nothing given by the legislature other than a
13    general sort of definition, sometimes.  ATF has to take
14    a specific example of a firearm --
15                 THE COURT:  And you don't see a difference
16    between a regulation and your response to a
17    classification letter?
18                 MR. RYAN:  I understand what you're saying,
19    sir, and I do understand that.  At the worst case
20    scenario, even if Chevron deference isn't applied, we
21    still --
22                 THE COURT:  We will get into the degree of
23    deference that's owed to it.  I'm just trying to
24    understand what your position is as to what it is, and
25    it's entirely possible that you could be entitled to
```

1    Chevron deference even though you don't adopt this in a

2    regulation.  You may be right about that.  But I'm

3    trying to understand what this thing is of yours, and it

4    sounds like there's no procedure that requires you to

5    issue it.  There's no procedure that expressly

6    authorizes you to issue it.  You derive it from the

7    delegated authority, the general authority that the DOJ

8    has to administer the statute.

9             MR. RYAN:  Yes, sir.

10             THE COURT:  And you've adopted no regulations

11   that deal with it.

12             MR. RYAN:  Regulations that --

13             THE COURT:  That deal with the authority and

14   means and procedures and process that you use in issuing

15   a classification letter.

16             MR. RYAN:  Not generally.  In specific

17   scenarios, sir, importing items for classification, yes,

18   by not as to the classification --

19             THE COURT:  Except for those areas for which

20   you have regulations that establish a classification

21   procedure, you mention importing, but with respect to

22   the issue we have here, you would agree that there is no

23   regulation that expressly, and no statute, that

24   expressly authorizes you to issue a classification

25   letter.

1           MR. RYAN:  That's right, sir.

2           THE COURT:  Okay.  So, if I am to infer that

3   Congress intended you to interpret this statute in a way

4   that would have force of law, it comes from the general

5   authority granted to the Department of Justice to

6   implement the statute.

7           MR. RYAN:  Yes, sir, specifically it would be

8   impossible to implement the statute without knowing

9   which of these things is a firearm.

10          THE COURT:  And -- well, right, but the

11  Executive Branch does a whole lot of things every single

12  day without creating law as to how a statute is

13  implemented, and many of those things, in fact most of

14  those things are reviewed by the court de novo, or

15  they're reviewed by the court and the court, the

16  Department of Justice makes its position clear to me.

17  Every time I have a criminal prosecution, they don't

18  produce a letter from the director of ATF and say this

19  is what the statute means, you are bound by law to

20  follow the director of ATF's interpretation of this.

21  They say, judge, we want you to adopt this

22  interpretation.  And I either adopt it or I don't.

23          That's normally the way statutes are

24  interpreted in our legal system.

25          MR. RYAN:  Yes, sir.

```
1              THE COURT:  There are occasions where agencies
2    give interpretations that have the force and effect of
3    law, and there are occasions where the agencies give
4    interpretations while doing other things that they do
5    that are entitled to degrees of deference and, but they
6    don't have the force of law.  They are useful and in
7    some cases the degree of deference may be strong enough
8    that if the agency's interpretation is plausible, it has
9    to be followed, but it doesn't mean that the agency's
10   interpretation has the force of law until the court
11   applies Chevron deference and says this is what the
12   statute means.  So, that's why I'm asking this point
13   about force of law.
14              Okay, let's talk about a different subject.  I
15   need an answer from both of you on this.  Do you agree
16   that whatever it is you've done in this case qualifies
17   as final agency action for purposes of the
18   Administrative Procedure Act?
19              MR. RYAN:  Yes, sir, it's the government's
20   position that this does qualify as final --
21              THE COURT:  And that means that it is ripe for
22   review under the APA.
23              MR. RYAN:  Yes, sir.
24              THE COURT:  Do you agree that this is final
25   agency action?
```

1          MR. HALBROOK:  Your Honor, yes.  I'm Stephen

2     Halbrook for Sig Sauer, and we allege that in the

3     complaint and it was agreed to in the answer to the

4     complaint that it is final agency action, yes, sir.

5          THE COURT:  Okay.  So what kind of action is

6     this?  It is not rule making.  Would we agree on that?

7          MR. HALBROOK:  Yes, your Honor.

8          THE COURT:  Do you agree it's not rule making?

9          MR. RYAN:  Yes, your Honor.

10          THE COURT:  Do you agree it's not formal

11     agency adjudication?

12          MR. RYAN:  Yes, your Honor.

13          THE COURT:  Do you agree?

14          MR. HALBROOK:  We agree.

15          THE COURT:  It appears to me to be informal

16     agency adjudication.  Do you agree with that?

17          MR. HALBROOK:  We agree, yes, your Honor.

18          THE COURT:  Do you agree with that?

19          MR. RYAN:  Yes, your Honor.

20          THE COURT:  Do you agree that therefore it is

21     subject to review under the APA under the arbitrary and

22     capricious standard in Section 706 as informal agency

23     action.  Do you agree?

24          MR. HALBROOK:  Arbitrary and capricious or

25     contrary to law.

1          THE COURT:  Contrary to law, that standard in

2     Section 706 which I referred to in shorthand form.

3          MR. HALBROOK:  Yes, your Honor.

4          THE COURT:  Do you agree?

5          MR. RYAN:  Yes, your Honor.

6          THE COURT:  Okay.  Those are very important

7     considerations.

8          I have a question I don't know the answer to.

9     If we have final agency action that is informal agency

10    adjudication subject to the APA, can someone circumvent

11    the APA by bringing a federal declaratory judgment

12    action to obtain the same interpretation using de novo

13    review under the Declaratory Judgment Act, or does the

14    fact that there is a right to review under the APA

15    preclude separate review under a different standard

16    under the Declaratory Judgment Act.

17         Do you have a thought about that?

18         MR. HALBROOK:  Yes, your Honor, that's why we

19    brought two counts in the complaint.  One of them APA

20    and the other Declaratory Judgment Act.

21         Traditionally where there's a dispute about

22    whether a criminal law applies, whether the apple is

23    poison, you don't have to eat it.  That was the whole

24    purpose of the Declaratory Judgment Act.  And that's why

25    we brought this action under that as well as the APA

1   because we have a classification by ATF it would be a

2   crime for us to make this product and distribute it in

3   commerce --

4        THE COURT:  But I don't ordinarily review

5   questions under the Declaratory Judgment Act under the

6   arbitrary and capricious standard.

7        Let me cut right to the point.  It seems to

8   me, although I have not researched the issue, that if

9   you have an action that's reviewable under the APA and

10  is subject to arbitrary and capricious review, you as a

11  plaintiff couldn't come into this court and bring only a

12  declaratory judgment claim and argue to me I should

13  determine that issue de novo and not apply arbitrary and

14  capricious review to the agency's action.  I should

15  conduct a full trial on the merits, hear evidence, make

16  my own findings of fact, and issue or not issue a

17  declaratory judgment.

18       It seems instead that I should treat this as

19  an administrative procedure act, administrative record

20  review case, and ask myself as a matter of law was the

21  action of the agency arbitrary, capricious and otherwise

22  not in accordance with law.  I shouldn't conduct some

23  kind of separate declaratory judgment at trial and

24  decide de novo whether I would reach the same

25  conclusions on my own.

1          Do you agree with that?

2          MR. HALBROOK:  Your Honor, it seems maybe in

3    some cases there will be a convergence with the APA

4    standard and what would otherwise be a declaratory

5    judgment act, action in any event.  Is the statute

6    clear?  Does it apply, in the case of statutes under the

7    criminal code, Title 18, like we have here?  Other rules

8    intervene that --

9          THE COURT:  Let me stop you and try an example

10   to explain what I'm concerned about.

11          Assume that the ATF did not have a

12   classification procedure here; right?  Assume that they

13   said to you when you sent them, we're proposing to

14   manufacture something.  If we don't do it right, we may

15   be committing crime.  We think we're going to be doing

16   it right and it's not a crime, will you please tell us.

17   And they say to you, we're not talking.  Figure it out.

18   After you manufacture, if you violate the law, we'll

19   indict you.  You would come into court and seek a

20   declaratory judgment and say we don't have to face

21   indictment to get an answer to this question.

22          Right?

23          MR. HALBROOK:  Correct, your Honor.

24          THE COURT:  And if we did that, as I do all

25   the time, people come in and say, okay, judge, we need a

1   discovery plan, we need a motion practice deadline, we
2   need an expert disclosure deadline, and we need a trial
3   date, and we go through all of that, then we have a
4   little trial, a little bench trial.  And you call a
5   bunch of witnesses and they call a bunch of witnesses,
6   and I hear the evidence and I decide is this legal or is
7   it not, and I grant or deny the request for a
8   declaratory judgment.  That's a very, very, very
9   different process from what I would do in an APA case.
10          In an APA case I would say APA decisions are
11  ordinarily administrative record review cases.  I
12  received the administrative record, as I do 10 or 15
13  times a year with Social Security cases, I receive the
14  administrative review record, I review the
15  administrative record, I determine whether there's
16  substantial evidence to support the judgment that the
17  ALJ made, I determine whether the ALJ violated the law
18  in any particular way, and then I give an answer without
19  taking evidence.
20          It seems to me that this case is that kind of
21  case.  It's an administrative record review case using a
22  Section 706 standard of review, and there isn't going to
23  be a trial in this case and there isn't going to be any
24  evidence in this case, and I make a determination as to
25  what -- whether what the agency did is arbitrary,

1    capricious and not otherwise in accordance with law, and

2    then I'm done.

3           You agree or disagree?

4           MR. HALBROOK:  That's the way most of these

5    cases are handled.  The court is allowed, if there is

6    still some question about evidence, to take further

7    evidence.  It's usually done with a supplemental

8    declaration.  But in a case that's particularly complex,

9    I have a case I wanted to cite about even in an APA

10   review case, additional evidence can be taken --

11          THE COURT:  I'm willing to acknowledge that

12   there are theoretical occasions in which you can receive

13   evidence.  I will acknowledge that.  There may be cases

14   in which a court would need to receive evidence.  If

15   there was -- if it was an allegation that the hearing

16   officer outside the presence of the record met with the

17   parties and said X, Y or Z, of course you would need to

18   receive evidence about what happened.

19          But would you agree with me that the typical

20   APA case is administrative record review?

21          MR. HALBROOK:  That's very typical, but also

22   keeping in mind the typical case does not involve

23   construction of a criminal statute.  So, if there's a

24   gap in what is needed in, like in summary judgment or if

25   there needed to be a limited factual hearing, we would

1    think the court would want to go there just --

2              THE COURT:  Let me try to put it to you more

3    specifically.  I do not see that there's any need for a

4    trial in this case.  I do not see that there is any need

5    for evidence in this case.  You haven't suggested to me

6    that there's a need for trial or evidence.  I'm prepared

7    to resolve this case under the APA Section 706 and ask

8    myself whether it's arbitrary, capricious or not

9    otherwise in accordance with the law based entirely on

10   the administrative record.  I don't believe you contend

11   that I can't do that.  I don't believe that the ATF

12   contends that I can't do that.  Indeed, I believe you

13   both suggest that I can and should do that.

14              Is that true or not?

15              MR. HALBROOK:  That's absolutely true.  We

16   think that --

17              THE COURT:  Do you agree with that as well?

18              MR. RYAN:  We do, your Honor.

19              THE COURT:  So there's no need for a trial

20   here; is that right?

21              MR. HALBROOK:  Yes.

22              THE COURT:  You don't think there is a need

23   for a trial, you don't think there's a need for a trial,

24   I don't think there's a need for a trial.  There isn't

25   going to be a trial.  Everybody agree?

1        MR. HALBROOK:  We agree, your Honor.

2        THE COURT:  Okay, so the trial is off.  Okay,

3   that's useful, that's useful because you don't have to

4   prepare for a trial, but it's also useful because we now

5   have a case that will be decided based solely on the

6   administrative record; correct?  You both agree?

7        MR. HALBROOK:  We don't think the facts are in

8   dispute, your Honor.

9        THE COURT:  All right.  So, and because we are

10   deciding the case based on the administrative record, it

11   is also true that the summary judgment standard is

12   essentially meaningless in this context.  Do you agree

13   with that?

14        MR. HALBROOK:  We agree, I mean, if there is

15   no factual issues that need to be resolved and --

16        THE COURT:  You don't even use the summary

17   judgment standard because there isn't going to be any

18   fact finding, okay?  There's really --

19        MR. HALBROOK:  Correct.

20        THE COURT:  -- just a legal issue.  The legal

21   issue is did the ATF act arbitrary and capriciously or

22   otherwise in accordance with law, and that is a pure

23   legal standard, and that standard is determined based on

24   my view of the administrative record.  Therefore there

25   is no facts to be found.  There's no possibility that

1   there are facts that are in dispute that would prevent

2   me from resolving the case.  There are no inferences

3   that should be granted in favor of or against the moving

4   party or the party opposing the motion.  There's none of

5   that complexity.

6          When we resolve a Social Security case in this

7   court, we have a motion for order affirming the decision

8   of the secretary and a motion objecting to that and a

9   motion to reverse.  That's effectively what we have

10  here.

11         You've read Judge Bates's decision in his gun

12  case; right?  You read that?

13         MR. RYAN:  That's right.

14         THE COURT:  What's the name of the case?

15         MR. RYAN:  Innovators.

16         THE COURT:  Innovators.  You've read

17  Innovators; right?

18         MR. HALBROOK:  Yes, your Honor, yes.

19         THE COURT:  He makes this point in Innovators.

20  Do either of you disagree with the point he makes in

21  Innovators that summary judgment doesn't have, there

22  isn't a role to play -- I'm not suggesting we leave here

23  without a decision.  I'm ready to take your briefs and

24  decide the case, but I don't believe it's appropriate to

25  use the summary judgment standard to do so; rather, I

1    believe it's appropriate to use the APA standard in 706.

2         If one of you disagrees, speak now or forever

3    hold your peace.

4         MR. HALBROOK:  Just so it's understood, your

5    Honor, we believe that the facts are not in dispute and

6    that it's an issue of law for the Court to decide.  We

7    don't agree that any deference is accorded to the

8    agency, and we want to emphasize that it is a criminal

9    statute, and the same rule that the Court decides in

10   this case would have to apply in a criminal case.

11        THE COURT:  Well, I'm going to be asking you

12   to be even clearer because that's not a clear answer to

13   my question.  I want you to be even clearer than that

14   and I want you to answer this question.

15        Do you agree that summary judgment, which

16   involves according inferences, construing evidence in

17   the light most favorable to the non-moving party,

18   applied neither to your motion for summary judgment nor

19   your cross motion for summary judgment, neither of you

20   can claim the benefit of that standard because it

21   doesn't make any sense to use it in an administrative

22   record review case, that's why we don't use it in Social

23   Security cases which is the most common we do in this

24   court maybe 60 of them a year, you know, so I'm using

25   that as an example.

1          Do you agree that the summary judgment

2     standard, and in particular the summary judgment

3     standard which requires that the court give the benefit

4     of inferences to the non-moving party, that that simply

5     doesn't play a role in the decision of this case?

6          MR. HALBROOK:  We're not relying on that

7     principle in this case, your Honor.

8          THE COURT:  Okay, well, don't rely on the

9     Court of Appeals if you get an outcome you don't like,

10    because I've asked you to try to persuade me now, and if

11    you're not willing to make that argument now, you

12    shouldn't be able to make it in the Court of Appeals.

13    Do you also agree?

14          MR. RYAN:  Yes, your Honor.

15          THE COURT:  Okay, that's helpful because,

16    again, as I write this order, I'm going to write it, I'm

17    going to say, and there's Judge Bates's decision refers

18    to District of Columbia Circuit law, but there's First

19    Circuit law that essentially says the same thing, they

20    describe it somewhat differently, but there's no summary

21    judgment in these kinds of cases because there are no

22    facts in dispute, there are no facts to be found, so you

23    don't -- it would be unnecessarily complicated for me to

24    analyze your motion according, for instance, for the

25    other side, analyze their motion, accord inferences to

1   you.  It leaves the possibility that I couldn't decide

2   the case because deciding one way I can't grant your

3   motion, deciding another way I can't grant their motion.

4   It's absurd.  And I think if you think about it you will

5   agree on that point, okay.

6           So, we've established some very important

7   things which are there are no statutes or regulations

8   that expressly authorize you to issue classification

9   letters.  This is final agency action.  There is no need

10  for a trial.  There is no separate federal declaratory

11  judgment statute motive of analyzing this case.  It's

12  analyzed as an APA 706 case which will be based entirely

13  on the administrative record and subject to the Section

14  706 standards.

15          Anybody disagree, speak now.

16          MR. HALBROOK:  We're in accord with that, your

17  Honor.

18          MR. RYAN:  Yes, your Honor.

19          THE COURT:  Okay.  Good.  All right, that's

20  very important.  I think that's very helpful.  I

21  appreciate that.

22          Now, we can go ahead and have you present.  I

23  think probably the best way is for the ATF to defend its

24  decision, and then you can respond to how they, what

25  they have to say.  If you've been briefed on how I like

1    to proceed, you'll probably realize that I spend as much

2    time asking questions as you do just speaking so, and

3    I'll ask you both to --

4            MR. ROUVALIS:  We tried to prepare them for

5    that.

6            THE COURT:  I will ask you both to stand up at

7    various times.  We will start with the structure of you

8    generally defending your decision and then you can

9    respond.

10           MR. HALBROOK:  Thank you, your Honor.

11           THE COURT:  I want to assure everybody that I

12   will stay until I've heard every last word that someone

13   wants to say.  I may not let you say what you want to

14   say when you want to say it, but just make a note and

15   I'll give you a chance to say whatever you want before

16   we conclude the hearing, okay?

17           All right, so why don't you go ahead.

18           MR. RYAN:  Yes, your Honor.  Thank you.  Since

19   the 1970s ATF has been familiar with something called a

20   monolithic baffle stack.  That was when the technology

21   came out and was used in silencers in certain machine

22   guns.  The firearm at the center of this case is called

23   the MPX, and the plaintiff developed this firearm for

24   law enforcement and military purposes.  It's a short

25   barreled machine gun, short barreled being necessary in

1  military and law enforcement applications for going down

2  hallways, tight spaces, you don't have a long barrel

3  sticking out.

4          THE COURT:  What's the difference in terms of

5  your regulatory authority depending upon the length of

6  the barrel?

7          MR. RYAN:  The length of the barrel is

8  specific.  A long rifle, for example, your Honor, or one

9  with a barrel over 16 inches in length is just a GCA

10  firearm.  That's under the Gun Control Act.

11          If it falls to under 16 inches in length, now

12  it's consider a National Firearms Act firearm and it's

13  regulated under the Tax Code as well.

14          THE COURT:  All right, so, if this as

15  marketed, if it's not a silencer, it's a, and your

16  acronyms escape me, but it's the less regulated, less

17  problematic for them why it isn't taxed the same way, et

18  cetera.

19          MR. RYAN:  Yes, sir.

20          THE COURT:  So that's the reason that they try

21  to extend this thing out to make the total barrel length

22  16 inches so they can get out from under your regulatory

23  regime.

24          MR. RYAN:  Under the Tax Code, yes, sir.

25          THE COURT:  Under the Tax Code, right, so it

1    doesn't cost as much to sell it because they don't have

2    to pay a tax every time they sell one.  Is that what it

3    is?

4              MR. RYAN:  It's really, sir, that the buyer

5    doesn't have to pay a tax to get it and get into a

6    registry.  They can just go to a gun store and buy it.

7              THE COURT:  Okay.  So, they took a gun which

8    they would have to, for which a buyer would have to pay

9    a tax, and they stick this thing on it, and it's long

10   enough now that they don't have to pay a tax.

11             MR. RYAN:  That's right.  If it's permanently

12   attached, your Honor, and ATF said for a long time, if

13   it's permanently attached, the barrel now measures over

14   16 inches in length, then because of the barrel length

15   it's not regulated.

16             THE COURT:  What are the other, if any,

17   consequences of barrel length being over 16 inches in

18   length that I should know about.  Are there any other

19   consequences?  Is it just a tax?

20             MR. RYAN:  Well, there are certain provisions.

21   For example, in the Gun Control Act, an 18-year-old can

22   buy these if they are a regular long rifle meaning the

23   barrel is over 16.  So there are various things like

24   that, interstate issues, things like that.

25             THE COURT:  Are there any crimes where the

1   nature of the crime is different if it is not a long

2   barreled firearm?

3          MR. RYAN:  I believe so, your Honor.  I think

4   there are some -- I believe there are some sentencing

5   types of issues if you use a National Firearms Act

6   weapon illegally as compared to just a regular weapon.

7          THE COURT:  And about if you sell one of these

8   firearms that's not a long barrel, but you sell it as if

9   it's a short barreled one, is that a crime?

10          MR. RYAN:  In order to sell it you would need

11   to have it registered to the person who takes it.  So

12   you can never possess one of the short barreled rifles

13   without having it first be registered to the possessor.

14          THE COURT:  Okay, but suppose you're Sturm

15   Ruger, and instead of getting a classification letter

16   they just went out and built this thing and market it

17   and started selling it, and they sold it as a, this is

18   not a National Firearms Act weapon, you don't have to

19   pay a tax, you don't have to register.  Would they be

20   committing a crime by doing that?

21          MR. RYAN:  That would be the criminal case you

22   were speaking about before, sir, and exactly the

23   scenario where you were asking us the questions.  The

24   question would be, now, when ATF goes to trial on that

25   do they win under the law.

1          THE COURT:  What is the crime of selling a

2    short-barreled rifle without complying with the National

3    Firearms Act?

4          MR. RYAN:  Under Section 5861, sir, of the Tax

5    Code, unregistered possession, selling without having

6    the proper registration, paying the tax even, either the

7    $200 making tax or the special occupancy tax that the

8    licensed manufacturer can have.

9          THE COURT:  So Sturm Ruger -- I'm used to the

10   other statute which makes it a crime if you're a felon

11   in possession of a gun and things like that.  I don't do

12   prosecutions under this other statute so I want to

13   understand it.

14         MR. RYAN:  Yes, sir.

15         THE COURT:  So you're telling me that if Sturm

16   Ruger, instead of using a classification letter, went

17   out and manufactured this, every time they shipped one

18   to another person, transferred possession of it like to

19   Wal-Mart or something, every time one of those was sold

20   without paying a tax, they would be committing a crime.

21         MR. RYAN:  Yes, sir.

22         THE COURT:  For which the company could be

23   indicted, the principals could be indicted, people could

24   end up going to jail over it.

25         MR. RYAN:  That's right, sir.

