# United States Court of Appeals
## For the First Circuit

---

No. 15-2230

SIG SAUER, INC.,

Plaintiff, Appellant,

v.

THOMAS E. BRANDON, Acting Director, United States Bureau of
Alcohol, Tobacco, Firearms, and Explosives,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

---

Before

Lynch, Thompson, and Barron,
Circuit Judges.

---

Stephen P. Halbrook, with whom Mark C. Rouvalis and Kenton J. Villano were on brief, for Appellant.
Abby C. Wright, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Donald Feith, United States Attorney, and Michael S. Raab, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for Appellee.

---

June 21, 2016

---

**BARRON**, **Circuit Judge**.  Sig Sauer, Inc., is a gun manufacturer headquartered in New Hampshire.  In this appeal, Sig Sauer challenges the District Court's decision to uphold a ruling by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that a gun Sig Sauer seeks to market includes a "silencer" under the National Firearms Act (the "NFA").  26 U.S.C. §§ 5801 et seq.  We affirm.

## I.

The NFA subjects "firearms" to various taxes and regulatory requirements, including that the firearm be registered with ATF.  Id. §§ 5811, 5821, 5822, 5841, 5842.  The NFA defines a "firearm" to include certain guns and gun parts, including "silencers."  18 U.S.C. § 921.  And the NFA defines a "silencer," to include not only "any device for silencing, muffling, or diminishing the report of a portable firearm," but also, and of particular relevance here, "any part intended only for use in" "assembling or fabricating a firearm silencer or firearm muffler."  Id. § 921(a)(24); 26 U.S.C. § 5845(a)(7) (emphasis added).  Failure to comply with the NFA's regulatory requirements can result in serious criminal penalties.  26 U.S.C. § 5871.

ATF permits -- but does not require -- gun makers to seek classification letters from ATF prior to manufacturing a gun.  See Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook § 7.2.4 (2009), available at:

https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-atf-p-53208/download; see also Innovator Enters., Inc. v. Jones, 28 F. Supp. 3d 14, 18-19, 19 n.2 (D.D.C. 2014).  A classification letter sets forth "the agency's official position concerning the status of the firearms under Federal firearms laws." Id. § 7.2.4.1.

In this case, Sig Sauer sought a classification letter from ATF regarding a part of a gun that it planned to manufacture.  Sig Sauer noted that ATF might deem the part at issue to be a silencer under the NFA on the ground that it was "intended only for use" in assembling or fabricating a silencer.  Sig Sauer contended, however, that the part was not intended only for such a use as it was also intended for use as a muzzle brake.  A muzzle brake is a device that is added to a gun to reduce recoil (the backwards force that results from firing the gun) and rise (the tendency of the barrel to move upwards when the gun is fired).  See Vais Arms, Inc. v. Vais, 383 F.3d 287, 288 n.1 (5th Cir. 2004).  On the basis of its argument that the part was intended for use as a muzzle brake, Sig Sauer argued to ATF that the part did not qualify as a silencer under the "intended only for use" prong of the NFA's definition of a silencer.

ATF disagreed and issued a classification letter that designated the part to be "intended only for use" in assembling or fabricating a silencer.  Sig Sauer then asked ATF to reconsider

- 3 -

its classification. ATF again determined, however, that the part was a silencer under the "intended only for use" prong of the NFA's definition of a silencer.

At that point, Sig Sauer challenged ATF's classification of the part as a silencer by filing suit in the District of New Hampshire under the Administrative Procedure Act (the "APA"). 5 U.S.C. §§ 701 et seq.[1] The parties then jointly moved to stay the proceedings so that ATF could reconsider the part's