```
 1                THE COURT:  Okay.  All right.
 2                MR. RYAN:  That's right, sir.  And so the MPX
 3     in this case --
 4                THE COURT:  Can I ask you about it in even
 5     more detail.
 6                MR. RYAN:  Yes, sir.
 7                THE COURT:  Tell me about silencers.  How does
 8     the law -- I know a silencer is a firearm for purposes
 9     of the statute that I deal with every day, so that if
10     you're in possession of a silencer and you're a
11     convicted felon, you're going to get in trouble, okay.
12     Do the same registration and taxation requirements apply
13     to sales of silencers that apply to short-barreled guns?
14                MR. RYAN:  Yes, your Honor.
15                THE COURT:  Okay.
16                MR. RYAN:  What's nice about silencers is it's
17     actually the one firearm where it completely overlaps
18     GCA --
19                THE COURT:  So it's identical.  It's a
20     silencer under the GCA, it's a silencer under the NFA.
21                MR. RYAN:  Yes, sir.
22                THE COURT:  And if you transfer possession
23     without appropriate registration of the silencer without
24     paying the appropriate tax, you can be guilty of a crime
25     for giving it to somebody, you can be guilty of a crime
```

1    for possessing it.  Fair to say?

2             MR. RYAN:  That's correct, your Honor.

3             THE COURT:  Okay.  So again, if Sturm Ruger

4    were to sell these things and what's on the end of this

5    thing is a silencer, they would be committing a crime

6    under this tax statute that you're talking about.

7             MR. RYAN:  That's correct, sir.

8             THE COURT:  All right.  Thank you.  Go ahead.

9             MR. RYAN:  So, one of the things that or one

10   of the variants that the MPX has is an integral silencer

11   and also one that they can accept an attachable

12   silencer.

13            In order to avoid all those issues we just

14   spoke about, sir, what --

15            THE COURT:  What you're calling a silencer, is

16   that a part or is that an assembly of parts?

17            MR. RYAN:  It's all of the above, sir, and --

18            THE COURT:  Well, in your brief you seem to --

19   in your letter on classification you seem to treat it as

20   a part.

21            MR. RYAN:  That's right.

22            THE COURT:  You don't in your letter treat it

23   as an assembly of parts, do you?

24            MR. RYAN:  And it's not a device, sir, that's

25   correct.

1              THE COURT:  So, for purposes of the statute,

2     your argument survives or fails by treating this as a

3     part.

4              MR. RYAN:  Well, I would point out that in

5     that classification letter there was actually the

6     reference to the combination of parts.

7              THE COURT:  Yeah, but you're not basing the

8     denial on that.  You're basing the denial on the part

9     provision; right?

10             MR. RYAN:  The difficulty in this, sir, is

11    that the monolithic baffle is sort of a unique design in

12    that where it would be several parts, it's now made into

13    a single part just because of manufacturing technology.

14             THE COURT:  I brought down my wrong file.  I'd

15    ask my clerk to go up.  I have an expandable file with

16    all my materials in it.  It's either on my desk or some-

17    where in my office, and in particular I'm looking for

18    that little page I gave you guys yesterday with the

19    statute on it.  If you can -- do you have a copy of that

20    here?

21             Would you agree with me that you can have a

22    silencer under the statute in one of three ways.  It can

23    be a silencer.  It can be a part.  Or it can be a, I

24    don't have the exact language in front of me, but

25    basically a combination -- yeah, it can be a silencer,

1    it can be a combination of parts, or it can be a part

2    and be a silencer.

3              MR. RYAN:  Yes, sir.

4              THE COURT:  Your letters and all of your

5    documents when I read them say to me that it's a

6    silencer because it's a part intended only for use in an

7    assembly or fabrication.  That's the only argument I see

8    you making in your letters.  Have I misread you?

9              MR. RYAN:  I don't think so, sir.

10             THE COURT:  Okay.  So your case rises or falls

11   solely on whether it's a part.

12             MR. RYAN:  Yes, sir.

13             THE COURT:  If it's not -- if you're not

14   relying on the language an assembly of -- excuse me, a

15   combination of parts, you're relying on the part

16   provision.

17             MR. RYAN:  Yes, your Honor.  The letter from

18   FATD specifically talks about the part, although --

19             THE COURT:  Now, you know why, I'm sure, as

20   you prepared for this argument, you understand why I am

21   asking that, because you've chosen of the three

22   provisions, the one that's hardest to qualify under;

23   right?

24             MR. RYAN:  Yes, sir, we understand.

25             THE COURT:  So, the combination of parts

1   provision, you can qualify as a silencer if it's

2   intended for use in assembling or fabricating a

3   silencer, even if it's also intended for use in

4   manufacturing a muzzle brake.  So, if you have a dual

5   use assembly of parts that is intended for both

6   purposes, you can regulate as a silencer; right?

7            MR. RYAN:  That's right, sir.

8            THE COURT:  But if you have a part -- if you

9   have a part that is intended -- that is used in

10  assembling a silencer, you can treat that part as a

11  silencer.  The only case when you can't is if it is

12  intended only for use in a silencer; right?

13           MR. RYAN:  Understand, yes, sir.

14           THE COURT:  So if the part can be -- is

15  intended for more than use as a silencer, it's intended

16  for use as a silencer, but it's also intended for use as

17  a muzzle brake, it's not a silencer.

18           MR. RYAN:  Understand that, sir.

19           THE COURT:  You agree?

20           MR. RYAN:  Yes, sir.

21           THE COURT:  Okay.  Because you've chosen to

22  rely on only the third section, your decision stands or

23  falls on whether your decision that this was a part

24  intended only for use in the fabrication of a silencer

25  was arbitrary, capricious or otherwise not in accordance

1    with the law?

2              MR. RYAN:  That's correct.

3              THE COURT:  You agree with all that?

4              MR. RYAN:  Yes, sir.

5              THE COURT:  I really appreciate your frankness

6    in answering your question.  It makes your case much

7    more difficult for you, but I appreciate your answer.

8              Let me ask you this.  So, I'll be frank with

9    you.  The two concerns I have with your case, that's one

10   of them, that I don't see you in any of your materials

11   in any way responding to their suggestion that this is

12   intended for use only as a silencer.  I see you making a

13   case for what I call objective intent as the appropriate

14   standard, and I think that's what you're relying on, and

15   I think we can talk about that, whether that standard

16   should be, how much deference should be given to your

17   view on that point, but, so, but the second argument is

18   independent of that.

19             Assume that you're right, that we use

20   objective intent, okay, objectively intended only if it

21   subjectively is intended for both and if it objectively

22   can be used for both, would you agree that the standard

23   is not met?

24             MR. RYAN:  I'm sorry, sir.

25             THE COURT:  You have trouble following me?

1    I'm sorry if I'm not clear.

2           MR. RYAN:  I'm not sure I understand, sir,

3    because the question would be what is that -- how do you

4    get to that standard.  This is not a unique or novel or

5    innovative design.  It's a run-of-the-mill silencer.

6           THE COURT:  I have to tell you, it looks to me

7    like they manufactured the internal part of a silencer,

8    they welded it to the gun to get it above 16 inches, and

9    you just need to put a sleeve over it and you've got

10   your standard issued silencer, that's what it looks to

11   me as a layperson, but that's not the issue I'm talking

12   to you about, okay.  I'm talking to you about a very

13   different -- and I'm sorry, sometimes I'm not as clear

14   as I should be, so I want to go back over this with you,

15   okay.

16          One of two problems I have with your analysis

17   here is this problem dealing with the word only, okay.

18   And in trying to figure out that problem, I'm going to

19   accept that you're right about objective intent.  The

20   basic theory of your letters are when we say -- when the

21   statute says intend, it means objectively intended, it

22   doesn't mean subjectively intend, it means objectively

23   intend, and we looked at all the evidence and we say

24   it's objectively intended to be used as a silencer.

25   That's what you say, okay, I think.  And you're nodding

1    your head yes, so you basically agree with that.

2              But I'm saying to you even if you're right

3    about all of that, there's still a huge problem for you

4    because it's not enough to show that it's objectively

5    intended to be used as a silencer, you have to show it's

6    objectively intended to be used only for a silencer.

7    And what these folks have said over and over and over

8    again to you is, we want to use this as a muzzle brake,

9    okay.  And you say, well, yeah, subjective intent, it's

10   not controlling.

11             But then they went further and they said

12   here's all the data showing you that it functions as a

13   muzzle brake.  You don't in any way respond to their

14   argument that even if -- their argument is even if you

15   think that we're intending to use this as a silencer,

16   and even if you're intending -- you think we're

17   objectively intending to use it as a silencer, we are

18   also using it as a muzzle brake, and because we are, and

19   because it functions that way, it's objectively intended

20   to be used as a muzzle brake, and the statute has only

21   with respect to a part in it, for a very good reason,

22   and that is Congress was very concerned about these

23   kits; right?  That's what prompted the adoption of this

24   amendment with these last two provisions.  And it's

25   quite clear they wanted to ban assemblies.  But there

1   comes a problem when you talk about a single part, okay.

2           Suppose Company A makes an assembly with

3   everything but a screw in it; right?  That assembly is

4   going to be regulable under that second theory.  But the

5   screw is only going to be regulable under the third

6   theory; right?  And the problem with that is screws can

7   and are used for all kinds of things.  And the ATF

8   doesn't have the power to ban the sale of screws.  You

9   see what I'm saying?

10          MR. RYAN:  That's correct.

11          THE COURT:  And Congress wrote this provision

12  exactly this way because they wanted to talk about dual

13  use parts, and say dual use parts can be sold even if

14  they can be used in a silencer.  And it seems to me one

15  of the fundamental problems with what you're doing here

16  is you're saying this functions as a silencer, all you

17  need is a sleeve to make it one, because it functions

18  that way it's objectively intended to be a silencer

19  because people objectively intend what inevitably

20  follows from what they do, and therefore we win, it's a

21  silencer.  But you don't in any way embrace or even

22  examine or talk about this second argument in any of

23  your letters.  And if you have, could you point it out

24  to me, because that's one of the two problems I'm having

25  with your argument.

 1              MR. RYAN:  Well, that's what all the testing

 2    was about, sir, and what we talked about --

 3              THE COURT:  I know, but did you say in there

 4    it doesn't function as a muzzle brake.  We looked at it

 5    and it doesn't serve to be a brake.

 6              MR. RYAN:  No, your Honor, because all

 7    monolithic baffle stats will function that way.

 8              THE COURT:  That's right, that's the problem.

 9    It's a loophole in the statute.  Believe me, it looks

10    like a loophole in the statute, but it's a loophole

11    that's rational and reasonable and not insane.  It's a

12    loophole that exists because Congress was concerned

13    about we don't want to ban dual use items.  We want to

14    have the ability to sell dual use items unless they are

15    an assembly of its intended for use as a silencer.  And

16    that's a highly rational way that Congress might want to

17    address this issue.  It isn't necessarily the way I

18    would have addressed it, but if it's a rational way that

19    they addressed it, you've got to address it in your

20    answer.  And in order not to be arbitrary and

21    capricious, you've got to engage with them on that

22    central point.

23              Now, if you said in your response, we've

24    tested this and it doesn't function as a muzzle brake,

25    therefore, it can't be intended to be a muzzle brake,