---

[1] The parties agree that ATF's issuance of a classification letter is a "final agency action" that is reviewable under the Administrative Procedure Act. 5 U.S.C. § 704. "In determining whether a particular agency action is final, 'the core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998) (brackets omitted) (quoting Franklin v. Massachusetts, 505 U.S. 788, 797 (1992)). It appears that there are no further steps in ATF's administrative process. See Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook § 7.2.4 (2009), available at: https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-atf-p-53208/download. And should ATF's classification decision stand, Sig Sauer will have to go through with the NFA's stringent requirements in order to sell its firearm -- as the classification letter states. See Franklin, 505 U.S. at 796-97 ("To determine when an agency action is final, we have looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967))). In consequence, we agree with the parties that ATF's classification decision is a "final agency action" and thus reviewable under the APA. See FTC v. Standard Oil Co., 449 U.S. 232, 241 (1980) (noting that the APA's finality requirement is satisfied when a decision is a "'definitive' statement[] of the [agency]'s position . . . and had a 'direct and immediate . . . effect on the day-to-day business' of the complaining parties." (fourth alteration in original) (quoting Abbott Labs., 387 U.S. at 151-52)).

classification.  ATF agreed to accept "additional documents or information" in reconsidering its prior ruling.  ATF also agreed that, in the event that it affirmed its prior ruling on remand, it would consider "additional information and documentation" if Sig Sauer chose to make such a submission before the case returned to the District Court.

On remand, ATF affirmed its decision yet again.  Sig Sauer then submitted, among other materials, affidavits that stated that it intended the part at issue to lengthen the gun's barrel to 16 inches so that the gun would not be subject to the NFA on the basis of its length, as rifles that are shorter than 16 inches are for that reason alone subject to the NFA.  See 26 U.S.C. § 5845(a)(3).  Sig Sauer thus contended that because it intended the part to make the gun sufficiently long that it would not be subject to the NFA on the basis of its length, the part was, for this reason, too, not "intended only for use" in assembling or fabricating a silencer.  ATF declined, however, to change its classification of the part.

Following ATF's decision on remand, the litigation resumed in district court, where the parties cross-moved for summary judgment.  After a hearing, the District Court granted ATF's motion for summary judgment and denied Sig Sauer's.  Sig Sauer, Inc. v. Jones, 133 F. Supp. 3d. 364 (D.N.H. 2015).  Sig Sauer then timely filed this appeal.

**II.**

"In the administrative law context, where we review directly the decision of the agency, the APA can serve as an overlay to the familiar de novo standard applicable to appeals from a district court's grant of a summary judgment." Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 674 (1st Cir. 1998). Under the APA, we review ATF's decision to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Baystate Alt. Staffing, 163 F.3d at 674. "A decision is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). And, of course, "[w]e may not substitute our judgment for that of the agency, even if we disagree with its conclusions." Id.

**III.**

Sig Sauer first contends that ATF classified the part as a silencer merely because it was "capable of use" in assembling or fabricating a silencer and thus failed to evaluate whether, as the

- 6 -

NFA requires, the part was "intended only for use" in assembling or fabricating a silencer. Sig Sauer bases this contention on the fact that ATF examined, among other things, the part's design features and objective capabilities.

But ATF persuasively explained in its classification letter that it examines a part's design features -- and thus the uses of which a part is capable -- as part of the inquiry into whether a part is intended to be used only in assembling or fabricating a silencer. Such an objective approach to ferreting out a party's intent is a very familiar one in the law. See, e.g., United States v. Siciliano, 578 F.3d 61, 77 (1st Cir. 2009) (noting that objective evidence is useful to "buttress or rebut direct testimony as to intent"); cf. Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor."); United States v. Gaw, 817 F.3d 1 (1st Cir. 2016) ("[T]he law is long since settled that the prosecution may prove its case without direct evidence of a defendant's guilty knowledge so long as the array of circumstantial evidence possesses sufficient persuasive power." (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994))). Nor do we have any reason to suppose it is an approach that the NFA prohibits. In fact, it is hard to believe that Congress intended

to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record -- such as a part's design features -- indicates is not actually an intended one. See United States v. Syverson, 90 F.3d 227, 232 (7th Cir. 1996) (holding that a device was "intended only for use" in assembling or fabricating a silencer notwithstanding the designer's stated intention that it be used as a muzzle brake).

Because we find persuasive ATF's contention that it may consider objective evidence in determining whether a part is "intended only for use" in assembling or fabricating a silencer, see Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), ATF committed no legal error of the sort Sig Sauer claims. Accordingly, we need decide only the sole remaining point of dispute between the parties: whether there is a sufficiently reasoned basis in the administrative record for ATF's classification of this part as one that is "intended only for use" in assembling or fabricating a silencer. And so we now turn to that issue.