```
1    you'd have no trouble if the evidence supported that.
2    Or if you had said, we don't think this is objectively
3    intended to function as a muzzle brake because we looked
4    at all the muzzle brakes on the market and yours is so
5    much less effective than all of those that you couldn't
6    possibly gain any market share by selling this,
7    therefore, you couldn't objectively intend to sell this
8    as a muzzle brake.  You'd be okay if the evidence
9    supported you in that.  But you didn't say anything
10   about it.
11         MR. RYAN:  The problem is, your Honor, I think
12   that nothing would be a silencer, the law would be
13   rendered moot --
14         THE COURT:  No, you know, that's a nice
15   argument but it's completely factually wrong, because
16   every assembly, every actual silencer, if it's
17   objectively intended to be a silencer, is a silencer,
18   okay?  Wait, let me finish.  And every assembly of parts
19   that's intended to be -- objectively intended to be a
20   silencer, would be a silencer.  So you could regulate
21   all kinds of silencers by giving this language its
22   ordinary meaning.
23              And let me be clear.  You have an argument
24   about how to interpret the statute on intended, but you
25   haven't presented any argument that the third prong of
```

 1   the statute, when it says only, doesn't mean only.  If

 2   you're making the argument that it doesn't mean only

 3   because it would be absurd for it to mean only, tell me

 4   what --

 5            MR. RYAN:  The third part of that statute

 6   would be rendered meaningless, your Honor, and I didn't

 7   mean to suggest the whole thing, the third part, the

 8   part intended only clause.

 9            THE COURT:  No, it wouldn't be, it would be

10   narrowed, but it would be -- see, because when -- and I

11   understand, you guys have a laser like focus on trying

12   to keep firearms from getting into the wrong hands,

13   regulating them appropriately, and I understand that,

14   and that's a very important function that you are

15   serving, but what did Congress mean when it inserted the

16   word only in that third provision?  You tell me.

17            MR. RYAN:  Well, I believe that they wanted to

18   avoid having things like a coke bottle, for example, or

19   some other legitimate item that you point out be

20   regulated as a silencer all by itself.

21            THE COURT:  Okay.

22            MR. RYAN:  What's happened here is the

23   plaintiff has taken that whole dynamic and flipped it

24   around.  What they've done is they've taken something

25   that they developed as a silencer and sold as a

1   silencer, and then said, but here's another use for it.

2   So --

3           THE COURT:  It's entirely possible that they

4   could be lying?  Your position really is, they're lying,

5   and, but you didn't find that they were lying.  If you

6   had, maybe I would be inclined to give you some for

7   deference.  But you didn't say, I'm sorry, you just are

8   wrong, you're not intending to market this as a muzzle

9   brake.  You're intending to market it as a silencer.

10  We're calling you out on it.  We don't believe you

11  because the evidence doesn't support a belief in the

12  truth of what you're saying.  If you had said that, I

13  would be inclined to defer to you, but you didn't say

14  that.

15          MR. RYAN:  Well, one example of that, your

16  Honor, is the fact that in the administrative record,

17  page nine, when they actually sent this item it had, for

18  example, the same number on it.  We called that out in

19  the classification letter saying what you've done here

20  is just made a silencer and you're trying to pass it off

21  --

22          THE COURT:  What do you mean the same number?

23          MR. RYAN:  For example, in this, these two

24  samples that were sent to the firearms and ammunition

25  technology branch, they have a part number on them, and

1    they are identical part numbers, because this was simply

2    taken off the shelf, one was called a silencer, one was

3    called a muzzle brake, and they were sent to ATF.  That

4    is in the classification letter.

5              THE COURT:  Right, but you don't conclude --

6    see, one thing you could say here, you could have said

7    is exactly that, this is not intended to function as a

8    muzzle brake.  It's intended to function as a silencer,

9    and I know you claim otherwise, but we don't believe

10   you, and here's the evidence to support our conclusion

11   that you are wrong about this, either mistaken or lying

12   or whatever.  You're trying to -- you're intending this

13   to be sold as a silencer.  And that would be a piece of

14   evidence that you would want to point to.

15             But you agree, that's not what you did.  You

16   did not in any way say to them, we find that you are not

17   intending to market this as a muzzle brake.  What you

18   said to them was intent is relevant, but what's relevant

19   is objective intent.  And that argument is a legitimate

20   argument that we can talk about, but it doesn't address

21   this other problem, which is only means only, and it's

22   not enough for you to say it's intended to be sold as a

23   silencer.  You have to show it's intended -- it should

24   be used only as a silencer.

25             Now, your point that that third provision

1    would become completely unenforceable I think is wrong,

2    because you could have a silencer kit that requires a

3    certain kind of pin to make it finally effective, sell

4    the assembly without the pin, and have another company

5    sell the pin.  The pin has no other use other than to

6    fit within that kit.  And the person selling that pin

7    would be selling a silencer under the third definition.

8    The person selling the kit would be selling a silencer

9    under the second part of the definition, even if I'm

10   right in saying only means only.

11          But I guess I want to ask you this.  If only

12   doesn't mean only, what does it mean.

13          MR. RYAN:  The problem is, what ATF pointed

14   out was that what the plaintiff had done in this case

15   was simply create a silencer and are now trying to pass

16   it off as something else.

17          THE COURT:  I know you keep saying that and I

18   understand you don't -- I'm saying let's assume you're

19   right about that.  I may not like it, you may not like

20   it, but I can't stop them from doing what is lawful.

21   And the statute tells us what's lawful and what's not.

22   And just because they want to do something that you

23   don't like and even if I didn't like it, I can't stop

24   them.  So you have to tell me how I can interpret that

25   third provision in a way that makes sense and gets you

1    to the result that you want to get to.  So I'm giving

2    you that chance now.

3              MR. RYAN:  All right, sir.  What we look at,

4    and I would suggest that the Court consider doing it

5    like ATF does it, they get the item in.  They know what

6    this thing is or they don't know what it is.  ATF went

7    through --

8              THE COURT:  That's what you did in the Bates

9    case and that's what you did here, but the problem is

10   you have a statute that you have to follow.

11             MR. RYAN:  Yes, sir.

12             THE COURT:  I know you want to do it a

13   different way, but you've got to get Congress to amend

14   the statute to do it the way you want, or you have to

15   come up with a plausible interpretation of the statute

16   that allows you to do what you want.  And what I'm

17   asking you now is not what you do, because I understand.

18   You look at it and say, does this look like a silencer

19   to us?  Yeah, it does.  Okay, it's a silencer.  And it's

20   a little more refined than that, but that's what you do.

21   I understand that.  There may be good reasons to do that

22   from a policy perspective.  But that's not what the

23   statute envisions.  The statute requires if you rely on

24   that third prong, that you do more than that.  You say I

25   understand.  I look at it.  This looks like a silencer.

1    If it looks like a silencer, it is a silencer because

2    it's objectively intended to be used as a silencer and

3    that's all we need to establish.

4            If you're proceeding under the second prong of

5    the statute, you may be right about that, but you're

6    proceeding only under the third prong which has an

7    additional limitation, which is it has to be intended

8    only for that.  So, if it's intended for something else,

9    it's lawful.  That's how I interpret the statute.  If

10   I've got that wrong, tell me how I should be

11   interpreting it differently because that's going to be a

12   problem.  I didn't see you even arguing for a different

13   interpretation of the statute on that point than the one

14   I'm giving to you now.  Are you?

15           MR. RYAN:  Sir, I think the argument is that

16   when you look at what intended only, all right, that has

17   to be the objective, and that's where we get into the

18   objective.  If somebody merely says, I intend this item,

19   I don't intend it to be a silencer, I intend it to be a

20   doorstop, which is an example that we used, ATF as the

21   administrative agency isn't arbitrary and capricious

22   when they look at the facts, look at similar items, test

23   similar items --

24           THE COURT:  Then they need to say to the

25   person, Sturm Ruger, you're trying to market a silencer

1   as a doorstop, okay, it's not a doorstop, it's a

2   silencer.  We don't believe you.  That's what you need

3   -- I know it's uncomfortable to say that, but I say that

4   to people all the time.  They get up and say things to

5   me and I just say, sorry, you're not telling me the

6   truth.  And that's what you have to do.  You can say to

7   Sig Sauer, you're lying.  If they tried to market a

8   silencer as a doorstop, you could say to them, you're

9   lying, you're not intending to market this as a

10  doorstop, and I can tell you why you're lying.  The

11  following circumstances lead me to conclude that you're

12  lying.  One, this doesn't function as a doorstop; two,

13  it costs several hundred dollars to manufacture and a

14  doorstop can be manufactured for five bucks; there's no

15  viable market for the use of this as a doorstop, but it

16  does function as a darn good silencer, which is the

17  field you're engaged in, and you could say to them on

18  the basis of that this is not a doorstop.  It's a

19  silencer.  And you're intending to use it as a silencer.

20  And you're intending it only to be used as a silencer.

21  And if you said that, any court would have to defer to

22  your expertise if you were at all -- if it was all

23  supportable by the evidence.

24          But that's not what you chose to do.  You

25  chose to treat this as if -- we're not saying you're not

1    telling us the truth.  You didn't in any way engage with

2    them on what their subjective intent was, because you

3    said your subjective intent is irrelevant.  Your

4    subjective intent, no matter how clear your subjective

5    intent is, does not allow you to avoid this regulation,

6    because if it's objectively intended to be used as a

7    silencer, regardless of what your subjective intent is,

8    it's a silencer.  Isn't that your position?

9           MR. RYAN:  That the objective is the vital

10    part, sir, yes, absolutely is important.

11           THE COURT:  I mean, if we had him under a

12    truth serum, the president of Sturm Ruger, and he said

13    it's intended to be used as a muzzle brake, and you did

14    extensive discovery of all of their records and their

15    emails and everything, you had the design parts and

16    memos of all the meetings over the course of several

17    years, and every single fact pointed to the fact that

18    this company wanted to market this only as a muzzle

19    brake, you would still conclude, if you believed it

20    functioned as a silencer, that it is intended to be

21    marketed as a silencer because objectively a reasonable

22    person would know that it would be used as a silencer.

23           Isn't that the position you take, the ATF

24    takes?

25           MR. RYAN:  I think I understand that, sir.  I

1   think that in the Crooker case they actually talked

2   about what would happen when -- for example, in that

3   case it was a homemade silencer.  What they later on

4   said was that if there's a commercially designed

5   silencer, you wouldn't have to show all these other

6   things about what its intended use or not, because

7   people know it's commercial and that's what it is, all

8   right, that's what it is.

9           THE COURT:  You're trying to argue the same

10   standard that you argued in Crooker essentially, because

11   if it functions as a silencer, it's objectively intended

12   to be a silencer.  I thought that's what you're saying,

13   isn't it?  If it functions as a silencer, it's

14   objectively intended to be a silencer, because people

15   are deemed to know that which follows inevitably from

16   their actions, that's the case.  Have you looked at any

17   case -- we're now straying into the other issue.  Let's

18   get back to the one that matters here now.

19           I am asking you right now, tell me what the

20   third, how the third prong of the statute, statutory

21   definition of silencer, applies in a case in which a

22   manufacturer produces a part that can be used both for a

23   silencer and for a muzzle brake if the evidence supports

24   the view that the manufacturer intended it to be used as

25   a muzzle brake.  How does that fit under the third prong

1    of that statute?

2         MR. RYAN:  If the evidence supports the view,

3    sir, that's not this case.

4         THE COURT:  Well, I'm trying to simplify it to

5    get an answer out of you, so that's why I'm asking the

6    hypothetical.  So follow with me, okay?

7         MR. RYAN:  Yes, sir.

8         THE COURT:  The evidence in the case is

9    absolutely clear that the manufacturer intends this to

10   be used and marketed in two ways.  One, as a muzzle

11   brake if sold alone and operated without the benefit of

12   the cover.  And two, as a silencer for people that want

13   to put a cover on it.  Okay?  Let's just say they intend

14   to do it that way.  Let's assume the muzzle brake is a

15   part and not an assembly, okay?  And we're only

16   construing the third part of that statute, okay?  Now,

17   let's assume that you have evidence that the

18   manufacturer is intending to do both of those things,

19   okay?  Let's assume you do testing and the testing shows

20   it can do both of those things, okay?  Is that a part

21   intended only for use in an assembly or fabrication of a

22   silencer?

23        MR. RYAN:  No, your Honor.

24        THE COURT:  Okay.  How is this case different

25   from that?

 1           MR. RYAN:  Because what the plaintiff cited

 2  and what they used as evidence that it could be used as

 3  something else, is merely an inherent function of

 4  silencers.  So, for example, when they say it reduces

 5  recoil, that's because there's a big weight on the end

 6  of the firearm.  Any weight will do that, all right.

 7  And when it redirects gases, that's inherently a

 8  function of monolithic cores.

 9           THE COURT:  Do you concede in this case that

10  the part at issue here will function as a muzzle brake?

11           MR. RYAN:  I don't know what function as a

12  muzzle brake means in this context, sir, because there's

13  a certain overlap between --

14           THE COURT:  How do muzzle brakes function?

15           MR. RYAN:  All right, muzzle brakes function,

16  your Honor, by at the end of the firearm, redirecting

17  the propellant gasses to counter recoil.

18           THE COURT:  So does this device, this part,

19  function as a muzzle brake as you've just defined it?

20           MR. RYAN:  It's heavy, your Honor.  I don't

21  know that what it does is actually redirects the gasses

22  to --

23           THE COURT:  Let me ask you more specifically.

24  Is there anywhere in your decision documents in which

25  the ATF explains that this is a silencer because it does

1    not function as a muzzle brake?

2            MR. RYAN:  Anywhere that it -- I'm sorry,

3    could you say that again, sir.

4            THE COURT:  They asked for classification.

5    You've responded; right?

6            MR. RYAN:  Yes, sir.

7            THE COURT:  Does your initial response say in

8    any way that this part is a silencer because it does not

9    function as a muzzle brake?

10           MR. RYAN:  No, your Honor.

11           THE COURT:  Does any of your subsequent

12   responses to their request for reconsideration say, in

13   any way, that this -- that this part does not function

14   as a muzzle brake?

15           MR. RYAN:  No, your Honor.

16           THE COURT:  All right.  So, there's no

17   evidence -- there's no evidence, or at least you did not

18   explain your decision in any way, by concluding that

19   this did not function as a muzzle brake.  Do you agree?

20           MR. RYAN:  Only that all of these items

21   function as muzzle brakes.  Silencers function as muzzle

22   brakes.

23           THE COURT:  So your theory is that every part

24   -- that every part like this will function as a muzzle

25   brake, and every part like this is a necessary component

1  of a silencer?

2         MR. RYAN:  That's right, as designed by the

3  companies themselves, sir, yes.

4         THE COURT:  And for that reason it is

5  necessarily the case that this is intended only for use

6  in the assembly of a silencer?

7         MR. RYAN:  Because that's what it really is,

8  yes, sir.  Yes, sir.

9         THE COURT:  Okay.  I've got to tell you, I

10  have a real problem with that position here.  I

11  understand your concern, and believe me, I'm concerned

12  about the unregistered, unregulated sales of silencers,

13  but I have to uphold the law, and I have to interpret

14  the statute the way -- I mean, I don't see -- your other

15  argument is that it involves some statutory

16  interpretation.  I can't discern the principal of

17  interpretation that you're using in presenting the

18  argument that you're presenting to me now.

19         What does only mean?

20         MR. RYAN:  We agree, sir, I think we're more

21  on the same page than it appears.  Only does mean as you

22  described it.  The problem in this case is ATF can't

23  just look at what a person or a company says and sends

24  in.  It must look at the known universe, all these

25  things, in fact run --

1          THE COURT:  You should explain why it doesn't

2    function as a muzzle brake or isn't intended to be sold

3    as a muzzle brake.  Why are you concluding that this is

4    not intended to be, intended for use in the assembly of

5    a muzzle brake?  Why are you concluding that this part

6    is not intended for use in the assembly of a muzzle

7    brake?

8          MR. RYAN:  For example, all of the -- all of

9    the characteristics of the item.  For example, your

10   Honor, the shoulder, the screw on the end of it, all of

11   these things are unnecessary.  What it really is and

12   what ATF did was looked at the item and said we

13   understand the argument, but what they've really done

14   here is taken a silencer and trying to give it another

15   name.  And it wasn't arbitrary and capricious for ATF to

16   say that.  It actually went in and tested like items and

17   actual muzzle brakes.

18         THE COURT:  I wish you had said that, it would

19   be an easier case.  If you said to them, you know,

20   you're lying, it's not intended to be used as a muzzle

21   brake, it would be an easier case, because then the sole

22   issue would be was your factual conclusion arbitrary and

23   capricious.  But, you never even addressed their

24   argument that it -- they concede it's a dual use item, I

25   think, they concede that with an additional part it

1    could be a silencer.  So it has potentially a dual use.

2    But they have consistently maintained they're intending

3    subjectively to market it as a muzzle brake, and they

4    have consistently maintained that it functions as a

5    muzzle brake, and they have consistently maintained that

6    even if you think it can be adapted to be used as a

7    silencer, it can be and is being intended to be sold as

8    a muzzle brake.  And under the statute, it's entitled to

9    be treated as a muzzle brake under that circumstance if

10   it's a part rather than an assembly.  That's I think

11   their position, and I don't think you ever responded to

12   that argument.

13          MR. RYAN:  Well, your Honor, it's true that

14   ATF never said you're lying.  They didn't say that.

15   However, ATF did provide, for example, on page 14 of the

16   original or the final classification, an example of the

17   blast that comes out when this thing is fired and where

18   the hand would have to be held, and it shows that the

19   blast would cover the hand.  It would be completely

20   worthless to use it like that.

21          It also points out the same numbers.  What

22   you've done is you've just taken this off the shelf,

23   it's the same number, took a picture of them together to

24   show they are exactly the same.  All right?  ATF never

25   said yes --

1          THE COURT:  Can you just explain this exhibit.

2    One is a silencer without the cover on it, is that what

3    you're telling me?

4          MR. RYAN:  In this case it's part of the

5    administrative record, page number nine.  It's a

6    side-by-side comparison of the Sig machine gun up here

7    and the submitted sample in question in this case.

8          This comes with as the outer tube here that

9    screws on with this nut.  This came just like this, your

10   Honor.

11         THE COURT:  But are they telling you, is

12   everybody in agreement that the top is a silencer, the

13   top weapon there has a silencer on it?

14         MR. RYAN:  As it's sold, yes, that's certainly

15   ATF's position.

16         THE COURT:  All right.  And the only

17   difference between the two is that what they're selling

18   is a muzzle brake, the interior internal component of

19   the silencer that they are also selling.

20         MR. RYAN:  That's right, your Honor.

21         THE COURT:  Do you agree on that?

22         MR. HALBROOK:  That the parts are the same,

23   yes, your Honor.

24         THE COURT:  So you've basically taken the cap

25   off your silencer, you welded it into the gun, and

1    you're just going to sell it as a muzzle brake.  You

2    agree with that?

3            MR. HALBROOK:  We agree with that, yes, your

4    Honor.

5            THE COURT:  Okay.  So, I understand the

6    problem from your perspective.  And their answer to that

7    is regulate the people selling the sleeve, because the

8    sleeve doesn't have any use other than to make it a

9    muzzle brake into a silencer.

10           Believe me, it looks like a loophole.  I

11   understand all those concerns, but again, the law is the

12   law.

13           MR. RYAN:  Yes, sir, but when Congress changed

14   that law in 1986, as you point out before, it wanted to

15   catch this type of thing where someone could actually

16   create a silencer part, spread them around, and you

17   would never be able to touch it because all you have to

18   do was have it -- so, what this does is it renders that

19   part of the law useless because now --

20           THE COURT:  That is where you're completely

21   wrong because what Congress in fact did was they're

22   concerned about kits, and they used a two-pronged

23   approach to kits and they said anybody selling an

24   assembly to be used as a silencer, we got them, it's a

25   silencer, okay, even if it doesn't have the last part,

1    it's a silencer.  So, if they leave out four parts, it's

2    an assembly of parts intended to be used as a silencer.

3    Even if it also functions as a muzzle brake, too bad,

4    it's intended to be used as a silencer and they're done.

5    And then they say, well, what about those people selling

6    the part, like the sleeve here, okay.  They say, well,

7    we have a concern.  The concern is we don't want to ban

8    the sale of all screws simply because someone might put

9    a screw in and it would complete the silencer, so we

10   have to be a little more careful with part than we do

11   with assembly, and so we came up with this language

12   only.  And I think that's what Congress was doing.  That

13   seems to be what's objectively manifest in the language

14   they chose.  Why didn't they just say any assembly or

15   part intended for use in a silencer?  They didn't do

16   that, because if they did, if they just collapsed two

17   and three together, why wouldn't they do that?  Do you

18   have an argument?

19            MR. RYAN:  I can't --

20            THE COURT:  Okay, I think the logical reason

21   why they would do it is because they are concerned that

22   parts may have multiple uses, and we don't want to ban

23   the sale of parts that have multiple uses.  Kits,

24   assemblies, even if they do have multiple uses, if

25   they're intended to be used as a silencer, we want to

1    ban them.  I think that's what they are saying.  And

2    what these guys have done is they're taken something

3    that you're prepared to treat as a part and they're

4    going to slide in under the part exception, because it

5    functions as a muzzle brake.  You want to stop them.  I

6    understand why you want to stop them.  But you can't

7    stop them unless you do it by law, so, and the problem

8    with only is you need to then engage with them on the

9    only argument.  So you have to then, in order for your

10   decision not to be arbitrary and capricious, you can't

11   just ignore their argument.  You can't just pretend it

12   doesn't exist and in your answer explain to them why

13   it's a silencer.  I can't find any point in there in

14   which you ever explain to them that this is why it's

15   intended only to be used as a muzzle brake, even though

16   you claim otherwise, and even though you submitted

17   evidence that it functions as a muzzle brake.

18             I understand your point.  Your point is that

19   every silencer will function as a muzzle brake,

20   therefore, this loophole will allow anybody who has a

21   part, that has this essential component of a silencer in

22   it, will be able to claim it's a muzzle brake.  I

23   understand the problem, but I don't see how it fits

24   within the statute.

25             MR. RYAN:  But, your Honor, the point I was

1    trying to make is just that when an agency isn't allowed

2    to look behind and look at what it actually is, what

3    that allows is a company to go ahead and say, okay, that

4    little screw, it's now used for doorknobs, and so now

5    it's not part-intended only.  And in that way you get

6    around the statute.  Congress couldn't have meant for

7    someone just to come up with some fanciful use for an

8    item.

9            THE COURT:  Please understand me, I completely

10   agree with you that the ATF doesn't have to take the

11   manufacturer's explanation for what it wants to do.  I

12   absolutely agree that the ATF has a duty to look behind

13   the manufacturer's explanation for what it does.  It

14   would be ridiculous to assume otherwise.  So I am not in

15   any way suggesting to you that the ATF is to simply

16   accept Sig Sauer's explanation.  And I have no problem

17   with you if they submitted this classification letter

18   and said, I'm sorry, this looks a lot like a silencer to

19   us, we need all your engineers here for depositions, we

20   need to see all your internal email, we have great

21   suspicions about this and we're simply not willing to

22   give you a letter approving this without conducting a

23   detailed investigation because this looks to us like a

24   silencer, and we have serious doubts about whether in

25   fact you're going to market this as a -- I would have no

 1    trouble with you doing that.  In my view it's entirely

 2    appropriate for you to do that when you suspect that a

 3    manufacturer is seeking to exploit a loophole.

 4            So I'm not, do not put me in the box of saying

 5    he won't let us look behind the manufacturer's

 6    explanation.  I think you have a duty to look behind the

 7    manufacturer's explanation.  The problem is you never

 8    even commented on their argument, the one I'm dealing

 9    with now.  You never in your decisions ever commented

10    and explained why, although this functions as a muzzle

11    brake and although you say you're going to sell it as a

12    muzzle brake, we think it is not intended to function

13    only as a muzzle brake.  One answer would be we don't

14    believe you, here's why.  And I outlined many ways you

15    could do that.  You could go and get depositions from

16    them, get them to tell you, you can look at all their

17    internal emails and their design documents, and you

18    could reach a conclusion, no, the evidence doesn't

19    support you on that, or you could look at the entire

20    market for muzzle brakes and say this is simply not an

21    economically viable product as a muzzle brake and as a

22    result, because it's clearly usable as a silencer, we

23    think this is what it's used for and it's not used for a

24    muzzle brake, because to be useable as a muzzle brake it

25    has to in some sense be commercially viable, and it's