**IV.**

ATF concluded that the part at issue is intended for use only in assembling or fabricating a silencer because it was designed with features that are common to all silencers but no muzzle brakes; because the gun that includes the part is not of a

- 8 -

type that requires, or is sold with, a muzzle brake; and because Sig Sauer initially submitted a prototype of the gun to ATF that functioned safely only if the part at issue was encased and thus had been made into a completed silencer. Given that the administrative record adequately supports these findings, and that these findings reasonably support ATF's conclusion that the part is "intended only for use" in assembling or fabricating a silencer, we conclude that ATF's classification of this part as a silencer is not arbitrary and capricious. See State Farm, 463 U.S. at 43.

We start with ATF's well supported findings that the part was identical to the interior of a silencer because it was a part that is known as "a monolithic baffle core." In reaching this conclusion, ATF pointed to the depictions of other monolithic baffle cores that are part of the administrative record and explained that, like these monolithic baffle cores, this part also "contains angled baffles and (when assembled with an outer tube) walls forming integral expansion chambers." ATF further explained that "expansion chambers . . . reduce sound by capturing and slowing propellant gases" and thus enable this part (when encased) to do the key thing that a silencer does: "diminish[] the report" of a firearm.

Further supporting ATF's finding that this part is a monolithic baffle core is the fact that, through testing, ATF found that the part significantly reduced the report of a gunshot when

- 9 -

it was encased.  Moreover, ATF supportably found that this part is <u>identical</u> to the monolithic baffle core that Sig Sauer uses as the interior of the complete silencers that it sells; that Sig Sauer used the same part number to identify the part in question here and the core of its removable silencer; that Sig Sauer labeled this part a "silencer" on its invoice;[2] and that the part included threading at the muzzle end that made it easy to encase the part to produce a complete silencer.

Sig Sauer points to nothing in the record that undermines these findings about the features of this part that make it identical to the interior of a silencer.  For while Sig Sauer disputes ATF's interpretation of the similarity between this part and the depictions of the monolithic baffle cores in the record, Sig Sauer has given us no reason not to defer to ATF's contrary interpretation of this evidence, which is well "within [ATF's] special competence."  <u>Penobscot Air Servs., Ltd.</u> v. <u>FAA</u>, 164 F.3d 713, 718 (1st Cir. 1999) (quoting <u>Univ. Camera Corp.</u> v. <u>NLRB</u>, 340 U.S. 474, 490 (1951)).  And our deference to ATF's interpretation of this evidence is especially warranted given that proper evaluation of this evidence "requires a high level of technical

---

[2] Sig Sauer contends that it labelled the part this way only in order to comply with ATF's ruling that the part in question is a silencer.  But ATF was free to conclude otherwise, as there is nothing in the record to suggest that ATF's ruling required the use of such a label.

expertise." Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 377 (1989) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)); see also R.I. Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ., 929 F.2d 844, 857 (1st Cir. 1991) (collecting cases).[3]

To be sure, the record does contain an affidavit from a Sig Sauer engineer purporting to distinguish this part from monolithic baffle cores. But Sig Sauer has made no effort to explain why we should credit that affidavit over ATF's conclusions. In fact, although Sig Sauer's counsel at argument stated that the finding that this part is a monolithic baffle core is not supported, he agreed with the District Court's characterization that Sig Sauer had "basically taken the cap off [of its] silencer, . . . welded it onto the gun, and [was] just going to sell it as a muzzle brake."

In finding that this part is identical to the interior of a silencer, ATF did not dispute that the part also reduced the gun's recoil and rise, as a muzzle brake also does. But as Sig Sauer itself emphasizes, the standard under the NFA's silencer definition focuses on the relevant part's intended use rather than on uses of which the relevant part is merely capable. See 18 U.S.C. § 921(a)(24); see United States v. Crooker, 608 F.3d 94, 97

---

[3] Sig Sauer does argue that the part at issue somewhat amplifies the sound of a gunshot when the part is not encased. But ATF found that the component was identical to the interior of a silencer because of how it functioned when it was encased.