```
 1   only viable as a silencer, and what you're doing is
 2   trying to develop market share for people that are going
 3   to manufacture their own cover for this and use it as a
 4   silencer.
 5           If you'd said that and there was evidence to
 6   support it, you'd be fine.  So I don't accept the label
 7   that my theory is that you shouldn't look behind what
 8   the manufacturer is saying.
 9           MR. RYAN:  And I wasn't trying to suggest
10   that, sir.  It's the government's position that, as you
11   point out, we must look behind it.  And I would point to
12   ATF's letter, page 15, the second paragraph, it says
13   therefore although Sig claims that its submission is a
14   muzzle brake, it is clearly a device that is well-known
15   in the firearm's community as a monolithic baffle core
16   and therefore a firearm silencer.
17           What ATF used to do that was all the testing.
18           THE COURT:  I agree.  They don't even disagree
19   with you on that point here today.
20           MR. RYAN:  Right.
21           THE COURT:  That isn't the issue.  The issue
22   is that it doesn't function as a muzzle brake.  It's
23   saying to me, ATF looked behind and we concluded that
24   this was a silencer component, yeah, they agree it's a
25   silencer component.  They agree it's the same thing they
```

1     use in their silencers, but that doesn't answer the

2     question.

3            I guess -- I don't know that we can be

4     productively going back and forth on this anymore.  If

5     there is anything more you want to say on the subject,

6     I'll be happy to hear it on this particular issue.

7            MR. RYAN:  Just the one thing, sir, and I will

8     leave it at that.  What ATF was trying to say in the

9     letter was all of these things that you've provided, the

10    same number, the identical thing, the fact that your

11    sample won't work without burning someone's hand, the

12    fact even that silencers as a natural function will

13    reduce recoil and not silence when it's apart, all

14    right, all of these things show that what you've told us

15    is different than what this thing actually is, and

16    that's the way ATF was going.

17           THE COURT:  And all of that would fit under

18    the second prong of the test if you accept objective

19    intent as the appropriate standard.

20           MR. RYAN:  But also the third, the agency is

21    allowed to look behind.  And that's what the agency was

22    --

23           THE COURT:  We're just talking past each other

24    on that point again.  We will just have to agree to

25    disagree.  I may be misunderstanding things, but I just

1    don't see your answer as responsive to the concern that

2    I'm presenting here.

3              MR. RYAN:  If I can try one more because it's

4    important, sir.

5              THE COURT:  Yes.

6              MR. RYAN:  There was a -- the problem is,

7    obviously, as I understand your position, only is out

8    there and if they're pointing out that, hey, there's

9    some other function for this, then it can't be only,

10   and I understand --

11             THE COURT:  No, no, no, I don't say that.  I

12   want to be clear.  It has to be intended only for use as

13   a silencer.  So, if the person says I'm going to use it

14   for something else, for example, if we have two guys,

15   two drug cartel members getting together in a room and

16   they're saying I want to use this as a silencer and

17   nothing else, and he puts it on the gun, the fact that

18   you could take the gun apart and use some component of

19   it as a muzzle brake doesn't provide a defense to the

20   criminal statute, because they're intending only to use

21   it as a muzzle brake -- as a silencer, excuse me.  What

22   I'm talking about is this context.  If they intend to

23   use it for a different purpose, and if they objectively

24   intend to use it for a different purpose, it can't be

25   intended to be used only as a silencer.  That seems to

1    me -- I mean, it's a very simple grammatical

2    proposition.  I don't know why you're having such

3    trouble with it.

4              MR. RYAN:  And I think, your Honor, because

5    what it suggests is that ATF somehow didn't take that

6    into consideration.  It did.  It looked at what they

7    said and all of the evidence that they showed for it.

8    But all of the evidence that they showed for it was

9    simply what you would expect of a silencer.  And so ATF

10   looked at that and said, yeah, we understand what the

11   plaintiff was trying to do here, but all the evidence

12   that they looked at, including the fact that it wouldn't

13   burn the hand and all the other things, means that that

14   isn't really what they were trying to do.

15             THE COURT:  Okay.  We've got to take a break.

16   What I think what I'll do is I'll let you respond to

17   what he said about this argument about only, and then

18   I'll come back and I'll talk to you about the second

19   issue I have with your case, which, and I think you and

20   I agree on this, that you interpret the word intended in

21   the statute, you agree that intention is required in

22   order for something to be a silencer?

23             MR. RYAN:  Yes, sir.

24             THE COURT:  Okay.  But where you disagree with

25   them is that they say subjective intention is required,

1    and you say objective intention is sufficient; right?

2            MR. RYAN:  I believe so.

3            THE COURT:  And that's a statutory

4    interpretation question, and that's where we get into

5    what level of deference is to be accorded to your

6    interpretation on that.  And I want to engage with you

7    both about that particular issue, because that issue, if

8    they're right on that issue, whether you tried to do

9    this under the second prong of the statute or the third,

10   if the evidence supported a judgment that this was

11   objectively intended, they lose.  Okay?  So that, and

12   their argument is he's wrong about this.  It's not

13   objective intent, it's subjective intent, that's what

14   the First Circuit held when it construed this statute.

15   You shouldn't give deference to the ATF's

16   interpretation.  If anything, you should apply the rule

17   of lenity and interpret the statute the same way the

18   First Circuit did, and therefore we should win because

19   the ATF never concluded we did not subjectively intend.

20   All they concluded is we objectively intended, and

21   that's based on an incorrect ruling of law, and

22   therefore the decision can't stand.  That's the argument

23   I want to engage -- first, when we come back, I want to

24   ask you to engage with me on this third prong argument,

25   and then I'm going to turn back to you and say please

1  engage with me on this objective intent argument, and

2  look for their response.

3        Those are what I see as the two issues in the

4  case.  I don't see Sturm Ruger as having any other

5  significant argument here.  I see their arguments to be

6  this was arbitrary and capricious and not in accordance

7  with law for two reasons.  First, they concluded that

8  this was a part and not an assembly, and they acted

9  arbitrarily in concluding that it can be only -- it's

10 intended only for use in assembling a silencer.  And

11 second, their argument is, to the extent they say this

12 is intended for use as a silencer, the ATF is wrong

13 because their judgment is based on incorrect

14 interpretations of the statute.  It requires subjective

15 intent.  There's no evidence of subjective intent here.

16 Because there's no evidence of subjective intent, the

17 ATF based its decision on an incorrect interpretation of

18 law and therefore the decision has to be invalidated

19 under 706.  Those are what I see as your two arguments.

20        Do you have anything else to tell me other

21 than those two things?

22        MR. HALBROOK:  Your Honor, that's basically

23 it, yes, sir.

24        THE COURT:  Okay.  So, when we come back,

25 then, I'll hear from you on the second argument, then