(1st Cir. 2010) (per curium). Thus, while the fact that this part incidentally reduces the gun's rise and recoil shows that it is capable of doing so, that fact is not necessarily determinative of whether Sig Sauer intended this part to be used for that purpose. See Crooker, 608 F.3d at 97; see also United States v. Carter, 465 F.3d 658, 667 (6th Cir. 2006) (per curium) ("[Congress's] word choice indicates a concern for the purpose of the mechanism, and the parts thereof, not the function." (emphasis omitted)). In fact, ATF supportably found that "any additional weight placed at the end of a firearm barrel may" incidentally reduce recoil and rise even though not everything that adds such weight is thereby intended to be used as a muzzle brake. Cf. Crooker, 608 F.3d at 97 ("If the statute [spoke of] a device 'capable' of being used as a silencer . . . there would be problems at least of degree in determining what 'capable' meant . . . ; apparently, a potato or a soda bottle may, with varying efficacy and varying risk, be used to muffle a firearm shot."). And, in concluding that in this case Sig Sauer did not intend the part to be used to reduce recoil and rise, ATF relied on several pieces of evidence that it reasonably determined pointed against the conclusion that Sig Sauer intended the part to be used as a muzzle brake and in favor of the conclusion that Sig Sauer intended the part to be used only in assembling or fabricating a silencer.

As an initial matter, ATF found that the part has design features uncharacteristic of muzzle brakes and characteristic only of the interior of silencers. In particular, ATF found that the length to width ratio of the part "is much greater than that of conventional muzzle brakes and is consistent with those of" silencers. ATF also found that while the interior of this part was designed with baffles so that the part would create "expansion chambers" when encased -- thus making the part useful in assembling or fabricating a silencer -- no muzzle brakes have such baffles.[4]

In addition, ATF found that the sort of gun for which this part was intended -- a pistol caliber semiautomatic gun -- has little or no practical use for a muzzle brake, because such guns do not produce a substantial recoil in the way that larger guns and automatic guns do. And ATF further found that other non-automatic guns of this type are not sold with muzzle brakes, a fact that ATF reasonably found indicated that any reduction in recoil and rise attributable to this part was incidental to its use as an integral component of a completed silencer.

---

[4] In its brief to us, ATF points to articles reviewing the gun, which ATF contends support its position that the part was not a conventional muzzle brake. These articles called the part "one of the coolest things to be unveiled," described it as a "gigantic" and "very large" "muzzle brake," and stated that it was a silencer core and that Sig Sauer would happily sell one the casing to turn the part into a silencer. In reply, Sig Sauer says that the articles recognize that the part was a muzzle brake. As it appears ATF did not rely on these articles in making its decision, we do not rely on them here.

In further support of its classification of the part, ATF reasonably found that the design of Sig Sauer's original prototype of the gun indicated that the part was not intended for use as a muzzle brake. That prototype included a longer hand guard, which partially covered the part in question. But muzzle brakes, ATF explained, are "designed to be positioned at the muzzle end of a firearm barrel, and in front of a shooter's hand." In fact, ATF noted that the prototype was designed so as to "redirect hot gases onto the shooter's hand each time a projectile was fired," thus making it so that the prototype could have been fired safely only if the part in question was encased. ATF thus concluded that "[t]he very configuration of SIG's submission . . . suggests that the submission is not, in fact, designed as a muzzle brake," and was instead designed only as a component of a silencer, as the part could have functioned safely on the initial prototype only if the part was made into a completed silencer.

Sig Sauer does nothing to rebut these findings. In offering a conclusory challenge to ATF's interpretation of the differences between this part and the depictions of the muzzle brakes that are contained in the administrative record, Sig Sauer offers no reason as to why we should favor its evaluation of this technical evidence over ATF's. See Marsh, 490 U.S. at 377; R.I. Higher Educ. Assistance Auth., 929 F.2d at 857 (collecting cases). And while Sig Sauer does point out in its brief that muzzle brakes

also have slots that allow gases to escape, Sig Sauer does not dispute ATF's finding that the slots in this part are designed to produce expansion chambers when encased while the slots in muzzle brakes are not.  Similarly, while Sig Sauer argues that some smaller caliber guns are sold with muzzle brakes, Sig Sauer does not dispute ATF's finding that pistol-caliber guns <u>that are not capable of automatic fire</u> -- as the gun in question here is not -- are not sold with muzzle brakes.