```
 1    we'll come back to the objective intent, hear from you,

 2    hear from them, and then we'll be done, okay?

 3              MR. RYAN:  Yes, sir.

 4              (Recess taken.)

 5              THE COURT:  I apologize.  I referred to Sig

 6    Sauer as Sturm Ruger.  Sturm Ruger is the only New

 7    Hampshire -- I didn't know that Sig Sauer was a New

 8    Hampshire company.  Where are you based?

 9              MR. SHAWVER:  In Newington, sir.

10              THE COURT:  Oh, okay.  And I thought it was

11    like a German company or something.  It's a local New

12    Hampshire --

13              MR. SHAWVER:  It was founded in Germany.  Most

14    of the manufacturing happens here in the U.S.

15              THE COURT:  But it's a German company, isn't

16    it?

17              MR. SHAWVER:  Yes.

18              THE COURT:  Oh, okay.

19              MR. HALBROOK:  Sig is a Swiss company and

20    Sauer was the German company.

21              THE COURT:  Okay, yeah, all right.  I keep

22    thinking Sturm Ruger because I've had Sturm Ruger cases

23    and it used to be the only real New Hampshire gun

24    manufacturer, the one that everybody talked about, so.

25    Okay, thanks.  Yes.
```

1          MR. RYAN:  Your Honor, could I just add one

2    thing for just a moment?

3          THE COURT:  Yes.

4          MR. RYAN:  You stated, and my colleague

5    brought up me, that the second portion of the

6    definition, the second clause dealt with completed kits,

7    and that --

8          THE COURT:  No, it doesn't, absolutely

9    doesn't.  Deals with a, if you -- I wish you had relied

10   on that provision more expressly, and that's why I asked

11   you about that because I agree that if you produced a

12   kit that in combination with other parts can be used to

13   make a silencer, and you're intending the kit for use as

14   a silencer, that is a violation, that is a kit that

15   requires NFA compliance.

16         MR. RYAN:  And that was my fault, your Honor.

17   I misunderstood.  I thought you were referring to the

18   second portion as the kit example.  And so I would just

19   point out --

20         THE COURT:  Well, I'm sorry, I am referring to

21   the second portion as a kit.

22         MR. RYAN:  So, as a complete kit, though.

23         THE COURT:  No, not a complete kit.  That's

24   exactly what Congress was concerned about, is people

25   gaming the system by selling a conversion kit that was

1  missing one part.

2          MR. RYAN:  That's right.

3          THE COURT:  And a conversion kit that's

4  missing one part, two parts, three parts, if you sell

5  more than one part together that's -- that's assemblable

6  in conjunction with other parts that's intended for use

7  as a silencer, you are subject to regulation under the

8  second part.

9          MR. RYAN:  That's right, your Honor.  And

10  again, I apologize for that.  I would point to our

11  letter, page five, the silencer parts category -- or

12  subheader.  It actually says, as stated, Sig's

13  submission is a monolithic baffle core which when

14  combined with an outer tube are parts designed,

15  redesigned and intended for use in assembling or

16  fabricating a firearm.

17          THE COURT:  That's in your final response.  It

18  isn't in your first letter, your second letter, it's in

19  your final response after the lawsuit was brought, and

20  you don't in any way explain why it is under that

21  provision.  All of your reasoning and all of your

22  letters focus on part, and that's why I think you

23  appropriately conceded when I asked you that you were

24  proceeding only under the third part and not the second

25  part.  I recognize your last letter has a reference to

1    the second component, but it's not the basis of your

2    decision.  That's not how I construe it.  If it were, if

3    you had written it differently, I think we'd have a very

4    different kind of case.  So, the third problem would

5    have gone away.  We would then have a debate about

6    whether this is a part or an assembly of parts.  You

7    probably don't want to get into that argument because

8    this looks like an extrusion of metal that's only a

9    single part.

10            Now, you might have available an argument to

11   you that wasn't raised at all that this is an assembly

12   of parts when you permanently affix that extrusion to a

13   weapon, and that makes the weapon with the part on it an

14   assembly of parts regulable under the second part.

15            You might have made that argument, but you did

16   not make that, there is not one hint in the proceedings

17   that that's what you were thinking.  You have not

18   presented that argument here today.  If you were to lose

19   here, I would probably remand the case to you and you

20   would have to think about how you want to deal with it,

21   but certainly it would be an argument that you could

22   make but did not make, that what is being shown here in

23   the request for confirmation is, involves more than one

24   part.  It involves gun parts and this extrusion of metal

25   permanently affixed to it.

1          MR. RYAN:  No, your Honor, and you are correct

2     that ATF did not consider the firearm with the

3     permanently attached as a combination of parts.  What

4     that section refers to is the combination of parts being

5     the baffle stack.

6          THE COURT:  Is that baffle stack more than one

7     piece of metal?

8          MR. RYAN:  It's a single piece of metal, sir

9     --

10         THE COURT:  How do I -- now, you never made

11    this argument in your materials, so I don't think you

12    can make it now, but to the extent you're trying to make

13    it now, how would that be seen as parts plural?

14         MR. RYAN:  The parts, your Honor, are the core

15    along with the tube and the screw.  As we pointed out --

16         THE COURT:  All right, that's another argument

17    you could have made but didn't make, which is this is a

18    part and it is an assembly of parts when you put the

19    other parts together.  But the problem with that

20    argument is a logical problem.  What is the third

21    provision designed to address if not exactly that

22    circumstance?

23         So you see what I'm saying to you is, if you

24    wanted to make an argument about assembly of parts, you

25    might have been able to make one, but it's a very

1   difficult argument to make.  You didn't make it at all

2   in your materials.

3          MR. RYAN:  That's the argument that's made on

4   page five.

5          THE COURT:  Tell me how you've made it.  Tell

6   me how you've explained how the baffle is parts.

7          MR. RYAN:  Not that the baffle is parts.

8          THE COURT:  They're not assembling it with a

9   cover or anything else.  And your argument is, your

10  argument is two means that, then two completely subsumes

11  three.

12         MR. RYAN:  No, your Honor, it's just the

13  example that they gave in the legislative history from

14  the police chiefs and ATF.

15         THE COURT:  Of course they did, but tell me

16  how -- you're making the argument now for the first time

17  in court rather than in your documents, and despite the

18  fact that you conceded to me earlier in the argument

19  that you're only proceeding under the third prong, so

20  let's assume you can get out from the fact that you

21  conceded to me at the beginning that you were not

22  proceeding under the third prong, let's see if you can

23  get out from the fact that you never in any way

24  explained any theory of how it is a silencer under the

25  second prong.  And let's say you're going to make your

1  argument now, okay.  How do you make an argument that

2  this is an assembly of parts under the second prong that

3  does not completely subsume within it the third prong?

4          MR. RYAN:  In that it's the three separate

5  parts that you would go around to the table at the gun

6  show and get.  Just because this person doesn't have a

7  -- they don't give it to you at the same time --

8          THE COURT:  So that every sale of one part

9  that's going to be used in a silencer, is an assembly of

10  parts because you could combine it with other parts to

11  make a silencer.  That's what you're saying?

12          MR. RYAN:  No, your Honor.

13          THE COURT:  Well, then, how are you -- your

14  argument is making no sense.

15          MR. RYAN:  In this case what you get is

16  something that is permanently attached to a firearm that

17  you later get the other parts for that now go on and

18  make the complete combination of parts or complete

19  device from those combination of parts.

20          THE COURT:  I don't think that I can sustain

21  an administrative adjustment under the APA based on a

22  theory that was not articulated and considered by the

23  decisionmaker.

24          If you have a trial, if I have a trial in my

25  court and an appeal is taken and I make a ruling, the

 1   Court of Appeals can sustain my decision on any basis,

 2   even if I don't cite the correct basis.  But under the

 3   APA, part of the arbitrary and capricious standard is

 4   that you need to engage with and explain your decision.

 5   And you're now coming up, you're manufacturing a

 6   completely new argument that is nowhere, it's not even

 7   in your briefs today, not in any substantive way, or I

 8   certainly didn't get it if it was in there.

 9             MR. RYAN:  Sir, I would point to the briefs,

10   the memorandum of law in support of the defendant's

11   motion for summary judgment filed on January 9th.  Page

12   3, page 12 and page 22 we actually talked about when

13   combined with an outer tube and end cap, are parts,

14   designed or redesigned, and intended for use in

15   assembling or fabricating a firearm silencer.

16             THE COURT:  That says it's a part.  It doesn't

17   say that it's an assembly of parts.  Show me where you

18   said in your brief that it's an assembly of parts.  This

19   extrusion is an assembly of parts because it is one part

20   but it can be combined with other parts to make a

21   silencer.  That's the argument you're presenting to me

22   now.  Show me where you made that in your brief.

23             MR. RYAN:  The argument is not that, your

24   Honor, I --

25             THE COURT:  Well, what is your argument?

 1   You're wasting my time here because you're just

 2   spinning, and I can't even get any purchase on what

 3   you're saying.

 4           MR. RYAN:  It's that they've simply broken

 5   down this one combination of parts.  Sig has it.  It's

 6   one design.  It's not something that someone has to come

 7   up with --

 8           THE COURT:  But your argument is -- you're

 9   frustrating me now because you're just getting almost

10   incoherent.

11           As I understand your argument, it is, judge,

12   even if this extrusion is a single part, the sale of the

13   extrusion is the sale of an assembly of parts under two,

14   and the reason it is is because it can be combined with

15   other parts to make a silencer.

16           Is that or is that not what you're saying?

17           MR. RYAN:  No, your Honor.

18           THE COURT:  Is the extrusion a part or is the

19   extrusion parts, just the extrusion?

20           MR. RYAN:  The core, sir, is that what you're

21   talking about?

22           THE COURT:  You give me the label that you're

23   comfortable with, okay?  What label are you comfortable

24   with?  Let's call it the core, all right?

25           MR. RYAN:  Yes.

1      THE COURT:  Is the core a part or is it

2  multiple parts?

3      MR. RYAN:  It's a part that is part of a

4  combination of parts.

5      THE COURT:  Is it a part or multiple parts?

6      MR. RYAN:  It's a part, sir.

7      THE COURT:  Where are the other parts that

8  they're trying to market and sell with this item?  What

9  other parts are they marketing and selling with this

10  item that constitute a silencer?

11      MR. RYAN:  The screw at the end and the outer

12  tube.

13      THE COURT:  Are they selling the screw at the

14  end and the outer tube with this product?

15      MR. RYAN:  They have them available, sir, and

16  so for example --

17      THE COURT:  Okay, I'm done with that.  I don't

18  want to hear anymore of that argument.  You've made it.

19  Just move on, okay?

20      Look, you were doing so well the first part of

21  your argument, then you just start making stuff up.

22  That's not an acceptable approach.  Okay?

23      Counsel, here's the thing that they said that

24  was most important to me.  They base their only argument

25  on evidence that suggests that if you try to operate

1    this weapon in the way that you sent it to them

2    initially, you will burn your hand, because the gases

3    will be directed back at your hand, so it can't be used

4    in that way.  Now your response to that is, that was

5    just a mistake.  We had a prototype handle.  We put it

6    on there just for purposes of getting it out the door.

7    We're never going to sell it that way.  And where we are

8    going to put the handle, you won't get burned.

9              Can you develop that argument a little bit

10   further for me.

11             MR. HALBROOK:  Yes, your Honor.  May I walk

12   around here and hold the rifle and explain it?

13             THE COURT:  Whatever you need.

14             MR. HALBROOK:  Thank you.  Because my response

15   goes also to your question about subjective intent

16   versus objective intent.

17             This is the rifle, and the first prototype --

18             THE COURT:  You can come around if you want.

19             MR. HALBROOK:  Pardon?

20             THE COURT:  I'm telling your colleague here

21   that he can come around and see what you're doing.

22             MR. HALBROOK:  This hand guard was longer than

23   it would normally be because that's what they had

24   available, and so the ATF's argument is that you

25   wouldn't hold it there because you'd burn your hand.

1    But this is actually what we sent them the second time.

2    Before they ever made that argument, we sent them the

3    prototype with this hand guard, which is the correct

4    one, and you would want to keep your hand back here

5    because you would not hold it there.

6              THE COURT:  And you would not get burned from

7    the gas back flow.

8              MR. HALBROOK:  No, no, your Honor.

9              THE COURT:  Do you disagree with that?

10             MR. RYAN:  That you would not get burned, sir?

11             THE COURT:  Right.

12             MR. RYAN:  How this -- no, your Honor.  And

13   the reason is, because it's so close to where you would

14   hold it, in fact there's a part here that your hand

15   would go up against, if it's going backwards as the

16   sound tests show and to the side, you're still too close

17   to it.  The flash --

18             THE COURT:  Do your experts in the materials

19   you sent to them in response to their, what he's

20   suggesting is the reference that you quoted to me was

21   based on the early prototype they sent you, and they

22   sent you a refined prototype before you made that

23   judgment, and your comments were related solely to the

24   earlier prototype, not to the product they actually

25   intend to market, is that your position?

1          MR. HALBROOK:  That your hand would not be

2     burned by holding it here --

3          THE COURT:  I'm sorry that I'm so inarticulate

4     that people can't understand me.  I'll try to be clearer

5     about it, okay?

6          I thought your position to me is as follows.

7     In response to their argument, judge, we sent them an

8     initial prototype that had the hand guard farther out

9     towards the end of the barrel of the weapon.

10          MR. HALBROOK:  Yes, your Honor, out here, yes.

11          THE COURT:  And before they got back to us

12     with their express concern that people will be burned if

13     they use the item as a muzzle brake without a cover over

14     it --

15          MR. HALBROOK:  Yes, your Honor.

16          THE COURT:  -- we sent them a revised

17     prototype that reflects the device we're actually going

18     to market.

19          MR. HALBROOK:  Yes, your Honor.

20          THE COURT:  That's the device I now have in my

21     hand.

22          MR. HALBROOK:  Yes, your Honor.

23          THE COURT:  And it is our testing and our view

24     is, and we informed them, that you will not be burned

25     when you operate the muzzle -- operate the weapon in

1  this way, because the handle is now correctly located

2  and it's back from any outer gas flow.

3          MR. HALBROOK:  That's correct, your Honor.

4          THE COURT:  Okay.  And that's what I was

5  asking you.  You've now given me the answer.

6          Now I'm going to turn to you and say, this is

7  what he says, okay.  Your people, what's in the

8  administrative record is, the ATF said to them at some

9  point, the example you submitted to us if used as a

10 muzzle brake without a cover is going to cause the user

11 to burn their hand.  He says that was based on the first

12 prototype, not the second.

13          Is that right or wrong?

14          MR. RYAN:  Yes, the second prototype had the

15 shorter muzzle brake -- sir, I'm sorry, shorter hand

16 guard.

17          THE COURT:  Answer my question.  Was the

18 comment that the agency made about burning the hand

19 based on observation and testing of the initial