   Sig Sauer does argue that ATF erred in giving weight to the fact that Sig Sauer originally submitted a prototype in which the part now claimed to be a muzzle brake actually could not safely function as one.  And we agree with Sig Sauer that the design of the original prototype is not dispositive of the part's intended use in its present incarnation.  Nonetheless, the fact that Sig Sauer was willing to proceed with a prototype in which the part could not be safely used as a muzzle brake at all does provide some additional support, in combination with the other findings on which ATF relied, for ATF's determination that Sig Sauer intended this part to be used only in assembling or fabricating a silencer, notwithstanding that the part also incidentally reduces recoil and rise.[5]

---

[5] Sig Sauer's reliance on <u>Innovator Enterprises</u> is misplaced, as that case is easily distinguishable.  28 F. Supp. 3d at 14. <u>Innovator Enterprises</u> dealt with the first prong of the silencer definition -- a "device for silencing, muffling, or diminishing

In sum, ATF reasonably determined on the basis of the record that the part's capacity to reduce recoil and rise was merely an incidental consequence of the inclusion of the part on the gun -- a consequence that ATF supportably found would result from adding any additional weight to the gun. Given that ATF supportably found that this type of gun does not need a muzzle brake and is not typically sold with a muzzle brake, and given that ATF supportably found that this part is identical to the interior of a silencer and does not share the design features typical of other muzzle brakes, we see no basis for concluding that ATF's classification of this part as having been "intended only for use" in assembling or fabricating a silencer is arbitrary and capricious.

Sig Sauer does make one last challenge to ATF's classification of the part. This challenge pertains not to the part's possible use as a muzzle brake, but rather to the fact that the part extended the gun's length. Sig Sauer argues that it intended the part to be used to extend the gun's barrel to 16 inches, so that its length would not make it subject to the NFA.

---

the report of a portable firearm" -- rather than the "intended only for use" prong that is at issue here. Id. at 18-19. Moreover, Innovator Enterprises determined that ATF had failed to examine whether the putatively complete silencer actually did diminish the report of a firearm, as ATF refused to do any sound testing of the part. Id. at 30. Here, by contrast, ATF did perform sound testing and determined that, when encased, the part reduced the report of a firearm.

- 16 -

See 26 U.S.C. § 5845(a)(3). Sig Sauer thus contends that, for this reason, the part was not intended only for use in assembling or fabricating a silencer as it was also intended to be used to make the gun sufficiently long that the gun would not be subject to the NFA due to its length.

ATF responds that a "use" must be determined from the point of view "of the firearm operator," rather than from the point of view of the manufacturer, even though it is the manufacturer's "intent" regarding the part's use that matters. Gov. Br. at 20. Otherwise, ATF contends, a manufacturer's claimed interest in increasing profitability or aesthetic appeal could count as an intended use for a part, thereby making the "intended only for use" prong of the silencer definition effectively meaningless. Accordingly, ATF argues that it is wrong to treat Sig Sauer's intention for the part to extend the gun's length as an intended use of that part.

We need not resolve whether ATF is right on this point because the District Court correctly concluded that Sig Sauer did not properly raise this argument regarding the part's length in its initial submission to ATF.[6] Sig Sauer did present this length-based argument when it submitted the "additional information and

---

[6] Sig Sauer's original submission merely noted that the firearm, measured with the part in question, was 16 inches long; Sig Sauer made no argument at that time that this fact had any bearing on whether the part was a silencer under the NFA.

documentation" that ATF agreed to accept on remand from the District Court.  But while ATF agreed on remand to consider "additional information and documentation," the agreement does not say that ATF agreed to address brand new arguments made for the first time in a new submission.  Thus, we agree with the District Court that Sig Sauer waived its argument about the part's length because it failed to raise that argument to the ATF prior to the District Court's remand to the agency.

### V.

For the foregoing reasons, the District Court's grant of summary judgment is **affirmed**.