20 prototype or the second?

21          MR. RYAN:  The initial prototype.

22          THE COURT:  Did they make that statement after

23 they had in their possession the second prototype?

24 That's what he says.  I need to know whether it's true

25 or not.

 1          MR. RYAN:  It may be, your Honor.  As far as

 2    the dates of when the firearm came in --

 3          THE COURT:  So you will look at the

 4    administrative record, you believe there will be

 5    something in the administrative record that will tell us

 6    that this was in fact in the possession of the ATF, this

 7    current version at the time it made the decision?

 8          MR. HALBROOK:  Your Honor, the administrative

 9    record reflects we sent them the sample with this short

10    hand guard.  They made that comment later in the letter

11    we received on August 15 of 2014.

12          THE COURT:  Okay.  You told them in your final

13    response that you won't burn your hand on this because

14    you've relocated the hand --

15          MR. HALBROOK:  Well, it was never an issue,

16    your Honor, because they had never said that before.  We

17    simply sent them this --

18          THE COURT:  When they did make it an issue,

19    you filed the last response I thought.

20          MR. HALBROOK:  Well, our response was to

21    explain how we sent the first hand guard, which was

22    longer, and we replaced it with the shorter one, and

23    that's the one we will market, and they never said

24    anything after that.

25          THE COURT:  That's what I'm trying to

1   establish.

2          MR. HALBROOK:  Yes, your Honor.

3          THE COURT:  You did send them a response that

4   said, you said people will burn their hand.  You base

5   that conclusion on the first prototype.

6          MR. HALBROOK:  Right.

7          THE COURT:  The second prototype has the hand

8   guard in a different spot.  You will not be burned when

9   using the prototype that we intend to market, and we did

10  that just because we used the first, I'm getting all the

11  terminology wrong but we all know what I mean, the first

12  hand guard rather than the second.

13         MR. HALBROOK:  That's a fair reading of what's

14  in the administrative record, yes, your Honor.

15         THE COURT:  So, I just want to know, is there

16  anything in the administrative record that tells us

17  whether a person operating the weapon they actually

18  intend to market will burn their hand or not?

19         MR. RYAN:  No, your Honor.

20         THE COURT:  Okay.  So I can't really, I mean,

21  even if I'm going to base the decision on the

22  administrative record, we don't have an answer to that

23  question.

24         MR. RYAN:  Only as to the later submission,

25  sir, that's correct.

1          THE COURT:  We have them saying it doesn't.

2     We don't have you saying it does.

3          MR. RYAN:  That's right as to the second.

4     Only to the first, sir.

5          THE COURT:  Right, okay.  All right, good.

6     Thank you.  So I assume, then, your response to this is

7     this is a phony issue, judge, it's based on a

8     preliminary assessment.  If they were going to act in a

9     non-arbitrary way, if this was something that would

10    affect their decision, they were obligated to test it

11    under the second weapon, which if they did would show

12    you wouldn't have their hand burned, therefore this

13    argument shouldn't be considered by you at all.

14         MR. HALBROOK:  We believe they were reaching

15    in that argument.  Their main argument was to call this

16    by one name, the monolithic baffle core, and that was

17    really the end issue for them, and that was kind of a

18    throw-in argument at the end.

19         THE COURT:  In truth it is one item.  It's the

20    same part you use in the silencer you're using as a,

21    want to market as a muzzle brake.

22         MR. HALBROOK:  And that brings up the

23    subjective and objective intent that I would like to

24    just go into very --

25         THE COURT:  Do you want to say anything about

1    the only argument because that's what I'd like to

2    address now, and then I'll give you a chance to be heard

3    on the subjective and objective issue.

4            MR. HALBROOK:  Well, maybe by holding the

5    rifle that helps us as well because it is an effective

6    muzzle brake.  And when you look at the video, I think

7    it might be on your screen, on the left side you see

8    where, you know, if you fire a gun it does have a muzzle

9    brake, it goes up like that and it pushes back, and here

10   it just comes back and you retain your target --

11           THE COURT:  He concedes that it will reduce

12   the brake in the muzzle, and nowhere in the record do

13   they ever say it doesn't.

14           MR. HALBROOK:  And that's why the word only

15   doesn't apply, that this is intended only for use to

16   fabricate a silencer, that's not correct.  People can,

17   if the Court agrees with us, people can buy this

18   product.  They may sell some covers that people who want

19   to go through the process of making a silencer, but it

20   may well be the market would be the people would use it

21   as a muzzle brake only and that's all they would ever

22   use it for.

23           THE COURT:  If you sold -- to make this into a

24   silencer you need a cover and a screw at the end.

25           MR. HALBROOK:  Yes, your Honor, to hold it on.

1           THE COURT:  Okay.  Do you sell the cover and

2   screw at the end as separate items?

3           MR. HALBROOK:  No, your Honor, my

4   understanding is Sig sells only complete silencers,

5   which would have all the components.  There's no reason

6   to sell this part by itself, the muzzle brake part,

7   because who would buy it, it's not a silencer.

8           THE COURT:  Okay, I'm not asking about that

9   part.  I'm asking about the cover and the screw that are

10  necessary to convert it.

11          MR. HALBROOK:  That -- all the parts go

12  together and that's the way they are sold is my

13  understanding.

14          THE COURT:  Do you sell only the -- if I

15  wanted to buy a replacement part for my silencer cover,

16  I blew a hole in it, dented it or something and I want

17  to call up Sig Sauer and say I would like to buy a cover

18  for my silencer, would you sell them a cover for their

19  silencer?

20          MR. HALBROOK:  They would have to buy a new

21  silencer.  That would have to be destroyed.  It would

22  have its own serial number on it.  You'd go through the

23  complete process --

24          THE COURT:  The answer is no, all right.

25          MR. HALBROOK:  Yes.

1          THE COURT:  So if you were, then, if you were,

2    then, if you were to market this item, and you or

3    anybody elsewhere were to sell a cover and cap that went

4    over it, those people would be selling a silencer.

5          MR. HALBROOK:  They would, you'd have to go

6    through the NFA process, yes.

7          THE COURT:  So, the cover and the cap would be

8    fully regulable under the NFA, and one could not

9    assemble a silencer from what you're doing without

10   getting an NFA regulated part.

11         MR. HALBROOK:  That's absolutely correct, yes,

12   your Honor.

13         THE COURT:  Because unlike your baffle core,

14   which can be both a silencer part and a muzzle brake in

15   your view, the tube and cap would be only useable for a

16   silencer and therefore qualifies under the third --

17   second or third definition of a silencer.

18         MR. HALBROOK:  Correct.  And the cover would

19   be marked with a serial number and company manufacturing

20   information, all the information required by regulation.

21         THE COURT:  So as you see it, the purpose of

22   the statute would not be fully eviscerated by allowing

23   this product to be marketed because it's a dual, the

24   baffle core is a dual use item, it is a single part, and

25   it can be used, because it's a dual use item and

1    functions as a muzzle brake and a silencer part, and

2    things that function as a silencer part and a muzzle

3    brake, if they are sold as a muzzle brake, they're

4    intended for sale as a muzzle brake, they can be used as

5    a muzzle brake, they aren't solely for use in assembling

6    a silencer, and therefore they're not regulable as

7    silencers under the third prong of the --

8              MR. HALBROOK:  Correct.  And if I could just

9    mention the Syverson case that Crooker relies on in

10   part.  It has three reasons for saying that what he

11   claims to be his subjective intent is not his objective

12   intent in actuality because in that case the court said

13   muzzle brakes normally have these cuts through them like

14   that.  His was just plain.  It was not cut with holes or

15   any other protrusion.

16             Secondly, the court -- and the course this one

17   has that.  Secondly, the court said his was not an

18   effective muzzle brake, it doesn't work as a muzzle

19   brake.  And this one we know does.  We've got the video

20   and ATF doesn't contest that.

21             Thirdly in that says, Syverson, it increased,

22   I mean, I'm sorry, it decreased sound, and in this case

23   we know that from ATF's own testing this increases

24   sound.

25             THE COURT:  Yeah, to me that's irrelevant

1   because it's not, I mean, you both have spent a lot of

2   time on that, but --

3          MR. HALBROOK:  Yes, your Honor.

4          THE COURT:  -- that's irrelevant, because

5   whether it decreases or increases sound, it's not

6   intended to be a fully functioning silencer.

7          MR. HALBROOK:  Correct.

8          THE COURT:  They're not arguing that it is.

9   They are saying it's a silencer because it qualifies

10  under the third component.  So, whether it reduces sound

11  by itself or not is irrelevant.  I assume it doesn't

12  reduce sound, but I don't think that matters one wit to

13  the analysis.

14         MR. HALBROOK:  The other thing we brought just

15  to show the Court was ATF calls this a muzzle brake, not

16  a silencer, and with this object on it it does decrease

17  the decibels.  It makes the gun --

18         THE COURT:  Well, if I put an empty coke

19  bottle, a coke bottle over my gun and fired at something

20  it decreases the sound.

21         MR. HALBROOK:  It does, yes, sir.

22         THE COURT:  And that's your silencer.  So, I

23  mean, again, I don't think that's the issue.

24         MR. HALBROOK:  But ATF argued that, I mean,

25  they had a list of or pictures of things that are not

1  silencers.  This is one of them.  And if you put this on

2  this device, it will do the same thing as on this other

3  device that is concededly just a muzzle brake.

4        THE COURT:  Yeah.  Their argument is, and I

5  know I'm oversimplifying, but if it looks like a duck

6  and quacks like a duck it's a duck, you know, that's

7  what your argument -- and believe me, I'm sympathetic to

8  that argument as a practical matter.  It's whether as a

9  legal matter it makes any difference.  But that's what

10  you keep coming back to.  It looks like a duck, it

11  quacks like a duck, it is a duck.  Come on, judge, wake

12  up.

13        MR. RYAN:  Not at all, sir.  If it looks like

14  a duck, quacks like a -- you aren't allowed to call it

15  an elephant, and that's really what we're going with.

16        I would point out that in the administrative

17  record, the one part that I think I disagree with, Adam

18  Henshaw I think his name is, 623 to 640 in the

19  administrative record, he actually talks, you do

20  actually or Sig will provide you with the tube and the

21  screw if you go through the process.  So they do in fact

22  sell those separately according to what we have in

23  the --

24        THE COURT:  He says as separate silencers.

25        MR. RYAN:  As devices that don't include the

 1    baffle stack, sir, I just want to make sure we're clear

 2    on that.

 3            THE COURT:  But it's important to me.  They

 4    will sell the tube and screw.  You said the

 5    administrative record, you've identified the pages so my

 6    clerk can go back and look, says we will sell people

 7    tubes and screws.  So I accept that.  He says we will do

 8    that only by selling it as an NFA silencer.  They have

 9    to be registered.  They have to pay the tax.  A person

10    possessing it is going to be deemed to be possessing a

11    silencer even though they don't have the baffle core.

12    And that's what they say.  Is that right or wrong?

13            MR. RYAN:  I think that's right, sir.  It's my

14    understanding that my friend on other side was talking

15    about the fact they would have to destroy it and you

16    would get a new one and they would never sell you

17    another part.  If someone bought this as a muzzle brake,

18    they would have a muzzle brake and you couldn't get the

19    other part.  I understood that from what he was saying

20    --

21            THE COURT:  You could get the other part but

22    you'd have to buy a silencer.

23            MR. RYAN:  And Sig would sell you those.

24            THE COURT:  Yeah, as a silencer.  They would

25    say, no, we're selling now a silencer.  If this product

1    is on the market, you're not going to be able to sell a

2    cover and a screw except as a silencer.

3            MR. HALBROOK:  Absolutely not, your Honor.

4            THE COURT:  And that's, I think that's, his

5    argument that the statute gets eviscerated.  No, it does

6    make it easier that someone now having bought this has

7    fewer parts to fabricate themselves to make a silencer,

8    but it doesn't completely eviscerate the law because if

9    you were to try to sell it, or some third party

10   aftermarket company were to sell tubes and screws that

11   fit over your baffle core, it's hard to see how those

12   tubes and screws would function as anything other than

13   to be used in assembling a silencer, and they would have

14   to be sold under the NFA requirements.

15           MR. HALBROOK:  We've made that, from the very

16   first submission to ATF, we've made that clear that this

17   product can be used for various purposes and it comes

18   under what your Honor has described as dual use --

19           THE COURT:  You describe it in the record as

20   dual use.

21           MR. HALBROOK:  We do as well.

22           THE COURT:  It is dual use.  It requires more

23   parts to complete the second use, but you've always

24   said, you've been quite frank, it's dual use.

25           Okay, let me hear briefly from the other side

1    on objective intent and Chevron deference versus

2    Skidmore deference.  I think I understand your argument

3    on this point reasonably well.  Your argument is that we

4    do have to prove that under the third prong that

5    somebody intended this for use only in connection with

6    the assembly of a silencer.  But they don't mean -- I

7    think your argument is, judge, when the statute says

8    intended, they don't mean subjectively intended only,

9    they mean objectively intended as well.  So we need not

10   prove subjective intent in order to treat a part as a

11   silencer.  It is sufficient if we are satisfied that its

12   objective intent is to be used in assembling a silencer.

13   Is that your position?

14            MR. RYAN:  Yes, your Honor.

15            THE COURT:  And you're saying we have special

16   expertise as an agency.  Under the law you should accord

17   deference to our expertise.  The term intended is

18   ambiguous.  It could be read to mean only subjective

19   intent, or it could be read to mean objective intent.

20   We get to decide that because we're the expert agency.

21   We're deciding in this letter that it's objective.  And

22   we believe the evidence in this case leads us to the

23   conclusion that it's objectively intended to be used as

24   a silencer.  You need to defer to that judgment, and

25   when you do, our action is not arbitrary and capricious.

1          Is that a fair statement of what your argument

2     is?

3          MR. RYAN:  Yes, your Honor.

4          THE COURT:  Okay.  So, you believe that

5     standard of deference is Chevron deference?

6          MR. RYAN:  Based on the Barker factors.

7          THE COURT:  Yeah, let's run through those with

8     me because Chevron/Barnhart together -- excuse me,

9     Meade/Barnhart together identify certain things that a

10    court ordinarily should consider in determining whether

11    to give Chevron deference.

12          Why do you think the facts in this case

13    warrant Chevron deference.

14          MR. RYAN:  If you look at the Innovator case,

15    sir, they went through that in some detail, and I'll

16    point the --

17          THE COURT:  Decided against you.

18          MR. RYAN:  The Innovator case, and I was going

19    to say, sir, because it was a two-page report without

20    any testing or other things and it dealt with a device,

21    so it's a little different.  Some of the things that the

22    court decided against --

23          THE COURT:  But it's important that -- you

24    aren't enacting a regulation; right?

25          MR. RYAN:  That's right, sir.

1          THE COURT:  There's nothing that suggests that

2     Congress specifically intended you to resolve statutory

3     construction problems on the meaning of intent.

4          MR. RYAN:  That's right, not on the meaning of

5     intent, sir.

6          THE COURT:  Okay.  You didn't put this out for

7     notice and comment, you didn't solicit public views

8     about it.

9          MR. RYAN:  That's correct.

10          THE COURT:  You issued it in connection with a

11     letter.  You didn't engage in any kind of formal process

12     in which anybody other than Sig Sauer was entitled to

13     offer input.

14          MR. RYAN:  That's right, no official hearing

15     or anything like that, sir.

16          THE COURT:  And your view is now everybody,

17     all courts in the United States, including the Supreme

18     Court of the United States, must accept your view based

19     on that ruling, that this is objective intent.

20          MR. RYAN:  Not as to the -- only as to the

21     firearm and the objective characteristic and ATF's

22     classification of it, sir, and so when I talk about --

23          THE COURT:  No, but in terms of intended, what

24     the meaning of the word intended is, you believe that

25     you have the authority to construe that to mean

1   objectively intended.  You believe that interpretation

2   you're giving has to be followed by all courts of the

3   United States, including the Supreme Court of the United

4   States, everybody must agree with you that intended in

5   that statute means objectively intended.

6           MR. RYAN:  I think that's a difficult position

7   to take, sir.

8           THE COURT:  But that's what you mean.

9           MR. RYAN:  Well, but --

10          THE COURT:  Crooker I have to ignore.  Your

11  position is, even though the First Circuit is above me

12  and even though the First Circuit in Crooker said

13  subjective intent governs in a 921 issue as to what a

14  silencer is, you say I must disregard Crooker.

15          MR. RYAN:  No, sir, not at all.

16          THE COURT:  How can I reconcile your

17  interpretation with Crooker?

18          MR. RYAN:  Crooker dealt with a device that

19  was not, that was not in any way shown, and the

20  government never even tried to show, it put nothing in

21  Crooker, for example.  The government never tried to

22  show intent at all.  What Crooker said was, hey, that

23  intent is important, but it never got to whose intent

24  we're talking about when, for example, in this case it's

25  a commercially developed silencer.

1          THE COURT:  To the extent that Crooker is read

2    to say that subjective intent is required, because

3    that's how I construe Crooker, and that's how every

4    judge in the First Circuit construes Crooker when they

5    give an instruction in a 921 case, which we do all the

6    time, you're saying that's wrong.  We have to change our

7    instructions now.  We now have to instruct every jury in

8    the United States with a 921 case, has to be instructed

9    that you need not prove, the government need not prove

10   that this defendant, this felon in possession of a

11   firearm, allegedly, intended that this device be used as

12   a, subjectively intended that this device be used as a

13   silencer, it is sufficient if he objectively intended

14   it.  From now on, contrary to all the criminal jury

15   instructions everywhere in the United States, we now all

16   have to go with what you're saying, and criminal

17   defendants no longer can get out of an indictment for

18   being a felon in possession of a firearm by arguing the

19   defense whatever, whatever he says was objectively

20   intended, I didn't intend it.  And that's the law in the

21   First Circuit.  That's the law in every circuit.  You're

22   saying we can't follow that law anymore.

23          MR. RYAN:  No, sir --

24          THE COURT:  How do I follow that law and adopt

25   your interpretation?

1          MR. RYAN:  What Crooker dealt with was the

2     complete device that was not for --

3          THE COURT:  Right, but in reaching the

4     conclusion they completely, they said you have to show

5     subjective intent.  If I pulled out my jury instructions

6     that I give in every one of these cases, it would say he

7     must have intended.  It's not sufficient if a reasonable

8     person would have understood that it would be used as a

9     firearm.  You must -- you have to prove beyond a

10    reasonable doubt that this person intended, otherwise

11    you're not a felon in possession of a firearm, okay.

12    That's the law that now I have to change based on some

13    letter that you give to Sig Sauer.

14         MR. RYAN:  No, your Honor.  What the

15    government can do in those cases is come back and say

16    here's all of the evidence that shows what the intent

17    was, and that you can show by, for example, under the

18    Staples case, the case from the Supreme Court --

19         THE COURT:  I understand the argument that you

20    can only, and I give this instruction, okay, I've been

21    doing this for a long, long time, all right, I can give

22    you instructions off the top of my head, but what we say

23    to people is, intent is a difficult thing to prove.  You

24    can't get inside someone's head.  You can only rely on

25    external evidence.  You can consider circumstances and

1    infer somebody's intent.  If that's all you were saying,

2    that's not objective intent.  That is circumstantial

3    evidence establishes subjective intent.  You're saying

4    something different, which is objective intent.  And

5    that's not the evidence can persuade you that somebody

6    subjectively intended.

7            So how can I give an instruction that you must

8    prove that somebody subjectively intended if the ATF

9    response in the Sig Sauer case is now the binding law

10   across the United States in all criminal cases enforcing

11   921 violations, how do I do that?

12           MR. RYAN:  I'm not sure how to answer the

13   question, sir.

14           THE COURT:  Yeah, it's a problem for you,

15   that's why, it's tough.

16           MR. RYAN:  And I understand, I do understand

17   the argument.  The problem is, is that there are other

18   cases, for example, that we cited, that talk about, for

19   example, the Focht case which was a fireworks case, and

20   the Poster 'N' Things case from the Supreme Court that

21   talked about yet although somebody can say these things,

22   you look at what the use is in the community.  ATF knows

23   that from going about and looking at all of these

24   things.

25           THE COURT:  Yeah, but right now the government

1    can't put somebody in jail for being a felon in

2    possession of a silencer unless they prove beyond a

3    reasonable doubt that that, if they have a, that what

4    they have is intended for use as a silencer, okay.

5    Everybody else in the world but this guy would see that

6    this is a silencer is not enough.  That evidence might

7    persuade you that he actually intended it, but the

8    elements of the claim is he had to subjectively intend

9    it.

10           Now, I understand you to be explaining that is

11   not correct.  Every court and every judge across the

12   country in criminal cases has been misinterpreting what

13   intended means.  We know what it means, and it means

14   objectively intended.  That's what you're saying, isn't

15   it?

16           MR. RYAN:  Well, I -- perhaps what it is,

17   then, your Honor, is an inartful use of objective.

18   Objective from the perspective of ATF, because they

19   don't necessarily have a trial where they put everything

20   out, they get the submission from the individual, then

21   have to look at the known universe of items and what

22   these items are, and figure out what the actual intent

23   is.

24           THE COURT:  Do you have any cases where the

25   objective intent standard that you're using is explained

1    in the decision?

2           MR. RYAN:  In our briefs, your Honor, we spoke

3    about the Poster 'N' Things case.  I can get the --

4           THE COURT:  Does it talk about objective

5    intent?

6           MR. RYAN:  It talks about primarily intended

7    and the community standard, so, not just that

8    individual.  And then also I believe the Focht case,

9    which is the fireworks case, of what these things, you

10   know, objectively would be going out to the community

11   and if they could be used in commercial grade fireworks

12   and not just individual, even though the producer or the

13   manufacturers themselves intend them to be --

14          THE COURT:  Well, here's a case you guys ought

15   to look at.  I don't know if you cited it.  Did anybody

16   cite the Brown and Williamson case, Supreme Court case,

17   FDA versus Brown and Williamson?  It's reported at 120

18   Supreme Court 1291.  It's a drug case and it deals with

19   the concept of objective intent.  And let me read

20   something to you and you tell me if this is along the

21   lines that you're thinking about.  Quoting now, nor is

22   the FDA's objective intent interpretation unreasonable.

23   It falls well within the established scope of the

24   ordinary meaning of the word intended, citing Agnew

25   against United States with a parenthetical that says

1    intent encompasses the known consequences of an act, end

2    of parenthetical, and the company's acknowledge that the

3    FDA can regulate a drug like substance in the ordinary

4    circumstance, i.e. where the manufacturer makes an

5    express claim so it is not unreasonable to conclude that

6    the agency retains such power where a product's effects

7    on the body are so well know, say, like those of aspirin

8    or Calamine lotion, that there is no need for express

9    representation because the product speaks for itself.

10              That sounds a lot to me like what you're

11   arguing is meant by the word intended.  Does that

12   resonate with you?  I'm trying to get a handle of what

13   your argument is.

14              MR. RYAN:  It does, sir, and it's close to

15   what the Crooker court alluded to.

16              THE COURT:  Okay, that's where we part

17   company.

18              MR. RYAN:  Well, when it spoke about the

19   government wouldn't have to come in until when there's a

20   commercially developed thing that this is what it is, we

21   know that's what it is, and I can provide you that --

22              THE COURT:  Okay, let's start again, okay.

23   So, do you understand, when I say the word subjectively

24   intended, I mean what is actually -- I'm saying I

25   subjectively intended something.  That means it's

1  actually in my mind.  I am intending this to occur;
2  right?
3          MR. RYAN:  Yes, sir.
4          THE COURT:  Okay.  That's a form of the, a
5  usage of the word intended, is it not, to refer what's
6  actually in somebody's mind?
7          MR. RYAN:  Yes, sir.
8          THE COURT:  Okay.  Now, where I don't tell you
9  what I'm intending to do, sometimes you can figure out
10  what I'm intending to do by watching me; right?
11          MR. RYAN:  Yes, sir.
12          THE COURT:  So, if I am doing this act right
13  now, and I'm not telling you that I'm intending to pick
14  up this file, you can infer that I'm intending to pick
15  up the file, because you are watching me do it; right?
16          MR. RYAN:  Yes, sir.
17          THE COURT:  So that is an action of which
18  subjective intent and inferring what's in my mind even
19  though I don't tell you, okay, that's using objective
20  evidence to infer what is actually in my mind, okay?
21  That is still subjective intent.  That's using objective
22  evidence to infer what's in my mind.
23          What I understand the Supreme Court meant in
24  Brown and Williamson is not that.  They meant something
25  that gave broader power to the FDA; that is, it doesn't

1    matter what's in the manufacturer's mind when they're

2    selling aspirin.  The effects of aspirin are very

3    well-known by people who sell it, and they objectively

4    intend those effects whether they are subjectively

5    thinking it or not.  In other words, we don't have to

6    prove that they thought in their mind we want to use

7    this as a silencer.  We just don't have to prove that.

8    It's sufficient if the circumstances lead us to conclude

9    that a person in their position would know of the

10   effects of their action and they would know that this

11   would be used as a silencer.

12          I think your argument is this latter example,

13   not the example of which you can infer what's in Sturm

14   Ruger's mind by what they did, and we show they

15   subjectively intended.  No, I don't think you can be

16   saying that.  I think they're saying, we don't have to

17   show what's in Sturm Ruger's mind.  We have shown that

18   anyone with their knowledge would understand that this

19   is a silencer part that they're selling, and by selling

20   it under these circumstances, any reasonable person

21   would know that this is going to be used as a silencer,

22   and that's enough for us to say it's a silencer,

23   regardless of what they're subjectively thinking.

24          I thought that's your position.  Is that your

25   position or is it not?

1          MR. RYAN:  Yes, yes, sir, I believe it is.

2          THE COURT:  So, your position is an objective

3    intent is what the word intended should mean; right?

4          MR. RYAN:  Yes, sir.

5          THE COURT:  Crooker would not permit a person

6    to be convicted without proof that they subjectively

7    intended.  I don't know, Mr. Plourde hasn't done this

8    kind of work but his colleague in the back of the room

9    has done it for many, many years, if she disagrees with

10   me, she should go up and tell Mr. Plourde, and she's now

11   shaking her head no, because she knows subjective intent

12   is an essential element of one of these violations.  The

13   theory that you are propounding will change the

14   instruction that has to be given in every criminal case

15   in the United States under 921(c) where there is a felon

16   in possession of a firearm charge.  That's the effect of

17   your letter to Sturm Ruger if what you're saying is

18   correct.  Now, just explain to me why that shouldn't be

19   the effect.

20          MR. RYAN:  And as I said before, sir, it may

21   simply be that what we're looking at are the objective

22   features in making this classification.  That

23   objectively, when you look at these things, you know,

24   and I understand your point on that, but you know that

25   based on this, this is what the thing must be.  And so

1    what you're looking at objectively is the item itself,

2    all the items that are out there in coming to a

3    conclusion about this is the intent.

4              And so I understand that --

5              THE COURT:  How is your expertise about what

6    intended means in the statute any greater than mine?

7              MR. RYAN:  It's not, your Honor, it's

8    knowledge of the device itself.

9              THE COURT:  The application of what intended

10   means, I think you have substantial expertise that I

11   don't have.  What intended means doesn't require any

12   expertise.  Doesn't require ATF knowledge.  Doesn't

13   require scientists and engineers, explosive experts, gun

14   designers, it just requires looking at what the word

15   means in context.

16             So, I don't think there's the -- the legal

17   question, what does intended mean, doesn't seem to

18   require expertise.  The application of what intended

19   means requires substantial expertise, and your judgment

20   should be entitled to more deference on that.

21             MR. RYAN:  That's correct, yes, sir.

22             THE COURT:  Okay.  What other reasons do you

23   want to offer as to why I should give Chevron deference

24   to your judgment about what intended means, not the

25   application of, but what intended means?

1           MR. RYAN:  Well, I think that our arguments

2  are for the application of that, sir, so all of those

3  Barnhart standards --

4           THE COURT:  Here is the problem, though.  You

5  told me that your case is based on an interpretation of

6  the word intended.  That means objective intent.  If

7  you're wrong about that, then your analysis falls apart.

8  If that's a pure legal question, and you don't have any

9  greater expertise than I do on it, if you haven't

10  enacted your interpretation through rule making, if you

11  haven't used formality and extensive judgment to acquire

12  what intended means, then I should not accord Chevron

13  deference to your interpretation, I should accord

14  Skidmore deference to it.

15           So, that's my thinking about, not application,

16  because I think application, you're right, you're

17  entitled to deference on it, but if you've done your

18  analysis using an incorrect interpretation of law, your

19  case falls apart, and that's the problem -- that's the

20  core problem I'm having with your analysis.

21           I'm not going to second guess you on whether

22  this deflects gases or doesn't deflect gases and how

23  silencers work and don't work.  I assume you're the

24  expert on those things.  But what intended means in a

25  statute that I've been instructing juries on for

1    20 years mean?  I don't think your expertise is any

2    greater than mine.  In fact, I think mine is way greater

3    than yours because I know how the word is used in the

4    criminal law that is the principal statute that the

5    phrase is in.  I apply that law every day.  You don't.

6    You're dealing with NFA issues that come up once in a

7    while.  I deal with it all the time.  I've probably had

8    30 or 40 or 50, maybe more, felon in -- probably, no,

9    several hundred felon in possession cases that I've had

10   to deal with either to evaluate the elements for

11   purposes of a guilty plea or have a trial on.  So that's

12   the problem.

13            Any concluding comments on this particular

14   issue?

15            MR. RYAN:  No, your Honor.

16            THE COURT:  All right.  I'll hear your

17   response to what he has to say.

18            MR. HALBROOK:  Your Honor, the case law is

19   clear that we would never defer to the government in the

20   interpretation of a criminal statute.

21            THE COURT:  I wish it were clear but it

22   absolutely is not.  In fact, the First Circuit has said

23   otherwise.  If Chevron deference, and I can show you the

24   case, if Chevron deference requires adopting the

25   agency's interpretation, the rule of lenity cannot save

1    a case.

2           Now Justice Scalia, one of my clerks showed me

3    this yesterday, Justice Scalia agrees with you, or at

4    least suggests strongly that he agrees with you because

5    he objected to the denial of cert in a case this year

6    and wanted briefed the question of should we ever apply

7    Chevron deference in a criminal statute, leaving in his

8    mind a great doubt.  But the truth is, it's an

9    unresolved question at the Supreme Court level.  The

10   Supreme Court has hinted both ways on that issue.   The

11   First Circuit, though, has said quite clearly the rule

12   of lenity cannot be used to override an interpretation

13   that's authorized under Chevron deference.

14          So, if there is Chevron deference here, I am

15   -- and the second thing that the Supreme Court has said

16   that's really shocked me is if Chevron deference

17   requires an interpretation of a statute to say X, even

18   if 20 years ago the U.S. Supreme Court interpreted the

19   same statute to mean not X, the court has to follow the

20   interpretation of the agency.

21          So, it is true that Chevron deference, where

22   it requires a particular interpretation, would override

23   Crooker.  If they adopted this interpretation say in

24   rule making, notice and comment rule making, and they

25   said we think, and in fact the law is that they have the

1   authority to enact rules to implement 921, and they

2   implemented 921 to have objective intent, and that

3   standard required Chevron deference, and I looked at the

4   meaning of the word intended and I said it was

5   ambiguous, and if I said that it's ambiguous and their

6   interpretation is a plausible interpretation, I would

7   have to enforce it, and I would have to disregard

8   Crooker.

9           MR. HALBROOK:  Your Honor, Chevron one,

10  though, says that if the statute's clear there's never a

11  deference.

12          THE COURT:  Right.

13          MR. HALBROOK:  Chevron two applies to

14  regulations, an agency's interpretation of regulation

15  you defer to, but when you get in cases like Christensen

16  on opinion letters like that's what this is, and you get

17  into --

18          THE COURT:  That's an argument that's, and I

19  agree with you, I think there's a strong argument that

20  Skidmore deference rather than Chevron deference should

21  apply to informal agency adjudications of this sort on

22  matters such as the one that's been raised here, and as

23  to interpretations of law that come out of informal

24  agency adjudications I'm inclined to agree with the

25  general proposition of Judge Bates in the Innovator case

1    that Skidmore deference should apply.

2              But if Chevron deference applies, I'm telling

3    you, I've researched this, personally, not my clerks,

4    me, and I'm satisfied that first, under First Circuit

5    law, if Chevron deference applies, I cannot adopt a

6    contrary interpretation simply because the rule of

7    lenity would require it.

8              MR. HALBROOK:  Your Honor, if there's a -- the

9    rule making power is given by the Congress to the

10   agency, that's one thing.

11             THE COURT:  Wherever Chevron deference is

12   required.

13             MR. HALBROOK:  But it doesn't even apply to

14   classification letters by the Customs Department --

15             THE COURT:  That's an argument that -- wait a

16   minute, that's an argument that Chevron deference

17   doesn't apply to classification letters.  That's not an

18   argument that the rule of lenity can override an

19   interpretation that's warranted where there is Chevron

20   deference.

21             MR. HALBROOK:  Your Honor, the FCC versus ABC

22   case that we cited by the Supreme Court said there

23   cannot be one interpretation for the Department of

24   Justice in criminal --

25             THE COURT:  I agree, there has to be a

1   consistent interpretation.  That's why I said if this is

2   subject to Chevron deference and their interpretation is

3   a plausible interpretation of an ambiguous statute, I

4   have to adopt it, judges all across the country have to

5   adopt it, the U.S. Supreme Court has to adopt it,

6   assuming it's constitutional, we all have to adopt it.

7   All right?  I agree, that would be one interpretation,

8   criminal and civil.  I agree that there are real

9   problems in my mind in according Chevron deference to an

10  interpretation of the statute that is inconsistent with

11  the rule of lenity.  I agree that there are justices on

12  the Supreme Court, Scalia being one, who would not apply

13  Chevron deference to criminal statutes at all, but I can

14  tell you, and I'll give you the quote because you seem

15  to doubt me.

16          MR. HALBROOK:  I don't doubt you, but the FCC

17  versus ABC case did apply the rule of lenity, ruled

18  against the agency, that was post-Skidmore, now to be

19  sure it was before Chevron.

20          THE COURT:  Okay, this is a 2005 First Circuit

21  decision, Olivo versus Chavez, 394 F.3d 45.  Now the

22  First Circuit are my masters.  I'm a faithful

23  lieutenant.

24          MR. HALBROOK:  Yes, your Honor.

25          THE COURT:  They give an order, I salute

1    smartly and obey, okay?  I have to follow their rule

2    whether it's right or wrong.  Here's what they say:

3    "Perez-Olivo argues, however, that we should not give

4    deference under Chevron to BOP's interpretation of the

5    GCT statute.  He argues instead that we should apply the

6    rule of lenity.  We disagree.  The rule of lenity

7    provides that where there is ambiguity in a criminal

8    statute, doubts are to be resolved in favor of the

9    defendant.  Here we are evaluating the reasonableness of

10   the BOP's calculation of reductions in a sentence for

11   GTC which is not strictly speaking a criminal statute,

12   and thus we do not believe the rule of lenity would

13   apply.  This determination, however, is unnecessary

14   because even if we were to assume arguendo that the GTC

15   statute was criminal, we know that, quote, the rule of

16   lenity applies only if after seizing everything from

17   which A can be derived we can make no more than a guess

18   as to what Congress intended.  Furthermore, the rule of

19   lenity does not foreclose deference to an administrative

20   agency's reasonable interpretation of a statute."

21   Citing the Supreme Court's opinion in Babbitt:  Quoting,

22   we have never suggested that the rule of lenity should

23   provide the standard for reviewing facial challenges to

24   administrative regulations whenever the governing

25   statute authorizes criminal enforcement."

1          I can cite to you cases from many other

2    circuits.  I can cite to you Supreme Court cases.  In my

3    view, if Chevron deference applies, you have to adopt

4    the agency construction if the statute's ambiguous and

5    it can be reasonably interpreted in the way the agency

6    is interpreting it.  I don't think Chevron deference

7    applies here and therefore I don't think I'm obligated

8    to do that, but if it did, I would have to defer.

9    That's my judgment.

10          MR. HALBROOK:  Your Honor, there's

11   inconsistent cases.  There's plenty of cases that say --

12          THE COURT:  Not in the First Circuit.

13          MR. HALBROOK:  We don't -- well, on matters

14   where the agency's entrusted with making a decision like

15   telling what is under some drug schedule maybe, but in

16   terms of the NFA and the GCA, ATF doesn't have that

17   power, the courts have consistently upheld the rules

18   that you articulate in terms of the jury instructions,

19   for example, on the word like intent, they don't defer

20   to the government's interpretation, the rule of lenity

21   does apply in cases of ambiguity.

22          We cited some of those cases in our briefs,

23   and the Abramski case is maybe the last time the Supreme

24   Court said that, they said we don't defer to the ATF.

25   Sometimes they get it right, sometimes they get it

1    wrong.

2           And just one other comment about positions

3    taken by ATF.  Understandably they want to have safe

4    harbor rules, but sometimes they extend the safe harbor

5    way out into the ocean and that's what we think has

6    happened here.  That they try to use some objective list

7    of whether something's a silencer based on their list,

8    and it really doesn't, it's not consistent with the

9    language of the statute in terms of this, the third

10   definition of silencer.

11          THE COURT:  Okay.  Anything else you want to

12   say on anything to deal with this case?

13          MR. HALBROOK:  Your Honor, I would just say

14   that we've already had a very thorough remand in this

15   case, and we think the case is ripe for decision on the

16   merits.

17          THE COURT:  I would remand it to the, if they

18   used an incorrect legal standard I would remand this to

19   the ATF and let them decide using the correct standard

20   because I think they're entitled to deference, so, I'm

21   not inclined to simply rule on it.  If my judgment is

22   that they've made a mistake, they should get a chance to

23   correct it, so, I'm inclined to remand it.

24          MR. HALBROOK:  I would just say in this case,

25   I mean, normally we would have litigated and you would

1   have remanded it and then it would have come back to the

2   Court, but we took the voluntary remand already and the

3   case has already extended --

4          THE COURT:  Yeah, as I said, in my view

5   there's a good argument here that Skidmore deference

6   should apply.  If Skidmore deference should apply,

7   there's an argument that the First Circuit in Crooker is

8   correct and that subjective intent is required.

9          If subjective intent is required, it appears

10  to me that the ATF used an incorrect legal standard when

11  it judged -- when it considered whether this is a

12  silencer or not.  If it used an incorrect legal

13  standard, its analysis can't survive.

14         But I don't know whether this would qualify as

15  a silencer under the correct determination or not, and

16  it's not up to me to decide that now.

17         So, you could go -- I'm not going to make a

18  determination that this is not a silencer.  I'm just

19  going to make a determination if you're right, that they

20  acted arbitrarily and capriciously in concluding

21  otherwise.  It might be a silencer, if they used a

22  correct analysis.

23         Now, you don't have to go back and get a

24  confirmation letter from them.  You can go ahead and

25  manufacture it, and if they indict you, you can deal

1   with it.  And then if they indict you and deal with it,

2   I'll deal the question then, but I think they're

3   entitled to determine using a correct legal standard

4   whether this is a silencer or not.

5          So, I understand you don't like it, but, you

6   know, they don't like that I have some concerns with

7   their interpretation of the statute.

8          MR. HALBROOK:  If I could just add that the F.

9   J. Vollmer case that we cited in our brief is an example

10  of the Circuit opinion saying that a remand is

11  unnecessary when the facts are clear and the law is

12  clear --

13         THE COURT:  The facts and the law aren't clear

14  here to me.  I think there's, you know, it does appear

15  to me that you guys know very well that this is a

16  silencer part, and it does appear to me that this is not

17  likely to have a significant market as a muzzle brake.

18         So, whether that means it's a silencer or not

19  is an issue that the ATF should decide, but they need to

20  do it under the correct standard, and they need to do it

21  in a way that's not arbitrary and capricious.  It's hard

22  to do.  It takes some work.

23         I'm concerned that they have not used the

24  correct standard here, but they need to consider whether

25  under the correct standard it is a silencer or not.  But

1   to say this isn't a silencer --

2              MR. HALBROOK:  Your Honor, given the --

3              THE COURT:  I don't know what you're

4   subjectively intending, but it certainly raises concern

5   that you're subjectively intending to sell this as a

6   silencer.

7              MR. HALBROOK:  Your Honor.

8              THE COURT:  I'm not going to say it's clear as

9   a matter of law without holding any trial that this is

10  not a silencer.

11             MR. HALBROOK:  ATF had all the time in the

12  world.  They had several months to evaluate it and to

13  ask for any information.

14             THE COURT:  I understand, but.

15             MR. HALBROOK:  But, you know, your Honor, the

16  Innovator case, it still hasn't come back from the

17  agency, which was decided well over a year ago.

18             We would hope the Court would reconsider and

19  not remand it if you agree with --

20             THE COURT:  I think substantively it's a very

21  important issue, this statute is a very significant

22  statute, and I am not going to be the one to say without

23  holding any trial, receiving any evidence, making any

24  findings of fact, that I'm concluding as a matter of law

25  that this is not a silencer and you can go ahead and

1    sell it around the world.  I'm not going to do that.

2    That would -- that is a -- something that requires very

3    careful consideration of evidence.

4              MR. HALBROOK:  Your Honor, if you do remand

5    the case, we would ask if you would set the deadline for

6    them to report back because, as I say, the <u>Innovator</u>

7    case is still hanging there after well over a year.

8    This case has been going on a significant period of time

9    and we'd appreciate it if there would be some deadline

10   for reporting back to the Court if you do remand.

11             THE COURT:  All right.  Thank you.  Anything

12   you want to say in addition to what you've already said

13   here?

14             MR. RYAN:  No, your Honor.

15             THE COURT:  So I'm going to continue to think

16   about this, but I think it should be obvious to you

17   guys.  I spent a lot of time reading and thinking about

18   this case, so I'm going to work on it hard, I'm going to

19   get a decision out before the end of August, and I do

20   have, I want to be clear, I have some significant

21   concerns that the ATF, although well intentioned, has

22   not correctly interpreted the statute.  I'm concerned

23   that the ATF, the ATF's contrary interpretation is not

24   entitled to Chevron deference, and that the deference

25   that it is entitled to does not warrant the adoption of

1    the ATF's interpretation.

2              I am also concerned that the ATF has not

3    correctly applied Section 3 to the evidence in the case

4    here and that therefore it acted arbitrarily in failing

5    to sufficiently comment upon and assess the argument

6    that the -- that Sig Sauer made under Section 3.

7              I have those concerns.  To the extent that

8    they turn out to be meritorious concerns and I determine

9    that the ATF decision cannot stand, my strong preference

10   would be and current intention would be to remand the

11   matter so that the ATF could consider the issue under a

12   correct standard, and my inclination would be to meet

13   with the parties after issuing the order, determine

14   whether somebody is going to take an appeal so we can

15   get this thing moving, and talk to you about what kind

16   of process we could agree on to get a relatively

17   expeditious redetermination of the issue by the ATF.

18             So, if the decision comes out the way I'm

19   currently thinking it should come out, you need to be

20   thinking about how you will both respond when I call you

21   on the phone and say what do you want to do from here.

22   Okay?

23             MR. HALBROOK:  Yes, your Honor.

24             THE COURT:  Anything else?  All right, thank

25   you.  I appreciate your argument and your briefing.

1          MR. HALBROOK:  Thank you, your Honor.

2          (Hearing concluded at 5:00 p.m.)

3

4

5

6                    C E R T I F I C A T E

7

8          I, Sandra L. Bailey, do hereby certify that

9    the foregoing transcript is a true and accurate

10   transcription of the within proceedings, to the best of

11   my knowledge, skill, ability and belief.

12

13

14   Submitted: 8/4/2015

**SANDRA L. BAILEY, LCR, CM, CRR**

15   LICENSED COURT REPORTER, NO. 15

16   STATE OF NEW HAMPSHIRE

17

18

19

20

21

22

23

24

25